JOHN J. D'AMATO   5540-0
JOHN T. MALONEY, JR.   4563-0
WILLIAM LEE   8361-0
D'AMATO & MALONEY, LLP
900 Fort Street Mall, Suite 1680
Honolulu, Hawai'i  96813
Telephone:  (808) 546-5200; (808) 546-5203 (f)
jdamato@benefitslawyers.com
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| NATASHA N. JACKSON, JANIN KLEID, and GARY BRADLEY,<br><br>Plaintiffs,<br><br>vs.<br><br>NEIL S. ABERCROMBIE, Governor, State of Hawai'i, and LORETTA J. FUDDY, Director, Department of Health, State of Hawai'i,<br><br>Defendants. | CIVIL NO.  CV11- 00734 ACK KSC<br><br>(CONSTITUTIONALITY OF STATE STATUTE)<br><br>FIRST AMENDED COMPLAINT; CERTIFICATE OF SERVICE |

## <u>COMPLAINT</u>

Plaintiffs NATASHA N. JACKSON, JANIN KLEID, and GARY

BRADLEY, by and through their attorneys, D'Amato & Maloney, LLP,

allege that they have been denied rights to Due Process and Equal Protection

secured by the U.S. Constitution in that they have been denied the right to

marry a person of the same sex.  Specifically, they allege the following:

## PARTIES AND NATURE OF CASE

1.      Plaintiff NATASHA N. JACKSON ("Jackson") is a woman and citizen and resident of Honolulu, State of Hawai'i.

2.      Plaintiff JANIN KLEID ("Kleid") is a woman and citizen and resident of Honolulu, State of Hawai'i.

3.      On November 18, 2011, Plaintiffs Jackson and Kleid sought to obtain a marriage license from the Department of Health, State of Hawai'i ("Department").

4.      Stella Somiko Allen, representing the Department, told them that they are denied the right to marry because they are both women.

5.      NEIL S. ABERCROMBIE ("Governor") is the Governor of Hawai'i and is sued in that capacity.  As Governor, he is the chief executive of Hawai'i and is charged with executing its laws.  Constitution of Hawai'i ("Haw. Const.") Art. 5, §§1 & 5.  The Governor resides in Honolulu and maintains a principal office in Honolulu.

6.      LORETTA J. FUDDY ("Director") is the Director of the Department and is sued in that capacity.  As Director, she is the chief executive of the Department and has ultimate responsibility for its functions, including the administration of marriage licenses.  Hawai'i Revised Statutes

("H.R.S.") §§26-13, 572-5.  The Director resides in Honolulu and maintains a principal office in Honolulu.

7.      Plaintiffs Jackson and Kleid allege that the denial of a marriage license to them by the State of Hawaiʻi pursuant to Section 572-1 of the H.R.S. and Section 23 of Article 1 of the Hawaiʻi Constitution violates rights to Due Process and Equal Protection under State law guaranteed them by the Fourteenth Amendment of the U.S. Constitution.  (As used to  identify rights protected by the Fourteenth Amendment of the U.S. Constitution, "Due Process" and "Equal Protection" will be capitalized in order to distinguish those rights from comparable rights under the Hawaiʻi Constitution and other State Constitutions.)

8.      Plaintiff GARY BRADLEY ("Bradley") is a man and citizen and resident of Honolulu, State of Hawaiʻi.

9.      Plaintiff Bradley and his partner, a male and foreign national, were the first male couple to enter into a civil union under the Hawaiʻi civil union law, which became effective on January 1, 2012.

10.      Plaintiff Bradley alleges that he and his partner entered into a civil union and did not seek a marriage license because it was futile for them to seek a marriage license under Section 572-1 of the H.R.S.

11.      Plaintiff Bradley alleges that denying the right to marry a

person of the same sex pursuant to Section 572-1 of the H.R.S. and Section 23 of Article 1 of the Hawai'i Constitution violates rights to Due Process and Equal Protection under State law guaranteed to him by the Fourteenth Amendment of the U.S. Constitution.

## **JURISDICTION AND VENUE**

12.    This Court has jurisdiction of this matter pursuant to 28 United States Code ("U.S.C.") §1331.

13.    Venue is proper under 28 U.S.C. §1391.

## **INTRODUCTION**

14.    People who are lesbian or gay make up a relatively powerless and unpopular minority, both in Hawai'i and the United States, generally. They have been and remain the subject of invidious discrimination by private actors and have also been denied rights under State law enjoyed by opposite sex couples and heterosexuals, including the right to marry.

15.    For more than twenty years, lesbian and gay couples have fought in State and Federal courts for the right to marry.

16.    In the 1990s, Baehr v. Miike put Hawai'i's State courts at the forefront of that fight.

17.    Baehr v. Miike was filed by three same sex couples on May 1, 1991 in Hawai'i's First Circuit Court under the name Baehr v. Lewin, Lewin

then being the Director of the Department.  The plaintiffs complained that they had been denied marriage licenses in violation of their rights to due process and equal protection under Hawai'i's Constitution.

18.    Baehr v. Miike was initially dismissed on the trial court's finding that the State had a rational purpose for limiting marriage to opposite sex couples.

19.    On appeal, the Hawai'i Supreme Court reversed.  In the plurality opinion rendered by Steven H. Levinson, J., the Hawai'i Supreme Court held that Section 572-1 of the H.R.S. discriminated on the basis of sex in determining who may and may not marry and that such a discriminatory use of a sexual classification constituted a facial violation of the equal protection clause of Hawai'i's Constitution.  Baehr v. Lewin, 74 Haw. 530, 580, 852 P.2d 44, 67 (Haw. 1993).  Consequently, the trial court was instructed that Section 572-1 of the H.R.S. was presumptively unconstitutional and that the State's justification for the law had to be subjected to strict scrutiny.  Id.  To overcome the presumption of unconstitutionality and survive the test of strict scrutiny, the State would need to carry the heavy burden of showing both that denying same sex couples the right to marry served compelling State interests and that Section 572-1 of the H.R.S. had been narrowly drawn to achieve those interests.  Id.

20.     Acknowledging that same sex marriage might be unpopular, Justice Levinson observed, "constitutional law may mandate, like it or not, that customs change with an evolving social order." Id., at 570.

21.     At trial, Kevin S. C. Chang, J., found that the State had failed to show that denying same sex couples the right to marry served compelling State interests. Baehr v. Miike, 1996 WL 694235, *25 (Haw.Cir.Ct.).

22.     The State had promised to show five compelling State interests were served by restricting marriage to opposite sex couples. Id., at *4.

23.     The State had promised to show that the denial served its "compelling interest in protecting the health and welfare of children and other persons". But it failed to show how same sex marriage would jeopardize children or anyone else. Instead, the Court found that, "The sexual orientation of parents does not automatically disqualify them from being good, fit, loving or successful parents"; id., at *20; and that, "Gay and lesbian parents and same-sex couples have the potential to raise children that are happy, healthy and well-adjusted." Id., at *21.

24.     The State had promised to show that the denial served its "compelling interest in fostering procreation within a marital setting" because such a setting was "optimal" for child rearing, but the State's own expert testified "that single parents, gay fathers, lesbian mothers and same-

6

sex couples have the potential to, and often do, raise children that are happy,

healthy and well-adjusted." <u>Id.</u>, at *4.  The Court found,

> There certainly is a benefit to children which comes from being raised by their mother and father in an intact and relatively stress free home.
>
> However, there is diversity in the structure and configuration of families. In Hawaii, and elsewhere, children are being raised by their natural parents, single parents, step-parents, grandparents, adopted parents, hanai parents, foster parents, gay and lesbian parents, and same-sex couples.
>
> There are also families in Hawaii, and elsewhere, which do not have children as family members.
>
> The evidence presented by Plaintiffs and Defendant establishes that the single most important factor in the development of a happy, healthy and well-adjusted child is the nurturing relationship between parent and child.

<u>Id.</u>, at *20 (paragraph numbering omitted).

25.    The State had promised to show that the denial served its

"compelling interest in securing or assuring recognition of Hawai'i

marriages in other jurisdictions".  But it failed "to establish or prove any

adverse impacts to the State of Hawaii or its citizens resulting from the

refusal of other jurisdictions to recognize Hawaii same-sex marriages or

from application of the federal constitutional provision which requires other

jurisdictions to give full faith and credit recognition to Hawaii same-sex

marriages".  <u>Id.</u>, at *19-20.

26.     The State had promised to show that the denial served its "compelling interest in protecting the State's public fisc from the reasonably foreseeable effects of State approval of same-sex marriage", but it failed to demonstrate how the State's fisc would be adversely affected.  Id., at *19.

27.     Finally, the State had promised to show it had a compelling interest in averting "the reasonably foreseeable effects of State approval of same-sex marriages" on the theory that such approval would lead to the legalization of all manner of sexual conduct and marriage, including "legalized prostitution, incest and polygamy".  But the Court dismissed that argument because it "disregards existing statutes and established precedent … and the Supreme Court's acknowledgment of compelling reasons to prevent and prohibit marriage under circumstances such as incest."  Id., at *24.

28.     Summing up the case, Judge Chang concluded that the State

> has failed to present sufficient credible evidence which demonstrates that the public interest in the well-being of children and families, or the optimal development of children would be adversely affected by same-sex marriage.  Nor has Defendant demonstrated how same-sex marriage would adversely affect the public fisc, the state interest in assuring recognition of Hawaii marriages in other states, the institution of traditional marriage, or any other important public or governmental interest.

Id., at *25.

29.     Accordingly, Judge Chang held that, "The evidentiary record presented in this case does not justify the sex-based classification of HRS Sec. 572-1" and entered judgment in favor of the Plaintiffs.  <u>Id.</u>

30.     On account of the bold and persuasive rulings by Justice Levinson and Judge Chang in <u>Baehr v. Miike</u>, Hawai'i was poised, in 1996, to be the first jurisdiction in the world to recognize same sex marriage.

31.     But as is well known, that was not to be.  Judge Chang's ruling in <u>Baehr v. Miike</u> was appealed to the Hawai'i Supreme Court and was stayed during the pendency of the appeal in order to give the Legislature the opportunity to act.  The Legislature did act in several ways.  First, it attempted to pass legislation permitting same sex marriage.  That legislation failed, and many of the legislators who had promoted it were turned out of office.  Next, the Legislature adopted the Reciprocal Beneficiaries Act ("RB Act") in 1997.  The RB Act provided a limited version of the rights incident to marriage to a whole range of beneficiaries, including individuals prohibited from marrying on account of the prohibition against incest.  Finally, in 1998, the Legislature put before the people a Constitutional amendment purporting to authorize the Legislature to limit marriage to opposite sex couples.  The so-called "marriage amendment" was duly ratified by a substantial majority and became law on November 3, 1998.

32.     Set forth at Section 23 of Article 1 of the Hawai'i Constitution, the "marriage amendment" provides that, "The legislature shall have the power to reserve marriage to opposite sex couples."

33.     Finally taking up the matter of the appeal of <u>Baehr v. Miike</u>, the Hawai'i Supreme Court held that the case's equal protection claim had been mooted by the "marriage amendment":

> The passage of the marriage amendment placed HRS Sec. 572-1 on new footing.  The marriage amendment validated HRS Sec. 572-1 by taking the statute out of the ambit of the equal protection clause of the Hawaii Constitution, at least insofar as the statute, both on its face and as applied, purported to limit access to the marital status to opposite-sex couples.  Accordingly, whether or not in the past it was violative of the equal protection clause in the foregoing respect, HRS Sec. 572-1 no longer is.  In light of the marriage amendment, HRS Sec. 572-1 must be given full force and effect… Inasmuch as HRS Sec. 572-1 is now a valid statute, the relief sought by the plaintiffs is unavailable.  The marriage amendment has rendered the plaintiffs' complaint moot.

<u>Baehr v. Miike</u>, Hawai'i Supreme Court, No. 20371, Order of Dec. 9, 1999.

34.     As the opinions of Justice Levinson and Judge Chang had seemed a great victory for lesbians and gays, so now did the final order in <u>Baehr v. Miike</u> represent a devastating defeat.  Not since <u>Dred Scott v. Sandford</u>, 60 U.S. (19 How.) 393, 15 L. Ed. 691 (1856), had plaintiffs been told by the court to which they had applied for relief that the relief sought could not be theirs because they had no constitutional right even to

complain.

35.     In the twelve years since <u>Baehr v. Miike</u> was dismissed, same

sex couples have won the right to marry in many jurisdictions.

36.     In 2001, the Netherlands became the first country to legalize

same sex marriage.  Same sex marriage is now permitted in nine countries in

addition to the Netherlands:  Argentina, Belgium, Canada, Iceland, Norway,

Portugal, Spain, South Africa, and Sweden.

37.      Same sex marriage is also permitted in Mexico City and in

parts of the United States, while same-sex marriages performed elsewhere

are recognized in Israel and in the Netherlands' possessions in the

Carribean—Aruba, Curacao, and Sint Maarten.

38.     The parts of the United States in which same sex marriage is

now recognized (ordered by the date of the relevant court ruling or

legislation) are Massachusetts (ruling dated 11/18/2003), Iowa (ruling dated

4/3/2009), New Hampshire (law enacted 6/3/2009), Vermont (law enacted

9/1/2009), the District of Columbia (law enacted 12/18/2009), Connecticut

(ruling dated 10/28/2010), and New York (law enacted 7/24/2011).  Same

sex marriage was also briefly recognized in California in 2008 in

consequence of a California Supreme Court order and may again become

recognized if the appeal of the result favorable to same sex couples in <u>Perry</u>

<u>v. Brown</u>, Case No. C 09-2292 (N.D.Cal. 8/4/2010), is denied.

39.     In all four jurisdictions in which the right of same sex couples to marry was won through litigation—Massachusetts, Iowa, Connecticut, and California—the litigation invariably included equal protection arguments like those made in Hawaiʻi, and, as had been the case in Hawaiʻi, in none of those States was the State able to show that its denial of marriage to same sex couples served a legitimate policy interest.

40.     In <u>Goodridge v. Department of Public Health</u>, 440 Mass. 309, 798 N.E.2d 941 (Mass. 2003), the Massachusetts Supreme Judicial Court reversed the trial court, holding that denying same sex couples the right to marry had no rational basis, let alone a compelling or substantial purpose, and that it therefore violated rights to due process and equal protection under the Massachusetts Constitution.  The opinion of the Massachusetts Supreme Judicial Court opened with language that could have been written by Justice Levinson or Judge Chang:

> Marriage is a vital social institution.  The exclusive commitment of two individuals to each other nurtures love and mutual support; it brings stability to our society.  For those who choose to marry, and for their children, marriage provides an abundance of legal, financial, and social benefits.  In return it imposes weighty legal, financial, and social obligations.  The question before us is whether, consistent with the Massachusetts Constitution, the Commonwealth may deny the protections, benefits, and obligations conferred by civil marriage to two individuals of the same sex who wish to marry.

> We conclude that it may not.  The Massachusetts Constitution affirms the dignity and equality of all individuals.  It forbids the creation of second-class citizens.  In reaching our conclusion we have given full deference to the arguments made by the Commonwealth.  But it has failed to identify any constitutionally adequate reason for denying civil marriage to same-sex couples.

Goodridge, supra, 440 Mass. at 312, 798 N.E.2d at 948.

41.    In Connecticut, the right to same sex marriage was mandated by the decision of the Connecticut Supreme Court in Kerrigan v. Commissioner of Public Health,  289 Conn. 135, 957 A.2d 407 (Conn. 2008).

42.    Plaintiffs' challenge to Connecticut's marriage law had been dismissed by the trial court on the State's argument that its adoption of a civil union law, during the pendency of plaintiffs' action, had given same sex couples the same rights as those of married couples, thereby foreclosing plaintiffs' argument that Connecticut had unfairly discriminated against them.  As summarized by the Connecticut Supreme Court,

> The trial court concluded that the plaintiffs could not establish "that they have suffered any legal harm that rises to constitutional magnitude"… because "[t]he effect of [the civil union law] has been to create an identical set of legal rights in Connecticut for same sex couples and opposite sex couples."

Kerrigan, supra, 289 Conn. at 146-7, 957 A.2d at 415.

43.    The Connecticut Supreme Court disagreed.  Concurring with plaintiffs that "marriage is not simply a term denominating a bundle of legal

13

rights" but "an institution of unique and enduring importance in our society, one that carries with it a special status"; id., 289 Conn. at 148-9, 957 A.2d at 416; the Connecticut Supreme Court held that the State's civil union law had created a status of "second class citizenship" for same sex couples, forbidden by the equal protection clause of Connecticut's Constitution.

> Especially in light of the long and undisputed history of invidious discrimination that gay persons have suffered…we cannot discount the plaintiffs' assertion that the legislature, in establishing a statutory scheme consigning same sex couples to civil unions, has relegated them to an inferior status, in essence, declaring them to be unworthy of the institution of marriage. … "Ultimately, the message is that what same-sex couples have is not as important or as significant as 'real' marriage, that such lesser relationships cannot have the name of marriage." … We therefore agree with the plaintiffs that "[m]aintaining a second-class citizen status for same-sex couples by excluding them from the institution of civil marriage *is* the constitutional infirmity at issue."

Id., 289 Conn. at 151, 957 A.2d at 418.

44.    In Varnum v. Brien, 763 N.W.2d 862 (Iowa 2009), the Iowa Supreme Court unanimously upheld the trial court's ruling that denying same sex couples the right to marry violated the equal protection clause of the Iowa Constitution.

45.    At the outset of their opinion, the Iowa Supreme Court emphasized the priority of their judicial duty over public opinion:

> A statute inconsistent with the Iowa Constitution must be declared void, even though it may be supported by strong and

14

> deep-seated traditional beliefs and popular opinion….
>
> […]
>
> Our responsibility… is to protect constitutional rights of individuals from legislative enactments that have denied those rights, even when the rights have not yet been broadly accepted, were at one time unimagined, or challenge a deeply ingrained practice or law viewed to be impervious to the passage of time.

Varnum, supra, 763 N.W.2d at 875.

46.    The Iowa Supreme Court held, first, that a heightened level of scrutiny of marriage law was mandated by certain factors, including, in particular, the history of discrimination against lesbian and gay people. Next, the court held that the State of Iowa had not met its burden under this heightened level of scrutiny of showing that its marriage law was substantially related to an important governmental objective; in fact, it had not demonstrated that any permissible State objective was served by denying same sex couples the right to marry.  Id., 763 N.W.2d at 880, 885, 887, 896-904, et passim.

47.    In In re Marriage Cases, 183 P.3d 384 (Cal. 2008), the California Supreme Court held that California's marriage law violated the California Constitution's equal protection clause by denying same sex couples the right to marry.

48.    In reaction, a citizens' initiative group proposed an amendment to the California Constitution for the November 4, 2008, state elections.  The

15

amendment purported to restrict marriage to a man and a woman and was entitled, "Proposition 8", on the state ballot.  Proposition 8 passed and became effective on November 5, 2008.

49.     Same sex couples attacked Proposition 8 in <u>Perry v. Brown</u> (originally, <u>Perry v. Swarznegger</u>), Case. No. C 09-2292 (N.D.Cal. 8/4/2010) ("<u>Perry</u>").  Plaintiffs brought their challenge in federal District Court, arguing that Proposition 8 violated their rights to Due Process and Equal Protection under the U.S. Constitution.

50.     The defendants in <u>Perry</u> were five representatives of the State of California or subordinate organizations, including the Governor and Attorney General.  Four of the five defendants declined to take a position on Proposition 8 or to defend it; the Attorney General answered with the view that Proposition 8 was unconstitutional.  <u>Perry</u>, <u>supra</u>, Findings of Fact and Conclusions of Law ("Ruling"), *3.

51.     The defense of Proposition 8 was taken on by the citizens' initiative group which had promoted it.

52.     The <u>Perry</u> Court found that the claims of the plaintiffs in the case were meritorious in that "Proposition 8 both unconstitutionally burdens the exercise of the fundamental right to marry and creates an irrational classification on the basis of sexual orientation."  <u>Perry</u>, <u>supra</u>, Ruling, *109.

16

53.   <u>Perry</u>'s holding rested on findings that have become commonplace since <u>Baehr v. Miike</u>—that marriage implicates fundamental relationships and rights, that same sex couples can make good and loving parents, that marriages between same sex couples will not undermine marriages between opposite sex couples, that denying same sex couples the right to marry denies them the dignity of marriage, merely punishes them for being who they are, and serves private moral beliefs, values, and prejudices rather than State interests.  On the issue of "traditional" marriage and changes in attitudes and law regarding marriage, the <u>Perry</u> Court observed,

> The right to marry has been historically and remains the right to choose a spouse and, with mutual consent, join together and form a household.  Race and gender restrictions shaped marriage during eras of race and gender inequality, but such restrictions were never part of the historical core of the institution of marriage.  Today, gender is not relevant to the state in determining spouses' obligations to each other and to their dependents.  Relative gender composition aside, same-sex couples are situated identically to opposite-sex couples in terms of their ability to perform the rights and obligations of marriage under California law.  Gender no longer forms an essential part of marriage; marriage under law is a union of equals.

<u>Id.</u>, Ruling, *113.

54.   The idea of same sex marriage has also gained in popular acceptance since the <u>Baehr</u> case.  A public opinion poll released by the Pew Institute on November 3, 2011, shows that, on a national basis, 42% of the public supports gay marriage, while 48% opposes it.

17

55.   In Hawai'i itself, the cause of same sex marriage has languished in a kind of legislative and legal limbo since the "marriage amendment" put an end to <u>Baehr v. Miike</u>.

56.   After several failed attempts at legislation, a civil union law was enacted in 2011 and became effective on January 1, 2012.

57.   The civil union law is intended to be a substitute for marriage, but Plaintiffs Jackson, Kleid, and Bradley (hereafter, "Plaintiffs") respectfully allege that it is not and cannot be.

58.   Plaintiffs believe that they have been deprived of a fundamental right and have been discriminated against unjustly by a law that is unfair, discriminatory, and not based upon any lawful purpose of the State of Hawai'i.

59.   Owing to <u>Baehr v. Miike</u>, Plaintiffs cannot rely any further upon the equal protection clause of the Hawai'i Constitution insofar as the right to marry is concerned.

60.   Plaintiffs yet have recourse, however, to the guarantees of Due Process and Equal Protection under State law secured by the Fourteenth Amendment of the U.S. Constitution.  It is on that basis, therefore, that Plaintiffs ask this Court for relief.

## ALLEGATIONS SPECIFIC TO PLAINTIFFS' CLAIMS

61.     At no time relevant to this Complaint, were Plaintiffs Jackson and Kleid disqualified from marrying each other or was Plaintiff Bradley disqualified from marrying his partner under Section 572-1 of the H.R.S., except for the reason of being of the same sex.

62.     Plaintiffs Jackson and Kleid maintain a household together and have been involved in a romantic and committed relationship with each other for four years.

63.     Likewise, Plaintiff Bradley and his partner maintain a household together and have been involved in a committed and romantic relationship with each other for more than three years.

64.     During their relationship, Plaintiffs Jackson and Kleid have experienced their share of vicissitudes, including serious health problems and the loss of jobs, but they have remained true to one another and steadfast in their relationship.  They pool their resources to share expenses and have been each other's main source of emotional support.

65.     Likewise, Plaintiff Bradley and his partner have faced their challenges as a couple over the last several years and have been each other's main source of support.

66.     Neither Plaintiff Jackson nor Plaintiff Kleid has any interest in

19

marrying a male, and Plaintiff Bradley has no interest in marrying a female.

67.     Plaintiffs Jackson and Kleid and Plaintiff Bradley and his partner desire to marry for all the many and varied reasons that any couple desire to marry, including that they wish to share in the security and cultural meaning of marriage; to declare, formalize, and celebrate with their family and friends their commitment and love for each other as spouses; to be accepted, each by the other's family, as their loved one's life partner; and to enjoy the legal and economic benefits of marriage, including the benefits provided under State law, Federal law, and such private contracts as private employers' employee benefit plans.

68.     Plaintiffs allege that Section 572-1 of the H.R.S. unlawfully denies them the right to marry, thereby frustrating their purposes, causing injury to their dignity as human beings, and depriving them of the economic and other benefits of marriage under Federal law and private contracts, including, in particular, private employers' employee benefit plans.

69.     In support of the foregoing paragraph, Plaintiffs allege, first, that the State's denying Plaintiffs the right to marry is unlawful because it does not serve any rational purpose of the State.

70.     The same treatment given spouses under Hawai'i statutory, regulatory, and decisional law must now be given to partners in civil unions

pursuant to Hawaiʻi's civil union law.

71.    Further, opposite sex couples as well as same sex couples may enter into civil unions under Hawaiʻi's civil union law.

72.    Consequently, each and every policy interest and legal purpose of the State served through Hawaiʻi's institution of marriage can now be served through Hawaiʻi's institution of civil unions.

73.    Because the manifest policy of Hawaiʻi law is to give identical legal treatment to spouses and to partners in civil unions under Hawaiʻi law, the State's continuing to deny same sex couples the right to marry, while permitting opposite sex couples to choose freely between marriage and civil unions, does not have a rational purpose furthering any lawful policy of the State, is purely an act of discrimination based upon the sex and sexual preferences of same sex couples, and is unlawful.

74.    Second, the State's denying same sex partners the right to marry is injurious and demeaning to such partners' dignity as human beings because it subordinates their relationships to those of heterosexual couples; the withholding of the right to marry constitutes the rebuke that same sex relationships are not entitled to the same respect as those of heterosexual couples.

75.    Hawaiʻi's civil union law purports to solve this problem by

21

replacing the denied status of marriage with the legally equivalent (for purposes of Hawai'i law) status of civil unions.

76.   But there is no substitute for marriage.

77.   As the Kerrigan and Perry courts held persuasively, marriage is not merely a bundle of rights, notwithstanding the treatment of a civil union as a bundle of rights equivalent to a marriage under Hawai'i law.  Marriage is a special and unique status, accorded unique meanings and traditions and affording those who participate in it unique respect.

78.   Hawai'i's "solution" to the problem of giving legal recognition to the relationships of same sex couples without permitting them to marry has not created equality but a system as pernicious and damaging in its effects as any system of segregation.  As African-Americans were permitted to ride on public buses but denied the right to sit in the front of the bus in an earlier time, so now are same sex couples given the "rights" of marriage under Hawai'i law but denied the respect and sanctity of marriage.

79.   Third, the State's denying same sex couples the right to marry deprives them of economic and other benefits under Federal law and private employee benefit contracts.

80.   The Hawaii State Legislature can force equivalence between civil unions and marriages under State law, but it is powerless to force such

equivalent treatment under Federal law or private employee benefit plans.

81.     State law relating to private employee benefit plans is preempted by Section 514(a) of the Employee Retirement Income Security Act ("ERISA").  Consequently, the State of Hawai'i may not require private employers to give partners in civil unions the same rights as spouses under their benefit plans.

82.     However, if same sex individuals could be spouses under Hawai'i law, then they would automatically be entitled to the same rights as spouses under any employee benefit plan that provides benefits to spouses, and they would be entitled to enforce such rights under Section 502(a) of ERISA.

83.     Under Federal law—including Federal income tax, estate tax, pension, and immigration law—more than 1,000 special rights and benefits are provided to spouses, but no such special rights and benefits are provided to partners in civil unions.

84.     Plaintiffs allege that they would be entitled—or could become entitled—to such special rights and benefits if they were permitted to marry under State law, notwithstanding Section 3 of the Defense of Marriage Act ("DOMA"), which purports to limit "marriage," for all purposes of Federal law, to unions between opposite sex couples.

85.     In a letter to Congress dated February 23, 2011, Attorney-General Holder gave notice that President Obama had made the determination that Section 3 of DOMA is unconstitutional as applied to same sex couples legally married under State law and that the Obama administration would no longer defend Section 3 of DOMA in court against such couples.  Attorney-General Holder explained,

> After careful consideration, including a review of my recommendation, the President has concluded that given a number of factors, including a documented history of discrimination, classifications based on sexual orientation should be subject to a heightened standard of scrutiny.  The President has also concluded that Section 3 of DOMA, as applied to legally married same-sex couples, fails to meet that standard and is therefore unconstitutional.

86.     In a letter dated February 23, 2011, the U.S. Department of Justice gave notice to the U.S. Circuit Court for the First Circuit that it would cease to prosecute appeals in two cases challenging DOMA.  In those cases, the trial court had held Section 3 of DOMA to be unconstitutional.

87.     Accordingly, Plaintiffs allege that if they could marry under Hawaiʻi law, then, DOMA notwithstanding, they would enjoy all the special rights and benefits of spouses under Federal law.

88.     At the least, if they could marry under Hawaiʻi law, Plaintiffs allege that they would have the right to challenge the denial of spousal benefits to same sex married couples pursuant to Section 3 of DOMA.

24

89.     But if Plaintiffs may not marry under Hawaiʻi law, but may only be partners in civil unions, then they will not have the right to the special Federal rights and benefits given to spouses under the clear terms of Federal law, and they will not have the right to challenge the denial of such rights and benefits should the Federal government seek to deny such rights and benefits under Section 3 of DOMA.

90.     Section 1 of Article 3 of the Hawaiʻi Constitution limits the legislative power of the State Legislature "to all rightful subjects of legislation not inconsistent with this constitution or the Constitution of the United States".

91.     At Article 6, Section 2, of the U.S. Constitution, the Supremacy Clause declares, in relevant part,

> This Constitution … shall be the supreme law of the land …, anything in the constitution or laws of any state to the contrary notwithstanding.

92.     Section 1 of the Fourteenth Amendment to the U.S. Constitution guarantees Plaintiffs Jackson and Kleid the right to Due Process and Equal Protection under State law, providing, in part (underlining added),

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; <u>nor shall any State deprive any person of life, liberty, or property, without due process of law</u>; <u>nor deny to any person within its jurisdiction the equal protection of the laws</u>.

25

93.     Section 572-1 of the H.R.S. provides, in part, "the marriage contract … shall be only between a man and a woman…"

## COUNT ONE

## VIOLATION OF PLAINTIFFS' RIGHT TO DUE PROCESS

94.     Plaintiffs hereby incorporate paragraphs 1 through 93, above, as though fully set forth herein.

95.     The freedom to marry is a fundamental civil right.  As Justice Levinson had observed in Baehr v. Lewin, supra, 74 Haw. at 562-3, 852 P.2d at 60, quoting Loving v. Virginia, 388 U.S. 1, 12 (1967),

> "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free [people]."  So "fundamental" does the United States Supreme Court consider the institution of marriage that it has deemed marriage to be "one of the 'basic civil rights [of men and women].'"

96.     By denying Plaintiffs the right to marry the same sex person of their choice, Section 572-1 of the H.R.S. severely burdens their opportunity to exercise the right of marriage in the jurisdiction of Hawai'i.  In fact, by limiting the choices of Plaintiffs Jackson and Kleid to males and of Plaintiff Bradley to females, Section 572-1 of the H.R.S. effectively denies Plaintiffs the right to marry because it is highly unlikely that any Plaintiff would ever choose to marry a person of the opposite sex.

97.     The State of Hawai'i does not have a rational purpose, let alone

a substantial or compelling reason, for denying same sex couples the right to marry and for so burdening Plaintiffs' exercise of the right to marry.

98.    The State of Hawai'i's denying same sex couples the right to marry is not based upon lawful policy interests but private moral judgments, values, and prejudices, including animus against homosexual individuals and wholly unfounded fears that same sex marriage will undermine the institution of marriage or harm children.

99.    For the foregoing reasons, Plaintiffs allege that Section 572-1 of the H.R.S. violates the right to Due Process under State law guaranteed them by the Fourteenth Amendment of the U.S. Constitution, both on its face and as applied to them; that it is consequently unlawful; that, to the extent that the "marriage amendment" purports to authorize such a violation of their rights, it is also unconstitutional, void, and without effect; and that neither provision of Hawai'i law may be enforced against same sex couples by the Governor, Director, or any person.

## COUNT TWO

## <u>VIOLATION OF PLAINTIFFS' RIGHT TO EQUAL PROTECTION</u>

100.    Plaintiffs hereby incorporate paragraphs 1 through 99, above, as though fully set forth herein.

101.    Section 572-1 of the H.R.S. prescribes who may and may not

27

marry on the basis of sex, permitting a man and a woman to marry but neither two men nor two women.

102.   By proscribing marriage between two men and between two women, Section 572-1 of the H.R.S. also proscribes marriage on the basis of sexual orientation since it is highly unlikely that any two individuals of the same sex who are not gay would wish to marry.

103.   Hawai'i's classification of who may and may not marry by sex and sexual orientation serves no rational purpose, let alone a compelling or substantial purpose.  It is instead a classification that makes no sense except as an expression of private moral judgments, values, and prejudices.

104.   For the foregoing reasons, Plaintiffs allege that Section 572-1 of the H.R.S. violates the right to Equal Protection under State law guaranteed them by the Fourteenth Amendment of the U.S. Constitution, both on its face and as applied to them; that it is consequently unlawful; that, to the extent that the "marriage amendment" purports to authorize such a violation of their rights, it is also unconstitutional, void, and without effect; and that neither provision of Hawai'i law may be enforced against same sex couples by the Governor, Director, or any person.

## COUNT THREE

## CLAIMS UNDER 42 U.S.C. §1983

105.   Plaintiffs hereby incorporate paragraphs 1 through 104, above, as though fully set forth herein.

106.   By enforcing Section 572-1 of the H.R.S. against same sex couples, the Governor, Director, and their agents have acted under color of State law to deny Plaintiffs rights to Due Process and Equal Protection secured by the Fourteenth Amendment of the U.S. Constitution.

107.   Plaintiffs are therefore entitled to the remedies provided by and through 42 U.S.C. §1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

a.   Declare that the restriction of the right of marriage to opposite sex couples under Section 572-1 of the H.R.S. violates the rights of Plaintiffs to Due Process and Equal Protection under State law guaranteed by the Fourteenth Amendment of the U.S. Constitution;

b.   Declare that the "marriage amendment" violates the rights of Plaintiffs to Due Process and Equal Protection under State law guaranteed by the Fourteenth Amendment of the U.S. Constitution to the extent it purports to authorize the Hawai'i Legislature to deny same sex couples the right to marry;

c.      Find that, on account of the actions of the Governor, Director,

and their agents in enforcing Section 572-1 of the H.R.S.,

Plaintiffs are entitled to the remedies of 42 U.S.C. §1983;

d.      Permanently enjoin the Governor, the Director, and any person

acting on their behalf from enforcing the restriction of marriage

to opposite sex couples under Section 572-1 of the H.R.S.;

e.      Award Plaintiffs their attorney's fees and costs and expert fees

pursuant to 42 U.S.C. §1988(b) and (c); and

f.      Award such other and further relief and make such other

findings and declarations, as it may deem just and proper.

DATED:  Honolulu, Hawai'i, January 27, 2012.

/s/ John J. D'Amato
JOHN J. D'AMATO
J. THOMAS MALONEY, JR.
WILLIAM LEE
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NATASHA N. JACKSON, JANIN KLEID, and GARY BRADLEY,<br><br>Plaintiffs,<br><br>vs.<br><br>NEIL S. ABERCROMBIE, Governor, State of Hawaiʻi, and LORETTA J. FUDDY, Director, Department of Health, State of Hawaiʻi,<br><br>Defendants. | CIVIL NO.  CV11- 00734 ACK KSC<br><br>(CONSTITUTIONALITY OF STATE STATUTE)<br><br>CERTIFICATE OF SERVICE |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the date noted below, a copy of PLAINTIFFS

NATASHA N. JACKSON, JANIN KLEID, and GARY BRADLEY'S FIRST

AMENDED COMPLAINT, was served via DELIVERY addressed as follows:

William J. Wynhoff, Esq. (bill.j.wynhoff@hawaii.gov)
Harvey E. Henderson, Jr., Esq. (Harvey.E.HendersonJr@hawaii.gov)
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813

DATED: Honolulu, Hawaii, this 27th day of January, 2012.

_____ /s/ William Lee _____
JOHN J. D'AMATO

31

JOHN T. MALONEY, Jr.
WILLIAM LEE

Attorneys for Plaintiffs
NATASHA N. JACKSON, JANIN KLEID,
and GARY BRADLEY