IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

NATASHA N. JACKSON, JANIN KLEID,)   Civ. No. 11-00734 ACK-KSC
and GARY BRADLEY,               )
                         )
         Plaintiffs,      )
                         )
     v.                    )
                         )
NEIL S. ABERCROMBIE, Governor, )
State of Hawaii, and LORETTA J. )
FUDDY, Director of Health, State)
of Hawaii,                 )
                         )
         Defendants.      )
_____)

## ORDER GRANTING HAWAII FAMILY FORUM'S MOTION TO INTERVENE

### PROCEDURAL BACKGROUND

On December 7, 2011, Plaintiffs Natasha N. Jackson and Janin Kleid filed suit against Hawaii Governor Neil S. Abercrombie and Loretta J. Fuddy, Director of Hawaii's Department of Health ("Defendants"). Doc. No. 1. On January 27, 2012, Plaintiffs filed a First Amended Complaint ("Am. Compl."), adding Gary Bradley as a plaintiff and expanding Plaintiffs' claims. Doc. No. 6. Specifically, Plaintiffs challenge Hawaii Revised Statutes ("H.R.S.") § 572-1, which states that a valid marriage contract shall be only between a man and woman, and Article I, Section 23 of the Hawaii Constitution (the "marriage amendment"), which provides that "[t]he legislature shall have the power to reserve marriage to opposite-sex couples." Plaintiffs assert

that these two laws violate the Equal Protection and Due Process Clauses of the United States Constitution.  Am. Compl. ¶¶ 94-104.

On February 21, 2012, Defendants filed separate answers to the Amended Complaint.  Doc. Nos. 9-10.  In his answer, Defendant Abercrombie stated that he "admits that to the extent HRS § 572-1 allows opposite sex couples, but not same sex couples, to get married, it violates the Due Process Clause and Equal Protection Clause of the United States Constitution."  Doc. No. 9 ("Abercrombie's Answer"), at 2.  In Defendant Fuddy's answer, she denies that § 572-1 and the marriage amendment violate the Constitution.  Doc. No. 10 ("Fuddy's Answer"), at 6-7.

On March 1, 2012, Hawaii Family Forum ("HFF") filed a motion to intervene as a defendant ("HFF's Motion").  Doc. No. 15.  HFF also filed a proposed answer denying that Hawaii's marriage laws are unconstitutional.  Doc. No. 16.  On April 9, 2012, Defendant Fuddy filed a memorandum in support of HFF's Motion ("Fuddy's Mem.").  Doc. No. 23.  Also on April 9, 2012, Plaintiffs and Defendant Abercrombie filed memoranda in opposition to HFF's Motion ("Pls.' Opp'n" and "Abercrombie's Opp'n," respectively).  Doc. Nos. 24, 27.  Plaintiffs also filed a request that the Court take judicial notice of several exhibits

attached to their opposition.[1/]  Doc. No. 26.  On April 16, 2012, HFF filed a reply in support of its Motion ("HFF's Reply").  Doc. No. 34.  On April 24, 2012, HFF submitted a supplemental authority it intended to rely on at the hearing.  Doc. No. 40. On April 25, 2012, Plaintiffs submitted a supplemental authority in support of their opposition.  Doc. No. 41.

The Court held a hearing on HFF's Motion on April 30, 2012.

## FACTUAL BACKGROUND[2/]

### I.   Same-Sex Marriage in Hawaii

In Hawaii, same-sex marriage has been the subject of much litigation and legislation.  In May 1991, several same-sex couples filed a lawsuit seeking a declaration that § 572-1 violated the equal protection, due process, and privacy components of the Hawaii Constitution in so far as it had been interpreted and applied by the Hawaii Department of Health to deny marriage licenses to same-sex couples.  Baehr v. Lewin, 852 P.2d 44, 48-49 (Haw. 1993).  The trial judge rejected the

---

[1/]Plaintiffs ask the Court to take judicial notice of eleven exhibits that they assert are copies of documents produced or made available by government agencies as public records.  See Doc. No. 26.  HFF has not opposed this request.  The Court will consider these documents for purposes of ruling on the instant motion.

[2/]The facts as recited in this Order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings.

plaintiffs' claims and granted a motion for judgment on the
pleadings in favor of the defendants.  See id. at 52.  On appeal,
a plurality of the Hawaii Supreme Court held that the Hawaii
statute restricting marriage to a male and a female couple
discriminates on the basis of sex, which constitutes a suspect
category for purposes of equal protection analysis under the
Hawaii Constitution.  Id. at 63-67.  Because the trial judge had
reviewed the marriage statutes for a rational basis, the Hawaii
Supreme Court remanded to the trial court to review it under the
strict scrutiny standard that applies to suspect categories.  Id.
at 68-69.  On December 3, 1996, on remand, the trial judge ruled
that § 572-1 violated the Equal Protection Clause of the Hawaii
Constitution.  See Baehr v. Miike, Civ. No. 91-13945, 1996 WL
694235 (Haw. Cir. Ct. Dec. 3, 1996).

Meanwhile, in 1994, the Legislature amended § 572-1 to
clarify the Legislature's intention that marriage should be
limited to those of the opposite sex.  Act of June 22, 1994, No.
217, 1994 Haw. Sess. Laws 526 (codified as amended at Haw. Rev.
Stat. § 572-1).  The legislature did so by adding the following
underlined language to 572-1: "In order to make valid the
marriage contract, which shall be only between a man and a woman
. . . ."  Id.

In 1997, the Legislature passed a proposed amendment to
the Hawaii State Constitution to include a new section titled

4

"Marriage" that states "[t]he legislature shall have the power to reserve marriage to opposite-sex couples."  1997 Haw. Sess. Laws 383.  In November 1998, the people ratified the amendment via a ballot.  See Haw. Const. Art. I, § 23.  On December 9, 1999, the Hawaii Supreme Court issued a four-page unpublished summary disposition of an appeal of the trial court's decision finding § 572-1 violated the Hawaii Constitution.  Baehr v. Miike, No. 20371, 1999 Haw. LEXIS 391 (Haw. Dec. 9, 1999).  The court held that the case was moot in light of the marriage amendment.  Id. at *8.  Specifically, the court held that "the passage of the marriage amendment placed HRS § 572-1 on new footing" and "validated HRS § 572-1 by taking the statute out of the ambit of the equal protection clause of the Hawaii Constitution, at least insofar as the statute, both on its face and as applied, purported to limit access to the marital status to opposite-sex couples."  Id. at *6.

     After several failed attempts, in 2011, the legislature enacted H.R.S. Chapter 572B (the "civil unions law"), which provides for civil unions between same-sex couples.  The civil unions law gives partners to a civil union all of the same state legal rights granted to married couples.  See H.R.S. § 572B-9.

     In this suit, Plaintiffs challenge § 572-1 and the marriage amendment as unconstitutional under the federal Constitution, asserting inter alia, that "[b]ecause the manifest

5

policy of Hawaii law is to give identical legal treatment to

spouses and to partners in civil unions under Hawaii law,

the State's continuing to deny same sex couples the right to

marry, while permitting opposite sex couples to choose freely

between marriage and civil unions, does not have a rational

purpose furthering any lawful policy of the State, is purely an

act of discrimination based upon the sex and sexual preferences

of same sex couples, and is unlawful."  Am. Compl. ¶ 73.

## II.  Hawaii Family Forum

HFF was incorporated on January 15, 1998.  Pls.' Opp'n

2.  The Internal Revenue Service ("I.R.S.") recognizes HFF as an

organization described in 26 U.S.C. § 501(c)(3) (a "501(c)(3)

organization"), thus qualifying HFF for favorable tax

treatment.[3/]   See id.  HFF describes itself as "a non-profit,

---

[3/]Section 501(c)(3) grants tax exemption to:

> Corporations, and any community chest, fund,
> or foundation, organized and operated
> exclusively for religious, charitable,
> scientific, testing for public safety,
> literary, or educational purposes, or to
> foster national or international amateur
> sports competition . . ., or for the
> prevention of cruelty to children or animals,
> no part of the net earnings of which inures
> to the benefit of any private shareholder or
> individual, no substantial part of the
> activities of which is carrying on
> propaganda, or otherwise attempting, to
> influence legislation (except as otherwise
> provided in subsection (h)), and which does
> not participate in, or intervene in
> (including the publishing or distributing of

6

pro-family education organization committed to preserving and strengthening families in Hawaii." HFF's Mot. 4. HFF states that "it was established with the initial goal of spearheading a campaign to urge voters to ratify the [marriage] amendment." Id.

HFF asserts that in months leading up to the November 1998 vote on the marriage amendment, it campaigned for the marriage amendment by producing and paying for 60 second radio advertisements on 13 Hawaii radio stations, which ran 18 to 48 times per week from July 29 through September 9, 1998; producing and paying for television advertisements that ran 116 times per week from August 24 through September 12, 1998, and again from September 20 through November 3, 1998; producing and running print advertisements in the Honolulu Star-Bulletin, Honolulu Advertiser, Honolulu Weekly, and Pacific Business News; encouraging citizens to register to vote; and providing voter registration information "[i]n order to get like-minded voters to the polls."[4] Id. at 4-5. After the election, HFF circulated information to local churches "regarding the victory and highlighting continuing judicial and legislative challenges." Id. at 5. HFF asserts it raised and expended more than $150,000

_____

statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

[4]As will be discussed infra, Plaintiffs vigorously dispute some of HFF's assertions, including HFF's characterization of its actions.

to finance activities related to its marriage amendment campaign. Id.

In July 1998, a noncandidate committee opposed to the marriage amendment lodged a complaint with Hawaii's Campaign Spending Commission (the "CSC") against HFF.  Pls.' Opp'n Ex. O. The noncandidate committee alleged that HFF had violated Hawaii's campaign spending laws through the expenditures incurred in the production and broadcast of one of its radio advertisements regarding the marriage amendment.  Id.

The CSC dismissed the complaint, relying on CSC Advisory Opinion 98-12, which provides that advertising that is "informational," expressing facts or opinions but not "expressly advocating" a particular vote, is protected by the First Amendment and therefore outside the jurisdiction of the CSC. Pls.' Opp'n Ex. O.  The CSC found that the HFF radio advertisement was informational because it was not "'unmistakable and unambiguous' in it's meaning, and does not provide a clear plea for action."[5/]  Id.

_____

[5/]The radio advertisement stated:

> The following is a very important voter education message brought to you by Hawaii Family Forum.

> When you go to the voting booth on November Third, along with selecting the candidates of your choice, you will be asked to vote on this very important ballot question: "Shall the Constitution of the State of Hawaii be

HFF asserts that following the passage of the marriage amendment, it has continued to lead efforts to oppose legislation that would weaken traditional marriage.  HFF's Mot. 6.  HFF explains that it has campaigned against the civil unions law by submitting testimony in opposition to the civil unions bills; providing public communications and outreach regarding the proposed bills; encouraging members of the public to contact specific legislators to express their opposition to civil unions; organizing an ongoing presence in the legislative galleries; organizing visits to individual legislative offices; coordinating a public rally demonstrating support for traditional marriage; coordinating an outreach to encourage former Governor Lingle to

---

amended to specify that the Legislature shall have the power to reserve marriage to opposite sex couples?"

What exactly does this mean?

If you vote "yes," your vote will help support the definition of marriage between one man and one woman.

If you vote "no," or if you leave your ballot blank, your vote will help to redefine marriage to include homosexual couples.

Don't leave this important issue for someone else to decide.  Do your part and register to vote.  Then go to the polls on November Third.

This message paid for by Hawaii Family Forum.

Pls.' Opp'n Ex. P.

9

veto a proposed civil unions bill in 2010; and coordinating an outreach to encourage Governor Abercrombie to veto the bill in 2011. Id. at 6-7.

HFF now seeks to intervene in this case to defend the constitutionality of § 572-1 and the marriage amendment (together, "Hawaii's marriage laws").[6/]

## DISCUSSION

The Federal Rules of Civil Procedure allow for the intervention of new parties into a case pursuant to Rule 24. Rule 24(a) governs intervention as of right and provides that, upon timely application, a court must allow a movant to intervene when the movant claims an interest in the action, the action may impair the movant's ability to protect that interest, and existing parties do not adequately represent the movant's interest. Rule 24(b) permits a court to allow a movant to intervene where the movant has a claim or defense sharing common questions of law or fact with the main action.

In considering a motion to intervene, a district court is required to accept as true the non-conclusory allegations made in support of the motion and it may take notice of uncontroverted facts in pleadings and affidavits opposing intervention. Sw. Ctr. for Biological Diversity v. Berg, 268 F.3d 810, 819-20 (9th

---

[6/]The Court notes that at the hearing, HFF agreed not to seek any time extensions or cause delays in this suit.

Cir. 2001).

# I.   Intervention as of Right

## A.   Legal Standard[7]

Pursuant to Federal Rule of Civil Procedure 24(a), absent an applicable statute, a proposed intervenor as of right must establish that four requirements are met: "(1) the intervention application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest."[8]   Prete v. Bradbury, 438 F.3d 949, 954 (9th Cir.

---

[7]Plaintiffs contend "[i]nasmuch as this case concerns the constitutionality of Hawaii laws under federal law, it follows from Karcher [v. May, 484 U.S. 72 (1987),] that this Court should first look to Hawaii law, not Ninth Circuit law, to answer the question whether HFF may intervene." Pls.' Opp'n 9-10.   In Karcher, the Supreme Court held that two former state legislative officers, who had intervened at the district court while presiding officers, did not have the right to appeal an adverse judgment on behalf of the state legislature after they lost their status as presiding officers. 484 U.S. at 81.   The Supreme Court held that there was no need to vacate the district court judgment because the state legislative officers had authority under state law to represent the state's interests in both the district court and court of appeals. Id. at 82. HFF has not claimed authority under state law to intervene on behalf of the state or state legislature. There is thus no need to consider state law in deciding the instant motion.

[8]Rule 24(a) provides:

> Upon timely motion, the court must permit
> anyone to intervene who:

2006) (internal quotations omitted).  Although the burden is on

the proposed intervenor to show that these four elements are met,

the requirements are broadly interpreted in favor of

intervention.  Id.  "In addition to mandating broad construction,

[a court's] review is guided primarily by practical

considerations, not technical distinctions." Citizens for

Balanced Use v. Mont. Wilderness Ass'n, 647 F.3d 893, 897 (9th

Cir. 2011) (internal quotations omitted).

   **B.   Application**

        HFF has met each requirement, and thus it is entitled

to intervene as of right; the Court will discuss each requirement

in turn.

        **1.   Timeliness of HFF's Motion**

        In evaluating timeliness, a court should consider "the

stage of the proceeding, prejudice to other parties, and the

reason for and length of the delay."  Idaho Farm Bureau Fed'n v.

Babbit, 58 F.3d 1392, 1397 (9th Cir. 1995).

        HFF filed its motion to intervene less than three

_____

          (1) is given an unconditional right to
          intervene by a federal statute; or

          (2) claims an interest relating to the
          property or transaction which is the subject
          of the action, and is so situated that
          disposing of the action may as a practical
          matter impair or impede the movant's ability
          to protect its interest, unless existing
          parties adequately represent that interest.

HFF does not contend that a federal statute gives it a right to
intervene.

months after Plaintiffs filed their complaint and less than two
weeks after Defendants filed their answers.  Neither Plaintiffs
nor Defendant Abercrombie has asserted that HFF's Motion is
untimely.  At this stage in the proceedings, no dispositive
issues have been raised or decided.  In considering the same
timing, the Ninth Circuit concluded: "The motion to intervene was
made at an early stage of the proceedings, the parties would not
have suffered prejudice from the grant of intervention at that
early stage, and intervention would not cause disruption or delay
in the proceedings.  These are traditional features of a timely
motion."  <u>Citizens for Balanced Use</u>, 647 F.3d at 897.

This Court finds that HFF's motion is timely and thus
HFF has met the first requirement for intervention as of right.

### 2. Significant Protectable Interest

#### a. Framework

The second consideration is whether the applicant has a
significant protectable interest in the action.  "Whether an
applicant for intervention as of right demonstrates sufficient
interest in an action is a practical, threshold inquiry, and [n]o
specific legal or equitable interest need be established."  <u>Id.</u>
(alteration in original) (internal quotations omitted).  "An
applicant has a 'significant protectable interest' in an action
if (1) it asserts an interest that is protected under some law
and (2) there is a 'relationship' between its legally protected
interest and the plaintiff's claims."  <u>Donnelly v. Glickman</u>, 159
F.3d 405, 409 (9th Cir. 1998).  "[T]he 'interest' test is

13

primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." <u>Forest Conservation Council v. U.S. Forest Serv.</u>, 66 F.3d 1489, 1496 (9th Cir. 1995) (internal quotations omitted) (abrogated on other grounds by <u>Wilderness Soc. v. U.S. Forest Serv.</u>, 630 F.3d 1173, 1178 (9th Cir. 2011)).

**b.   Arguments**

HFF asserts that as a public interest group that vigorously supported the challenged laws, it has a protectable interest in the subject matter of the litigation.  HFF's Mot. 10. HFF asserts that its interest "runs far deeper than that of the public at large." <u>Id.</u> at 13.  It explains that it "has devoted substantial time, effort, and resources through its planning, productions, and payment for many TV and radio advertisements, campaign events, and materials, organization of many volunteers, successful legal defense of its campaign classification, testimony before the legislature, and fundraising." <u>Id.</u>  It further contends that it has "labored incessantly for the last fifteen years, all with the goal of enacting Hawaii's marriage amendment and protecting Hawaii's marriage law." <u>Id.</u> at 13-14.

Defendant Abercrombie argues that HFF did not actively support the enactment of § 572-1 or the marriage amendment and thus does not have a significant protectable interest in this action.  Abercrombie's Opp'n 13.  Specifically, Defendant Abercrombie asserts that HFF could not have supported the enactment of § 572-1 because the provision was enacted in 1994,

before HFF formed in 1998.  Id. at 15.  Defendant Abercrombie argues that HFF does not have a protectable interest in the marriage amendment because HFF did not "actively support" its passage.  Defendant Abercrombie relies on HFF's admissions in proceedings before the Hawaii Campaign Spending Commission ("CSC") that its radio advertisement was informational and not "express advocacy."  See id. at 16.

Plaintiffs assert that because HFF is tax-exempt under 26 U.S.C. § 501(c)(3), it may not claim the right to intervene on the basis of legislative lobbying.  Pls.' Opp'n 1-2, 8. Plaintiffs further contend that there is no support that HFF acted as an advocate for the marriage amendment and that, "[i]nstead, the evidence is that HFF's role was small and informational in nature."  Id. at 4.  Plaintiffs assert that HFF's claimed expenditure of $150,000 represents only 9% of the total amount spent in support of the marriage amendment and that in contrast, Save Traditional Marriage ("STM") spent about 88% in support of its passage.  Id.  Plaintiffs, like Defendant Abercrombie, also argue that HFF's response to the complaint before the CSC establishes that HFF did not act as an advocate with respect to the marriage amendment.  Id. at 5.

Plaintiffs assert that because HFF was incorporated in 1998, it cannot claim direct involvement in the 1994 amendment to § 572-1.  Id. at 6.  Plaintiffs contend that HFF could not have created a stake in § 572-1 or the marriage amendment through its actions opposing civil unions bills, asserting that "HFF's claim

is contradicted by the fact that the subject of the civil union bills was entirely different from the subject of the 'marriage amendment' and Section 572-1." Id.  Plaintiffs assert that the marriage amendment and § 572-1 are about access to the legal title of marriage, while the exclusive concern of the civil union bills was access to the legal incidents of marriage.  Id. at 21.

### c.   Application

Under Ninth Circuit precedent, "[a] public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported." Babbitt, 58 F.3d at 1397 (upholding intervention as of right by conservation group that had participated in the listing of endangered species in suit alleging violations of the Endangered Species Act); see Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 527 (9th Cir. 1983) (holding national wildlife organization had a right to intervene in a suit challenging the actions of the Interior Secretary in connection with the development of a bird conservation area when the organization had participated in the administrative process surrounding such development); Wash. State Bldg. & Constr. Trades Council v. Spellman, 684 F.2d 627, 630 (9th Cir. 1982) (holding that a public interest group that had sponsored an initiative statute was entitled to intervene as of right in suit challenging the constitutionality of the statute). The issue here is whether HFF, through its actions, sufficiently "supported" Hawaii's marriage laws such that it has a significant protectable interest in the laws.

16

The Court first notes that the fact that HFF is tax-exempt under § 501(c)(3) is not controlling.  Plaintiffs have failed to come forward with any case law or authority supporting its contention that 501(c)(3) organizations are per se barred from intervening in suits challenging legislation.  HFF, in contrast, has noted that in Smelt v. County of Orange, No. SACV04-1042-GLT (C.D. Cal. Nov. 2, 2004), a case challenging the federal Defense of Marriage Act, the district court allowed a 501(c)(3) public interest organization to intervene to defend the law.  See Doc. No. 40, Ex. A.  Moreover, a 501(c)(3) organization is restricted, but not prohibited, from engaging in lobbying activities.  See 26 U.S.C. § 501(h); Treas. Reg. § 1.501(h)-3(b). It is possible for a 501(c)(3) organization to engage in lobbying as a substantial part of its activities, at least for some years, and incur a tax penalty but remain a 501(c)(3) organization.[9/] See 26 U.S.C. § 501(h);[10/] Treas. Reg. § 1.501(h)-3.

--------

[9/]In fact, for year 2009, HFF incurred a tax penalty of $20,741 because it exceeded its ceiling expenditure amount on lobbying by $82,965.  See Pls.' Opp'n 18 n.11 & Ex. G.

[10/]Section 501(h), titled "Expenditures by public charities to influence legislation" provides in part:

> (1) General rule.--In the case of an organization to which this subsection applies, exemption from taxation under subsection (a) shall be denied because a substantial part of the activities of such organization consists of carrying on propaganda, or otherwise attempting, to influence legislation, but only if such organization normally--

17

HFF's 501(c)(3) status is governed by the Internal
Revenue Service and relates exclusively to its tax status.   The
"interest test" applicable here, however, "is not a clear-cut or
bright-line rule."   S. Cal. Edison Co. v. Lynch, 307 F.3d 794,
803 (9th Cir. 2002), modified on other grounds, 353 F.3d 648 (9th
Cir. 2003).   Rather, a court's examination "is guided primarily
by practical considerations, not technical distinctions."
Citizens for Balanced Use, 647 F.3d at 897.   Accordingly, it is
appropriate to consider the actual facts related to HFF's
activities, rather than merely HFF's tax status.

HFF's position before the CSC is also not controlling.
HFF explains that "its arguments to the CSC and its use of the
defined term 'express advocacy' were specific to the campaign
spending rules, and nothing more."   HFF's Reply 8.   Furthermore,
only one radio advertisement was at issue before the CSC, not all
of HFF's activities connected to the marriage amendment.   See
Pls.' Opp'n Ex. O.   Significantly, "express advocacy," is a term
used in First Amendment jurisprudence; the Ninth Circuit
construes the term to contain the following three components: (1)
"the message of the communication must be unmistakable and
unambiguous, suggestive of one plausible meaning"; (2) "the

---

(A) makes lobbying expenditures in excess of
the lobbying ceiling amount for such
organization for each taxable year, or

(B) makes grass roots expenditures in excess
of the grass roots ceiling amount for such
organization for each taxable year.

speech must present a clear plea for action"; and (3) "the action advocated by the communication must be clearly stated." <u>Cal. Pro-Life Council, Inc. v. Getman</u>, 328 f.3d 1088, 1098 n.9 (9th Cir. 2003) (internal quotations omitted).  The narrow definition of this term as used in First Amendment jurisprudence is not coterminous with "support" within the meaning of intervention jurisprudence, which directs district courts to follow "practical and equitable considerations" and to construe the requirements of Rule 24(a) "broadly in favor of proposed intervenors."  <u>See Wilderness Soc.</u>, 630 F.3d at 1179.  Accordingly, in considering whether HFF supported the marriage amendment, the Court will consider all of HFF's actions related to the marriage amendment, including HFF's motivations.

        HFF asserts that "[o]pponents of the [marriage] amendment obviously understood that the intended effect of HFF's ads was to support [its] passage."  HFF's Reply 5.  As the CSC advisory opinion which HFF relied on in forming its advertisements states, "[t]he disturbing consequences" of the "express advocacy" and "informational advocacy" distinction "is that it makes it possible for electioneering to proceed under the guise of education, thereby exempting it from the disclosure, disclaimer and contribution limit restrictions."  <u>See</u> Abercrombie's Opp'n Ex. C.  In practicality, that is what happened here.

        Although not "express advocacy" within the meaning of campaign spending laws, HFF spent money and time in providing

19

information to the public in an effort to get the marriage
amendment passed.  HFF asserts that it "led a $150,000 campaign
to educate voters – a substantial amount by anyone's measure –
using an educational strategy that it correctly believed would
encourage voters to vote yes on the marriage amendment."  HFF's
Reply 12.  No one disputes that HFF's goal in such action was to
get the marriage amendment passed.[11/]  HFF submitted an
advertisement of the group "Protect Our Constitution/Human Rights
Campaign" that shows the group understood HFF as a supporter of
the marriage amendment.  HFF's Reply Ex. A.  HFF also encouraged
citizens to register to vote and provided voter registration
information "[i]n order to get like-minded voters to the polls."
HFF's Mot. 5.  After the marriage amendment passed, HFF
circulated memos to local churches "regarding the victory and
highlighting continuing judicial and legislative challenges" to
the "battle to preserve marriage between one man and one woman."
Id. & Ex. A.  These actions demonstrate that HFF actively

---

[11/]HFF points out that Plaintiffs' Exhibit N, a newspaper
article from the Star-Bulletin dated October 31, 1998, gives
insight into their strategy.  See HFF's Reply 8 n.4.  The article
states that many citizens found the ballot language confusing and
that research polls revealed that more citizens favored limiting
marriage to those relationships between a man and woman than
those who voted yes on the proposed ballot language when not told
what a "yes" and "no" vote meant.  See Pls.' Opp'n Ex. N.  HFF
contends this reveals how their explanation of the meaning of a
yes and no vote supported passage of the amendment "without
needing to explicitly advocate a yes vote."  HFF's Reply 8 n.4.

supported the marriage amendment.[12]

HFF need not demonstrate that it has the most substantial interest vis-a-vis other groups that supported the marriage amendment. HFF's Reply 12. HFF explains that if that were the case, in situations where the lead supporter had dissolved shortly after it succeeded in getting legislation passed, as was done here with STM, there would be no potential interveners. Id. at 11-12. Although an "undifferentiated, generalized interest" in the outcome of a proceeding is insufficient, see S. Cal. Edison Co., 307 F.3d at 803, HFF has shown that through its actions supporting Hawaii's marriage laws, it has a greater and different interest than the public at large.

In Tucson Women's Center v. Arizona Medical Board, Civ. No. 09-1909, 2009 WL 4438933 (D. Ariz. 2009), the district court disagreed with the plaintiff's argument that because the intervenor-applicant group had not taken a leadership role in

---

[12]Plaintiffs cite Northwest Forest Resource Council v. Glickman, 82 F.3d 825 (9th Cir. 1996), for the proposition that "[u]nless [HFF] can show direct involvement in the 'marriage amendment,' its motion must fail." Pls.' Opp'n 20. In Glickman, the Ninth Circuit merely noted, however, that the cases in which public interest groups had intervened generally share the common thread that they had been directly involved in the enactment of the law or in the administrative proceedings. Glickman, 82 F.3d at 837. The court followed this observation with the statement that "we do not here rule out the possibility that a public interest organization might adduce sufficient interest to intervene even where it had not participated in or supported the legislation." Id. at 838. Here, the Court concludes that HFF had "direct involvement" in the enactment of the marriage amendment through its efforts supporting the passage of the amendment.

supporting challenged legislation, it was not "sufficiently 'active' to warrant intervention." Id. at *4. The court stated that because the group actively supported the challenged law by providing testimony before a legislative committee "it cannot conclude that this active support fell below some unspecified level of sufficiency." Id. Here too, HFF's active support for the marriage amendment – through producing and paying for radio, tv, and newspaper advertisements to provide the public information as to what the ballot meant, and encouraging like-minded citizens to vote – is not nullified by the fact that other groups spent more money supporting the amendment.

HFF also asserts that it actively supported H.R.S. § 572-1 through its opposition to various civil union bills because it believed the introduction of civil unions would threaten marriage as defined in § 572-1. HFF.'s Reply 2, 12-13. The Court need not decide if this opposition alone would confer a significant protectable interest in the challenged laws to HFF. The laws challenged in the Amended Complaint - the marriage amendment and § 572-1 – are interrelated because the marriage amendment insulated the challenged portion of § 572-1 from state constitutional attack. Furthermore, Plaintiffs have put the civil unions law at issue in this case through relying on it for some of their allegations in the Amended Complaint (generally asserting that because under the civil unions law partners are given all the state law benefits of marriage, denying them the right to marry under § 572-1 does not have a rational purpose and

22

"is purely an act of discrimination based upon the sex and sexual preferences of same sex couples"). <u>See</u> Am. Compl. ¶¶ 70-78.  The laws will not be viewed in isolation by the Court.  Accordingly, the Court concludes that HFF's significant protectable interest in the marriage amendment is sufficient to meet the third requirement of intervention as of right.

Although there is no bright-line rule regarding the level of interest required to support a right to intervene, HFF through its actions aimed at getting the marriage amendment ratified and ensuring that the definition of marriage as set forth in § 572-1 is not changed, has "actively supported" Hawaii's marriage laws such that it has a significant protectable interest in this case.

### 3.   Impairment of the Ability to Protect the Intervenor's Interest

HFF has shown that it has a significant protectable interest and thus the Court must determine whether its interest would as a practical matter be impaired or impeded by the disposition of this suit.  <u>See</u> <u>Berg</u>, 268 F.3d at 821.  The Ninth Circuit instructs that "'[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, [it] should, as a general rule, be entitled to intervene.'"  <u>Id.</u> (first alteration in original) (quoting Fed. R. Civ. P. 24 advisory committee's notes).  Generally, after determining that the applicant has a protectable interest, courts

have "little difficulty concluding" that the disposition of the case may affect such interest.  Lockyer v. United States, 450 F.3d 436, 442 (9th Cir. 2006).

HFF contends that if it is not allowed to intervene, not only will it be harmed by having no legal means to challenge an adverse holding, it will suffer practical harm if laws that it has campaigned for fifteen years to enact and protect are invalidated.  HFF's Mot. 14-15.  It asserts that an adverse ruling could impair its interest "by undoing all that it has done on behalf of many Hawaiian citizens to obtain and protect [Hawaii's marriage] laws."  Id. at 15-16.

The Ninth Circuit has held that an adverse court decision on a measure that a public interest group has supported may, as a practical matter, impair the interest held by the public interest group.  Prete, 438 F.3d 954.  Here, an adverse decision would impair HFF's interest in preserving § 572-1 and the marriage amendment.  Thus, HFF has met the third requirement for intervention as of right.

### 4.   Adequacy of Representation

The burden of establishing inadequacy of representation is a minimal one.  The Ninth Circuit has stressed that "intervention of right does not require an absolute certainty . . . that existing parties will not adequately represent [the applicant's] interests."  Citizens for Balanced Use, 647 F.3d at 900.  Rather, the movant satisfies his burden by showing

24

representation of his interest "may be" inadequate.  Id.

A presumption of adequacy arises when the applicant and an existing party share the same ultimate objective.  Id. at 898. There is also a presumption that the government adequately represents its constituency when it is acting on their behalf. Id.  To rebut one or either of these presumptions, an applicant must make a compelling showing of inadequacy.  Id.  In assessing whether a party has sufficiently rebutted a presumption of adequacy, the Court consider several factors, including "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect."  Perry v. Proposition 8 Official Proponents, 587 F.3d 947, 952 (9th Cir. 2009) (internal quotations omitted).

HFF points to a press release by Defendant Abercrombie, in which he states that Hawaii's law allowing only heterosexual couples to marry is "inequality, and [he] will not defend it."[13] See HFF's Mot. 16; Abercrombie's Opp'n Ex. A.  HFF asserts that "intervention is especially warranted when a defending official

---

[13]/The Court notes that the press release states that Defendant Abercrombie is defending against Plaintiffs' civil rights claim arising under 42 U.S.C. § 1983.  Abercrombie's Opp'n Ex. A.  Defendant Abercrombie also asserts that he will defend "the state against any money damages claims."  Id.

seeks the same legal outcome as the plaintiff." HFF's Mot. 16. HFF asserts that although Defendant "Fuddy announced that '[b]ecause I am being sued for administering the law, I will also defend it,'" her interests are "fundamentally different and weaker than those of HFF's." HFF's Mot. 19.

Plaintiffs assert that Director Fuddy will adequately represent HFF's interest. They contend that HFF and Director Fuddy have identical interest - to defend the law restricting the legal status of marriage to opposite-sex couples – and therefore a presumption of adequacy arises. Pls.' Opp'n 25. Defendant Abercrombie similarly argues that a presumption of adequacy arises because Director Fuddy and HFF have identical interest, i.e., "the same 'ultimate objective' – defending the constitutionality of HRS § 572-1 and Article 1, Section 23." Abercrombie's Opp'n 6. He asserts that a second presumption, or strengthened first presumption, arises because Director Fuddy is a State defendant. Id. Defendant Abercrombie asserts that HFF has failed to make a compelling showing to rebut the presumption of adequacy "because there is no indication in this case that Defendant Fuddy will do anything other than fully defend the challenged law." Id.

Here, there is no doubt that Defendant Abercrombie will not represent HFF's interest. He declines to defend the constitutionality of Hawaii's statute limiting marriage to

26

relationships between a man and woman and states that the marriage amendment does not violate the federal Constitution under his construction that it "merely provides that under the <u>Hawaii State</u> Constitution, and only under the Hawaii State Constitution, the Legislature has the power to reserve marriage to opposite sex couples." Abercrombie's Answer 2-3.  In contrast, HFF contends that § 572-1 and the marriage amendment are constitutional.  HFF's Mot. 17.  Thus, the disputed issue here is whether Director Fuddy will adequately represent HFF's interest.

Even assuming a presumption of adequacy applies, HFF has sufficiently rebutted that presumption with the unique circumstances of the two defendants in this case.  That is, Defendant Fuddy and Defendant Abercrombie, members of the state executive branch sued in their official capacities, have taken opposing positions in this case.

In <u>Sagebrush Rebellion, Inc. v. Watt</u>, 713 F.2d 525 (9th Cir. 1983), the Ninth Circuit concluded that Interior Secretary Watt might not have adequately represented the interest of a national wildlife organization that sought to intervene as a defendant.  The plaintiff was a non-profit organization that brought suit challenging the legality of actions taken by the former Interior Secretary.  <u>Id.</u> at 526.  The Ninth Circuit explained that several facts supported that Watt may not

27

adequately represent the proposed intervenor's interest, including that the proposed intervenor had expertise apart from that of Watt, the proposed intervenor offered a perspective which differed materially from Watt, and that Watt had formerly served as the head of the organization that was representing the plaintiff in the action.  Id at 528.

Here too, although a government official is the defendant in this case, it is an atypical situation.  Director Fuddy is appointed by, under the supervision of, and subject to removal by Governor Abercrombie.  See Haw. Const. Art. V, § 6. Defendant Abercrombie not only declines to defend § 572-1 in this case, but affirmatively states to the Court that it is unconstitutional.  Moreover, Defendant Abercrombie has publicly stated that in so far as Hawaii's law allows only opposite-sex couples to marry, it is "inequality, and [he] will not defend it."  Abercrombie's Opp'n Ex. A.  This posture places Defendant Fuddy in the strange position of advancing an opposing position on this divisive issue.  Additionally, the Attorney General, also appointed by Governor Abercrombie, is representing both Director Fuddy and Governor Abercrombie.  See Haw. Const. Art. V, § 6. The Attorney General's Office has assigned separate legal teams to the two defendants and has put up a "wall" between them.  See Abercrombie's Opp'n Ex. A.  Although the Court does not doubt the sincerity or competence of Defendant Fuddy's attorneys, it cannot

28

conclude that Defendant Abercrombie's position will have no effect on the legal arguments or strategies that they set forth. See id.

In light of this odd posture, the three considerations set forth above weigh in favor of the conclusion that HFF may not be adequately represented by Defendant Fuddy.  With regard to the first and second factors, given that Defendant Fuddy is taking an opposing position to that of the Governor whom she serves under, the Court cannot conclude that her interest "is such that [she] will undoubtedly make all of a proposed intervenor's arguments," or that she "is capable and willing to make such arguments." Arakaki v. Cayetano, 324 F.3d 1078, 1086 (9th Cir. 2003).  This is particularly so in light of the sensitive issues and strong beliefs surrounding same-sex marriage.

HFF also meets the third factor as it may offer a perspective not shared with and potentially neglected by Defendant Fuddy.  See id.  Defending Hawaii's marriage laws will require Defendant Fuddy to advance arguments as to what Plaintiffs refer to as the core issue of this case - "the State's rationale for denying Plaintiffs the legal status of marriage." Pls.' Opp'n 29.  Given the current posture of the case, it is a possibility that HFF, as a public interest group that has advocated for Hawaii's marriage laws and is not constrained by political considerations, will advance broader and more

29

comprehensive rationales.  Defendant Fuddy herself notes that "it is vitally important that the court have the benefit of the broadest, most comprehensive, and best discussion of the issue possible."  Fuddy's Mem. 2.  Thus, HFF may offer a perspective not shared by Defendant Fuddy.

HFF has rebutted the presumption of adequate representation by making a compelling showing that "representation of its interests 'may be' inadequate."  Arakaki, 324 F.3d at 1086; see Citizens for Balanced Use, 647 F.3d at 901 ("[W]e cannot conclude that the Forest Service will undoubtedly make all of Applicants' arguments, nor can we be assured that the Forest Service is capable of making and willing to make such arguments.  Even if we applied a presumption of adequate representation, that presumption was persuasively rebutted by Applicants' presentation."); HRPT Props. Trust v. Lingle, Civ. No. 09-00375 SOM-KSC, Doc. No. 41 (Order Granting Citizen for Fair Valuation's Motion to Intervene) (D. Haw. Oct. 21, 2009) (determining public interest group that had sponsored and advocated for a challenged law offered a perspective not shared by the Governor and thus had met their burden to show that its interest may not be adequately represented).

Accordingly, HFF has established that it has a right to intervene in this suit.

## II.  Permissive Intervention

HFF also moves for permissive intervention.[14]  Rule 24(b)(1) provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."[15]  The Ninth Circuit has "often stated that permissive intervention requires (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." Freedom From Religion Found., Inc. v. Geithner, 644 F.3d 836, 843 (9th Cir. 2011) (internal quotations omitted).  "In exercising its discretion the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).  When a proposed intervenor has otherwise met the requirements, "[t]he court may also consider other factors in the exercise of its discretion, including the nature and extent of the intervenors' interest and whether the intervenors' interests are adequately represented by other parties." Perry, 587 F.3d at 955 (internal quotations omitted).

---

[14]Although it is unnecessary to consider HFF's request for permissive intervention because the Court has found HFF is entitled to intervene as of right, the Court grants permissive intervention in the alternative.

[15]Rule 24(b)(1) also provides that a court may permit anyone to intervene who is given a conditional right to intervene by federal statute.  HFF has not asserted there is an applicable statute.

Plaintiffs assert that because HFF does not have a significant protectable interest in Hawaii's marriage laws, it does not have independent grounds for jurisdiction.  They contend that without making such a showing, permissive intervention is not permitted.  Pls.' Opp'n 27.  Plaintiffs do not contest that HFF's motion was timely or that there is a common question of law and fact with HFF's proposed defense and the main action. Plaintiffs assert, however, that they are concerned that HFF's participation will prolong the case, add to its costs, and inject issues extraneous to its resolution.  Id. at 29.

Defendant Abercrombie argues that the Court should not allow HFF to permissively intervene because Defendant Fuddy adequately represents HFF's interest.  Abercrombie's Opp'n 23. He further contends that HFF's intervention will likely prolong or delay the litigation and increase the burdens and costs on the Court and parties.  Id. at 24.

In Freedom From Religion Foundation, Inc. v. Geithner, 644 F.3d 836 (9th Cir. 2011), the Ninth Circuit explained that the independent ground for jurisdiction requirement stems from the concern that intervention might be used to enlarge inappropriately the jurisdiction of district courts.  Id. at 843. This concern "manifests itself most concretely" in diversity cases where proposed intervenors seek to litigate state law claims over which the district court would not otherwise have

jurisdiction. Id. In federal-question cases, however, the jurisdictional requirement only prevents the enlargement of federal jurisdiction where the proposed-intervenor seeks to bring state-law claims into the suit. Id. Based on these recognitions, the Ninth Circuit "clarif[ied] that the independent jurisdictional grounds requirement does not apply to proposed intervenors in federal-question cases when the proposed intervenor is not raising new [state-law] claims." Id. The laws at issue in this suit are challenged under federal law. HFF seeks to intervene to defend the laws, not assert any new claims. Thus the independent jurisdictional requirement is inapplicable.

HFF has met the requirements for permissive intervention and the Court will exercise its discretion to allow it to intervene. As discussed supra, HFF has filed a timely motion. HFF seeks to intervene to defend the constitutionality of Hawaii's marriage laws. Because this is the precise issue raised by Plaintiffs' claims, there are common questions of law and fact between HFF's defense and the main issues of the case. Additionally, HFF's intervention in this suit will not unduly delay the proceedings or prejudice the parties. HFF's participation will not complicate the issues or inject new claims into the suit. Rather, HFF's presence will contribute to the full development and analysis of the issues in this action. Plaintiffs need not be concerned about HFF injecting extraneous

33

issues into this case as the Court is capable of preventing the introduction of such issues.

HFF has shown that it has an interest in Hawaii's marriage laws and that the existing parties may not adequately represent that interest.  Thus, the Court exercises its discretion to allow HFF to permissively intervene in this suit.

### CONCLUSION

For the foregoing reasons, the Court GRANTS HFF's Motion to Intervene.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 2, 2012.



_____
Alan C. Kay
Sr. United States District Judge

Natasha N. Jackson, et al. v. Neil S. Abercrombie, et al., Civ. No. 11-00734 ACK-KSC; Order Granting Hawaii Family Forum's Motion to Intervene