IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NATASHA N. JACKSON, JANIN KLEID, and GARY BRADLEY,<br><br>        Plaintiffs,<br><br>        v.<br><br>NEIL S. ABERCROMBIE, Governor, State of Hawaii, and LORETTA J. FUDDY, Director of Health, State of Hawaii,<br><br>        Defendants.<br><br>        and<br><br>HAWAII FAMILY FORUM,<br><br>        Defendant-Intervenor. | Civ. No. 11-00734 ACK-KSC |

**ORDER GRANTING HFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT FUDDY'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND HFF'S MOTION TO DISMISS DEFENDANT ABERCROMBIE, AND DENYING AS MOOT DEFENDANT ABERCROMBIE'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

SYNOPSIS . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . 7

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . 11

I.    Same-Sex Marriage in Hawaii . . . . . . . . . . . . . 11

II.   Same-Sex Marriage Nationwide . . . . . . . . . . . . 18

III.  Federal Defense of Marriage Act . . . . . . . . . . . 22

IV.   The Parties in This Case.. . . . . . . . . . . . . . 24

STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . 25

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . 28

I.    Defendant Abercrombie's Status as a Party . . . . . . 28

      A.   Sovereign Immunity . . . . . . . . . . . . . . 29

      B.   Article III.. . . . . . . . . . . . . . . . . 31

II.   Baker v. Nelson . . . . . . . . . . . . . . . . . . 35

      A.   The Due Process Claim.. . . . . . . . . . . . 39

      B.   The Equal Protection Claim . . . . . . . . . . 40

III.  The Merits of Plaintiffs' Claims . . . . . . . . . . 43

      A.   Perry v. Brown . . . . . . . . . . . . . . . . 44

      B.   Romer v. Evans . . . . . . . . . . . . . . . . 53

      C.   Plaintiffs' Due Process Claim . . . . . . . . . 57

           1.   Description of the Asserted Fundamental
                Right .. . . . . . . . . . . . . . . . . 59

           2.   The Nation's History and Tradition.. . . . . . 63

      D.   Plaintiffs' Equal Protection . . . . . . . . . 68

           1.   Gender Discrimination .. . . . . . . . . . 69

           2.   Sexual Orientation Discrimination .. . . . . 70

E.    Rational Basis Review . . . . . . . . . . . . . . .  79

      1.   Standard.. . . . . . . . . . . . . . . . . .  79

      2.   Application . . . . . . . . . . . . . . . . .  86

           a.   Plaintiffs' and Defendant Abercrombie's
                Overarching Arguments.. . . . . . . . . .  88
                i.   The Relevant Question .. . . . . . .  88
                ii.  Effect of the Civil Unions Law.. . .  90

           b.   Encouraging the Stability of Relationships
                that Have the Ability to Procreate
                Naturally.. . . . . . . . . . . . . . . .  98

           c.   Promoting the Ideal, Where Possible,
                Children Are Raised by Their Mother and
                Father in a Stable Relationship.. . . . . 105

           d.   Cautiously Experimenting With Social
                Change . . . . . . . . . . . . . . . . . 111

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . 116

## SYNOPSIS

This action is one of multiple lawsuits that have been filed in state and federal courts seeking to invalidate laws that reserve marriage to those relationships between a man and woman. Specifically, Plaintiffs' complaint asserts that Article 1, Section 23 of the Hawaii Constitution, which provides that "[t]he legislature shall have the power to reserve marriage to opposite-sex couples," and Hawaii Revised Statutes § 572-1, which states that marriage "shall be only between a man and a woman," violate the Due Process and Equal Protection Clauses of the United States Constitution.

The Court is mindful of the Supreme Court's cautionary note that "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Thus, "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). "This note of caution is especially important in cases . . . where moral and personal passions run high and where there is great risk that 'the liberty protected by the Due Process Clause [will] be subtly transformed into the policy preferences' of unelected judges." Log Cabin Republicans v. United States, 658 F.3d 1162, 1174 (9th Cir. 2011)

(O'Scannlain, J., concurring) (second alteration in original) (quoting Glucksberg, 521 U.S. at 720).  In discussing the importance of judicial restraint in certain circumstances, the Hawaii Supreme Court has likewise acknowledged the need to "recognize that, although courts, at times, in arriving at decisions have taken into consideration social needs and policy, it is the paramount role of the legislature as a coordinate branch of our government to meet the needs and demands of changing times and legislative accordingly."  Bissen v. Fujii, 466 P.2d 429, 431 (Haw. 1970).

For the reasons set forth herein, Plaintiffs' claims are foreclosed by the Supreme Court's summary dismissal for want of a substantial federal question in Baker v. Nelson, 409 U.S. 810 (1972) (mem.).  In Baker, the Supreme Court dismissed an appeal from the Minnesota Supreme Court's decision holding that a Minnesota statute that defined marriage as a union between persons of the opposite sex did not violate the First, Eighth, Ninth, and Fourteenth Amendments of the federal Constitution.  See Baker v. Nelson, 191 N.W.2d 185 (Minn. 1971), appeal dismissed, 409 U.S. 810 (1972).  Alternatively, Plaintiffs' claims fail on the merits.

The Court first notes that Perry v. Brown, 671 F.3d 1052 (9th Cir. 2012), a case in which the Ninth Circuit held that an amendment to the California Constitution that stated "[o]nly

marriage between a man and a woman is valid or recognized in California" ("Proposition 8") violated the Equal Protection Clause of the United States Constitution, does not control this case.  The Ninth Circuit repeatedly asserted that its holding was limited to the unique facts of California's same-sex marriage history, i.e., "California had already extended to committed same-sex couples both the incidents of marriage and the official designation of 'marriage,' and Proposition 8's only effect was to take away that important and legally significant designation, while leaving in place all of its incidents."  Id. at 1064 ("We need not and do not answer the broader question in this case . . . [The] unique and strictly limited effect of Proposition 8 allows us to address the amendment's constitutionality on narrow grounds.").  No same-sex couples have been married in Hawaii nor have ever had the legal right to do so.  Thus the legislature's amendment to § 572-1 and Hawaii's marriage amendment did not take away from same-sex couples the designation of marriage while leaving in place all of its incidents as Hawaii, unlike California, did not have a civil unions law at the time the legislature amended § 572-1 or when the people ratified the marriage amendment.  Consequently, this case does not involve the same unique facts determined dispositive in Perry.

    Carefully describing the right at issue, as required by both the Supreme Court and Ninth Circuit, the right Plaintiffs

seek to exercise is the right to marry someone of the same-sex.
See Glucksberg, 521 U.S. at 721; Raich v. Gonzales, 500 F.3d 850,
863-64 (9th Cir. 2007).  The right to marry someone of the same-
sex, is not "objectively, deeply rooted in this Nation's history
and tradition" and thus it is not a fundamental right.  See
Glucksberg, 521 U.S. at 720-21 ("[w]e have regularly observed
that the Due Process Clause specially protects those fundamental
rights and liberties which are, objectively, 'deeply rooted in
this Nation's history and tradition.' . . . This approach tends
to rein in the subjective elements that are necessarily present
in due-process judicial review") (citations omitted); In re
Kandu, 315 B.R. 123, 140 (Bankr. W.D. Wash. 2004) (holding that
because same-sex marriage is not deeply rooted in the history and
tradition of our Nation, it is not a fundamental right).  Because
a fundamental right or suspect classification is not at issue,
Plaintiffs' due process claim is subject to rational basis
review.

Plaintiffs' equal protection claim is also subject to
rational basis review.  Hawaii's marriage laws do not treat males
and females differently as a class; consequently, the laws do not
discriminate on the basis of gender.  The United States Supreme
Court has never held that heightened scrutiny applies to
classifications based on sexual orientation and every circuit
that has addressed this issue, i.e., all circuits but the Second

and Third Circuits, have unanimously declined to treat sexual orientation classifications as suspect.  See Romer v. Evans, 517 U.S. 620 (1996) (applying rational basis review to a classification based on sexual orientation); infra, n.25 (collecting circuit court cases).  Significantly, the Ninth Circuit, which is binding authority on this Court, has affirmatively held that homosexuals are not a suspect class.  See High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 573-74 (9th Cir. 1990).

Rational basis review is the "paradigm of judicial restraint." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313-14 (1993).  Under rational basis review, a law is presumed constitutional and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." Heller v. Doe, 509 U.S. 312, 320 (1993) (alteration in original) (internal quotations omitted).  Rational basis review does not authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." Id. at 319 (alteration in original) (internal quotations omitted).

Plaintiffs have failed to meet their burden. Specifically, the legislature could rationally conclude that defining marriage as a union between a man and woman provides an

inducement for opposite-sex couples to marry, thereby decreasing the percentage of children accidently conceived outside of a stable, long-term relationship. The Supreme Court has stated that a classification subject to rational basis review will be upheld when "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not." Johnson v. Robison, 415 U.S. 361, 382-83 (1974). It is undisputed opposite-sex couples can naturally procreate and same-sex couples cannot. Thus, allowing opposite-sex couples to marry furthers this interest and allowing same-sex couples to marry would not do so.

The legislature could also rationally conclude that other things being equal, it is best for children to be raised by a parent of each sex. Under rational basis review, as long as the rationale for a classification is at least debatable, the classification is constitutional. Both sides presented evidence on this issue and both sides pointed out flaws in their opponents' evidence. Thus, the Court concludes this rationale is at least debatable and therefore sufficient.

Finally, the state could rationally conclude that it is addressing a divisive social issue with caution. In 1997, the legislature extended certain rights to same-sex couples through the creation of reciprocal-beneficiary relationships. In 2011, the legislature passed a civil unions law, conferring all of the

6

state legal rights and benefits of marriage (except the title

marriage) on same-sex couples who enter into a civil union.  In

this situation, to suddenly constitutionalize the issue of same-

sex marriage "would short-circuit" the legislative actions with

regard to the rights of same-sex couples that have been taking

place in Hawaii.  See Dist. Attorney's Office v. Osborne, 557

U.S. 52, 72-73 (2009).

Accordingly, Hawaii's marriage laws are not

unconstitutional.  Nationwide, citizens are engaged in a robust

debate over this divisive social issue.  If the traditional

institution of marriage is to be restructured, as sought by

Plaintiffs, it should be done by a democratically-elected

legislature or the people through a constitutional amendment, not

through judicial legislation that would inappropriately preempt

democratic deliberation regarding whether or not to authorize

same-sex marriage.

## PROCEDURAL BACKGROUND

On December 7, 2011, Plaintiffs Natasha N. Jackson and

Janin Kleid filed suit against Hawaii Governor Neil S.

Abercrombie and Loretta J. Fuddy, Director of Hawaii's Department

of Health.  Doc. No. 1.  On January 27, 2012, Plaintiffs filed a

First Amended Complaint ("Am. Compl."), adding Gary Bradley as a

plaintiff (collectively with Jackson and Kleid, "Plaintiffs") and

expanding their claims.  Doc. No. 6.  Specifically, Plaintiffs

challenge Hawaii Revised Statutes ("H.R.S.") § 572-1, which states that a valid marriage contract shall be only between a man and woman, and Article I, Section 23 of the Hawaii Constitution (the "marriage amendment"), which provides that "[t]he legislature shall have the power to reserve marriage to opposite-sex couples."  Plaintiffs assert that these two laws (together, "Hawaii's marriage laws") violate the Equal Protection and Due Process Clauses of the United States Constitution.  Am. Compl. ¶¶ 94-104.

On February 21, 2012, Defendant Fuddy and Defendant Abercrombie filed separate answers to the Amended Complaint. Doc. Nos. 9 & 10.  In his answer, Defendant Abercrombie stated that he "admits that to the extent HRS § 572-1 allows opposite sex couples, but not same sex couples, to get married, it violates the Due Process Clause and Equal Protection Clause of the United States Constitution."  Doc. No. 9, at 2.  In Defendant Fuddy's answer, she denies that § 572-1 and the marriage amendment violate the Constitution.  Doc. No. 10, at 6-7.

On March 1, 2012, Hawaii Family Forum ("HFF") filed a motion to intervene in this case as a defendant.  Doc. No. 15. HFF also filed a proposed answer denying that Hawaii's marriage laws are unconstitutional.  Doc. No. 16.  On May 2, 2012, the Court granted HFF's motion to intervene.  Doc. No. 43.

On June 15, 2012, Defendant Fuddy filed a motion for

8

summary judgment ("Defendant Fuddy's Motion"), accompanied by a supporting memorandum ("Fuddy's Mot. Mem.") and a concise statement of facts ("Fuddy's CSF").  Doc. Nos. 63 & 64.  The same day, Plaintiffs filed a motion for summary judgment ("Plaintiffs' Motion"), accompanied by a supporting memorandum ("Pls.' Mot. Mem.") and concise statement of facts ("Pls.' CSF").  Doc. Nos. 65 & 66.  Also on June 15, 2012, HFF filed a motion for summary judgment and to dismiss Defendant Abercrombie ("HFF's Motion"), accompanied by a supporting memorandum ("HFF's Mot. Mem.") and a concise statement of facts ("HFF's CSF").  Doc. Nos. 67 & 68.

On June 29, 2012, Defendant Abercrombie filed a countermotion for partial summary judgment ("Abercrombie's Countermotion").  Doc. No. 92.  Defendant Abercrombie filed a single memorandum in support of the Countermotion, in response to Plaintiffs' Motion, and in opposition to HFF and Defendant Fuddy's motions ("Abercrombie's Mot. Mem.").  Id.  Defendant Abercrombie also filed a concise statement of facts in support of the Countermotion ("Abercrombie's CSF"), a response to Defendant Fuddy's CSF, a response to HFF's CSF, and a response to Plaintiffs' CSF.  Doc. Nos. 89-91, 93.

On June 29, 2012, Defendant Fuddy filed an opposition to Plaintiffs' Motion ("Fuddy's Opp'n"), a response to Plaintiffs' CSF, and a statement of no opposition to HFF's Motion.  Doc. Nos. 78-80.  The same day, HFF filed an opposition

to Plaintiffs' Motion ("HFF's Opp'n"), a response to Plaintiffs' CSF, and a statement of no opposition to Defendant Fuddy's Motion.  Doc. Nos. 82, 84, & 85.

Plaintiffs filed a single memorandum in opposition to HFF and Defendant Fuddy's motions on June 29, 2012 ("Pls.' Opp'n").  Doc. No. 86.  Plaintiffs also filed a combined response to Defendant Fuddy's CSF and HFF's CSF ("Pls.' Resp. to CSFs"). Doc. No. 87.

On June 29, 2012, Equality Hawaii and Hawaii LGBT Legal Association ("Equality Hawaii") filed a motion for leave to file brief of amici curiae.  Doc. No. 83.  Equality Hawaii submitted a proposed brief in support of Plaintiffs' Opposition ("Equality Hawaii's Br.").[1/]  Id.  On July 2, 2012, the Court granted Equality Hawaii's Motion.  Doc. No. 94.

On July 10, 2012, Defendant Fuddy filed a response to Defendant Abercrombie's CSF and a combined memorandum in opposition to Defendant Abercrombie's Countermotion and reply to Plaintiffs' Opposition ("Fuddy's Reply").  Doc. Nos. 99 & 100. On July 10, 2012, HFF filed a combined memorandum opposing Defendant Abercrombie's Countermotion and replying to Plaintiffs' Opposition ("HFF's Reply"), along with a response to Defendant Abercrombie's CSF.  Doc. Nos. 101 & 102.  Also on July 10, 2012,

---

[1/]Plaintiffs joined the position set forth by Hawaii Equality in their brief.  See Pls.' Opp'n 4.

10

Plaintiffs filed a reply to HFF's Opposition ("Pls.' Reply to HFF"), a reply to Defendant Fuddy's Opposition ("Pls.' Reply to Fuddy"), and a statement of no opposition to Defendant Abercrombie's Countermotion.  Doc. Nos. 103-05.  On July 17, 2012, Defendant Abercrombie filed a reply in support of his countermotion ("Abercrombie's Reply").  Doc. No. 108.

On July 24, 2012, the Court held a hearing on Plaintiffs' Motion, Defendant Fuddy's Motion, HFF's Motions, and Defendant Abercrombie's Countermotion.

## FACTUAL BACKGROUND

### I.   Same-Sex Marriage in Hawaii

In Hawaii, same-sex marriage has been the subject of litigation and legislation for years.  In May 1991, several same-sex couples filed a lawsuit seeking a declaration that § 572-1 violated the equal protection, due process, and privacy components of the Hawaii Constitution in so far as it had been interpreted and applied by the Hawaii Department of Health to deny marriage licenses to same-sex couples. See Baehr v. Lewin, 852 P.2d 44, 48-49 (Haw. 1993).  The trial court rejected the plaintiffs' claims and granted a motion for judgment on the pleadings in favor of the defendants.  See id. at 52.

On appeal, the Hawaii Supreme Court, relying on federal case law, held that there is no fundamental right to marriage for same-sex couples under the Hawaii Constitution "arising out of

11

the right to privacy or otherwise." <u>Id.</u> at 57.  A plurality of the Hawaii Supreme Court held that the Hawaii statute restricting marriage to opposite-sex couples discriminates on the basis of sex, which constitutes a suspect category for purposes of equal protection analysis under the Hawaii Constitution.[2/]  <u>Id.</u> at 63-67.  Because the trial court had reviewed the marriage laws for a rational basis, the Hawaii Supreme Court remanded to the trial court to review it under the strict scrutiny standard that applies to suspect categories.  <u>Id.</u> at 68-69.

On December 3, 1996, on remand, the trial court ruled

---

[2/]In explaining its decision that statutes discriminating on the basis of sex are subject to strict scrutiny, the plurality in <u>Baehr</u> stated that:

> The equal protection clauses of the United States and Hawaii Constitutions are not mirror images of one another.  The fourteenth amendment to the United States Constitution somewhat concisely provides, in relevant part, that a state may not 'deny to any person within its jurisdiction the equal protection of the laws.' Hawaii's counterpart is more elaborate.  Article I, section 5 of the Hawaii Constitution provides in relevant part that '[n]o person shall . . . be denied the equal protection of the laws, <u>nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of</u> race, religion, <u>sex</u>, or ancestry.' (Emphasis added.)  Thus, by its plain language, the Hawaii Constitution prohibits state-sanctioned discrimination against any person in the exercise of his or her civil rights on the basis of sex.

<u>Baehr</u>, 852 P.2d at 59-60 (alteration in original).

that § 572-1 violated the equal protection component of the Hawaii Constitution.  See Baehr v. Miike, Civ. No. 91-13945, 1996 WL 694235 (Haw. Cir. Ct. Dec. 3, 1996).  Consequently, the court ordered that the state could not deny an application for a marriage license solely because the applicants were the same sex. Id. at *22.  The trial court suspended the implementation of his decision, however, to provide time for the case to be reviewed by the Hawaii Supreme Court.  See Baehr v. Miike, Civ. No. 91-13945, Doc. No. 190 (Dec. 12, 1996).

Meanwhile, in 1994, the legislature responded to the Hawaii Supreme Court's remand in Baehr by amending § 572-1 to clarify the legislature's intention that marriage should be limited to those of the opposite-sex.  Act of June 22, 1994, No. 217, 1994 Haw. Sess. Laws 526 (codified as amended at Haw. Rev. Stat. § 572-1).  The legislature did so by adding the following underlined language to § 572-1: "In order to make valid the marriage contract, which shall be only between a man and a woman. . . ."  Id.  The preface to the House bill, H.B. No. 2312, set forth the legislature's findings and purpose.  The legislature stated that the Hawaii Supreme Court's Baehr opinion "effaces the recognized tradition of marriage in this State and, in so doing, impermissibly negates the constitutionally mandated role of the legislature as a co-equal, coordinate branch of government." 1994 Hawaii Laws Act 217, H.B. 2312, § 1.  Specifically, it

states that "[p]olicy determinations of this nature are clearly for nonjudicial discretion, and are more properly left to the legislature or the people of the State through a constitutional convention."  Id.  The legislature additionally found that Hawaii's marriage licensing statutes "were intended to foster and protect the propagation of the human race through male-female marriages."  Id.

In 1997, the legislature passed a proposed amendment to the Hawaii Constitution to include a new section titled "Marriage" that states "[t]he legislature shall have the power to reserve marriage to opposite-sex couples."  See 1997 Haw. Sess. Laws 1247, H.B. 117, § 2.  The statement of intent in the final form of the bill for the marriage amendment provided: "[T]he unique social institution of marriage involving the legal relationship of matrimony between a man and a woman is a protected relationship of fundamental and unequaled importance to the State, the nation, and society."  Id. at 1246.  It reasserted that marriage should be dealt with by the legislature, not the courts: "[T]he question of whether or not to issue marriage licenses to couples of the same sex is a fundamental policy issue to be decided by the elected representatives of the people."  Id. at 1246-47.  Finally, it noted that the proposed amendment would not impose a permanent bar to same-sex marriage: "This constitutional measure is . . . designed . . . to ensure that the

14

legislature will remain open to the petitions of those who seek a change in the marriage laws, and that such petitioners can be considered on an equal basis with those who oppose a change in our current marriage statutes." Id. at 1247.

During the same legislative session, in April 1997, the legislature passed H.B. No. 118, the Reciprocal Beneficiaries Act, which granted persons who are legally prohibited from marrying the ability to register as reciprocal beneficiaries and obtain certain rights associated with marriage. See Hawaii Reciprocal Beneficiaries Act, 1997 Haw. Sess. Laws 383 (codified in part at H.R.S. § 572C). The findings under the Act state:

> The legislature finds that the people of Hawaii choose to preserve the tradition of marriage as a unique social institution based upon the committed union of one man and one woman. The legislature further finds that because of its unique status, marriage provides access to a multiplicity of rights and benefits throughout our laws that are contingent upon that status. As such, marriage should be subject to restrictions such as prohibiting respective parties to a valid marriage contract from standing in relation to each other. . . . However, the legislature concurrently acknowledges that there are many individuals who have significant personal, emotional, and economic relationships with another individual yet are prohibited by such legal restrictions from marrying. For example, two individuals who are related to one another, such as a widowed mother and her unmarried son, or two individuals who are of the same gender. Therefore, the legislature believes that certain rights and benefits presently available only to married couples should be made available to couples comprised of two

15

> individuals who are legally prohibited from
> marrying one another.

H.R.S. § 572C-2.

In November 1998, the people of Hawaii ratified the marriage amendment. See Haw. Const. art. I, § 23. Sixty-nine percent of the electorate voted for the amendment, twenty-nine percent voted against the amendment, and two percent left their ballots blank. See David Orgon Coolidge, The Hawaii Marriage Amendment: Its Origins, Meaning and Fate, 22 U. Haw. L. Rev. 19, 101 (2000).

Thereafter, on December 9, 1999, the Hawaii Supreme Court issued a four-page unpublished summary disposition of the appeal of the trial court's decision finding § 572-1 violated the Hawaii Constitution. Baehr v. Miike, No. 20371, 1999 Haw. LEXIS 391 (Haw. Dec. 9, 1999). The Hawaii Supreme Court held that the case was moot in light of the marriage amendment. Id. at *8. Specifically, the court explained: "The marriage amendment validated HRS § 572-1 by taking the statute out of the ambit of the equal protection clause of the Hawaii Constitution, at least insofar as the statute, both on its face and as applied, purported to limit access to the marital status to opposite-sex couples." Id. at *6. The court elaborated that "whether or not in the past it was violative of the equal protection clause in the foregoing respect, HRS § 572-1 no longer is. In light of the marriage amendment, HRS § 572-1 must be given full force and

16

effect." <u>Id.</u> at *6-7.

After several failed attempts, in 2011, the legislature passed a civil unions bill.  <u>See</u> H.R.S. § 572B.  On February 23, 2011, Governor Abercrombie signed the bill into law (the "civil unions law").  <u>See</u> B.J. Reyes, <u>Hawaii Now Seventh State to Legalize Civil Unions</u>, Star Advertiser (Feb. 23, 2011, 2:10 PM HST), www.staradvertiser.com/news/breaking/116776119.html?id=1167 76119.  Pursuant to H.R.S. § 572B-2, which took effect on January 1, 2012, a person is eligible to enter into a civil union if the person is:

> (1) Not a partner in another civil union or a spouse in a marriage
>
> (2) At least eighteen years of age; and
>
> (3) Not related to the other proposed partner in the civil union, as provided in section 572B-3.

H.R.S. § 572B-2, as amended by 2012 Haw. Laws Act 267 (H.B. 2569).[3/]  The civil unions law gives partners to a civil union all of the same state legal rights granted to married couples.[4/]

---

[3/]On July 6, 2012, the legislature passed amendments to the civil unions law for "additional clarification to minimize confusion and aid in the proper interpretation of" the civil unions law.  <u>See</u> 2012 Haw. Laws Act 267, § 1 (H.B. 2569).

[4/]The civil unions law states:

> Partners to a civil union lawfully entered into pursuant to this chapter shall have all the same rights, benefits, protections, and responsibilities under law, whether derived
>
> (continued...)

<u>See</u> H.R.S. § 572B-9.

## II.  Same-Sex Marriage Nationwide

Hawaii is not alone in the political and legal debate over official recognition of same-sex relationships.  The right to same-sex marriage has been established through litigation in Iowa, Connecticut, Massachusetts, and California.  <u>See</u> <u>Varnum v. Brien</u>, 763 N.W.2d 862 (Iowa 2009) (holding state statute limiting civil marriage to opposite-sex couples violated the Iowa Constitution's equal protection clause); <u>Kerrigan v. Comm'r of Pub. Health</u>, 957 A.2d 407 (Conn. 2008) (holding Connecticut laws restricting civil marriage to opposite-sex couples violated the equal protection rights of the Connecticut Constitution); <u>Goodridge v. Dep't of Pub. Health</u>, 798 N.E.2d 941 (Mass. 2003) (holding that licensing statute which did not provide for same-sex marriage violated the equal protection and due process liberty principles of the Massachusetts Constitution); <u>Perry v. Brown</u>, 671 F.3d 1052 (9th Cir. 2012) (holding California's constitutional amendment banning same-sex marriage violated the United States Constitution in the unique circumstances of same-

---

[4/](...continued)
     from statutes, administrative rules, court
     decisions, the common law, or any other
     source of civil law, as are granted to those
     who contract, obtain a license, and are
     solemnized pursuant to chapter 572.

H.R.S. § 572B-9.

sex marriage in California).[5/]

New York, Washington D.C., New Hampshire, and Vermont, recognize same-sex marriage through legislative enactment.  See N.Y. Dom. Rel. Law § 10-a (McKinney 2011); D.C. Code § 46-401 (2010); N.H. Rev. Stat. Ann. § 457:1-a (2010); Vt. Stat. Ann. tit. 15, § 8 (2009).  Washington recently passed legislation allowing same-sex marriage.  See Act of Feb. 13, 2012, 2012 Wash. Legis. Serv. ch. 3 (S.S.B. 6239) (West).  In March 2012, Maryland's governor signed a measure legalizing same-sex marriage.  See John Wagner, Md. Marriage Petitioners Told of Success, The Washington Post (July 10, 2012, 4:23 PM ET), http://www.washingtonpost.com/blogs/maryland-politics/post/md-marriage-petitioners-told-of-success/2012/07/10/gJQAqVBIbW_blog.html. The law is scheduled to take effect in January 2013.  See id. The laws in Washington and Maryland are subject to voter referendum in November 2012.  See id.; Michael Winter, November referendum blocks Wash. same-sex marriage law, USAToday (June 6, 2012, 10:28 PM), http://content.usatoday.com/communities/ondeadline/post/2012/06/november-referendum-blocks-wash-same-sex-

---

[5/]The Court notes that in Perry, the Ninth Circuit stayed its decision pending issuance of the mandate.  See Perry, 671 F.3d at 1098 n.27.  On June 5, 2012, the Ninth Circuit denied a petition for rehearing en banc.  See Perry v. Brown, 681 F.3d 1065 (9th Cir. 2012).  The proponents of Proposition 8 filed a petition for certiorari with the Supreme Court on July 30, 2012. See Perry, No. 10-16696, Doc. No. 427 (9th Cir.).

marriage-law/1#.T_3ekRehQWI.

The New Jersey legislature recently adopted legislation to legalize same-sex marriage, but Governor Chris Christie vetoed the legislation and there were insufficient votes to override the veto.  See Garden State Equality v. Dow, 2012 WL 540608, at *9 n.8 (N.J. Super. L. Feb. 21, 2012) (unpublished).  Governor Christie called for the legislature to put a referendum on same-sex marriage on the ballot in November 2012, stating: "An issue of this magnitude and importance, which requires a constitutional amendment, should be left to the people of New Jersey to decide." Kate Zernike, Christie Keeps His Promise to Veto Gay Marriage Bill, The New York Times (February 17, 2012), http://www.nytimes. com/2012/02/18/nyregion/christie-vetoes-gay-marriage-bill.html. Shortly after Governor Christie's veto, Garden State Equality, an advocacy organization, seven same-sex couples, and ten of the couples' children filed suit against state officials asserting that the New Jersey Civil Union Act violates the Fourteenth Amendment.  See Garden State Equality, 2012 WL 540608, at *2, 10.

In addition to Hawaii, states that recognize civil unions (or their equivalent) are Delaware, Illinois, Rhode Island, Nevada, and Oregon.[6/]  See Del. Code Ann. tit. 13 §§ 201-

---

[6/]Same-sex couples in Nevada have filed suit against state officials asserting that Nevada's marriage laws violate the United States Constitution.  A defendant, the Nevada Governor, has filed a motion to dismiss which is scheduled to be heard on August 10, 2012.  See Sevcik v. Sandoval, Civ. No. 12-00578 (D. (continued...)

217 (2011); 750 Ill. Comp. Stat. Ann. 75/1 (West 2011); R.I. Gen. Laws § 8-3-19 (2009); Nev. Rev. Stat. § 122A.010-.510 (2009); Or. Rev. Stat. § 106.300, et seq. (2008).  Maine provides for limited domestic partnerships without clearly granting marital privileges to partners.  See Me. Rev. Stat. tit. 22 § 2710 (2009).  In Maine, voters will vote on an initiative to approve same-sex marriage in November 2012.  See Katharine Q. Seelye, Gay Marriage Again on Ballot in Maine, The New York Times (June 24, 2012), http://www.nytimes.com/2012/06/25/us/politics/second-time-around-hope-for-gay-marriage-in-maine.html.

    Thus, thirty-eight states have a statute and/or constitutional provision limiting marriage to relationships between a man and woman.  See National Conference of State Legislatures, Defining Marriage: Defense of Marriage Acts and Same-Sex Marriage Laws (June 2012), http://www.ncsl.org/issues-research/human-services/same-sex-marriage-overview.aspx.  Of these states, twenty-nine have placed the limitation in their state constitutions (twenty-six of these have statutes adopting the limitation).  See id.  A further nine states have statutory language restricting marriage to opposite-sex couples.[7]  See id.

---

    [6]/(...continued)
Nev. April 10, 2012).

    [7]/These calculations do not include Washington and Maryland, where the laws adopting same-sex marriage will be put before voter referendum in November 2012 or California, where the Ninth Circuit invalidated Proposition 8 in Perry.

### III. Federal Defense of Marriage Act

The Federal Government has also been involved in the social and political dispute over same-sex marriage.  In 1996, Congress passed, and President Clinton signed into law, the Defense of Marriage Act ("DOMA").  DOMA has two basic provisions.  One provision is that no state is required to give effect to a relationship between same-sex individuals that is treated as marriage under the laws of another state ("Section 2").  28 U.S.C. § 1738C.  The other is that in determining the meaning of any federal law or federal administrative decision, "the word 'marriage' means only a legal union between one man and one woman as husband and wife" ("Section 3").  1 U.S.C. § 7.  The General Accounting Office estimated in 2004 that DOMA affects the implementation of 1,138 federal laws.  See Letter from Dayna K. Shah, Assoc. Gen. Counsel, GAO, to Bill Frist, Majority Leader, U.S. Senate (Jan. 23, 2004), http://www.gao.gov/new.items/d04353 r.pdf.

Challenges to the constitutionality of DOMA have been filed in several courts.  In the midst of this DOMA litigation, in February 2011, Attorney General Eric Holder announced that the government would no longer defend Section 3 of DOMA.  See Letter from Eric H. Holder, Jr., Att'y Gen., to Rep. John A. Boehner, Speaker of the House, Letter to Congress on Litigation Involving the Defense of Marriage Act (Feb. 23, 2011), http://www.justice. gov/opa/pr/2011/February/11-ag-223.html.  Attorney General Holder

22

stated that the Executive Branch would, however, continue to enforce Section 3.  Id.

Only one Court of Appeals, the First Circuit, has ruled on the constitutionality of DOMA.  In Massachusetts v. U.S. Dep't of Health & Human Servs., 682 F.3d 1 (1st Cir. 2012) ("Mass. v. HHS"), the First Circuit held Section 3 of DOMA violated the Equal Protection Clause.[8]  Three DOMA cases are currently on appeal, two in the Ninth Circuit and one in the Second Circuit, from decisions holding Section 3 is unconstitutional.[9]  See Golinski v. U.S. Office of Pers. Mgmt., Nos. 12-15388 & 12-15409 (9th Cir.);[10] Dragovich v. U.S. Dep't of the Treasury, No. 12-16461 (9th Cir.); Windsor v. United States, Nos. 12-2335 & 12-2435 (2d Cir.).[11]

Four district courts have held that Section 3 is constitutional.  See Lui v. Holder, Civ. No. 11-01267, Doc. No.

---

[8]BLAG filed a petition for certiorari in Mass. v. HHS on June 29, 2012.  See Fuddy's Response to Abercrombie's CSF, Ex. 5.

[9]The Court notes that on July 31, 2012 a district court in the District of Connecticut held Section 3 of DOMA was unconstitutional.  See Pedersen v. U.S. Office of Pers. Mgmt., Civ. No. 10-1750, Doc. No. 116.  No party has appealed thus far.

[10]On July 16, 2012, the plaintiff in Windsor v. United States, Nos. 12-2335 (2d Cir.), who won at the district court, filed a petition for certiorari before judgment to the Supreme Court.  See id. at Doc. No. 89.

[11]On July 3, 2012, the Solicitor General filed a petition for certiorari before judgment in Golinski v. United States Office of Personnel Managment, Nos. 12-15409, Doc. No. 77 (July 3, 2012).

38 (C.D. Cal. Sept. 28, 2011); <u>Torres-Barragan v. Holder</u>, Civ. No. 09-08564, Doc. No. 24 (C.D. Cal. Apr. 30, 2010); <u>Wilson v. Ake</u>, 354 F. Supp. 2d 1298 (M.D. Fla. 2005); <u>Hunt v. Ake</u>, No. 04-1852, Doc. No. 35 (M.D. Fla. Jan. 20, 2005).  One bankruptcy court in the Ninth Circuit has held Section 3 is constitutional, <u>see In re Kandu</u>, 315 B.R. 123 (Bankr. W.D. Wash. 2004), and one has held DOMA is unconstitutional.  <u>See In re Balas</u>, 449 B.R. 567 (Bankr. C.D. Cal. 2011).  There are several other DOMA cases pending in district courts around the country.

## IV.  The Parties in This Case

Plaintiffs Natasha N. Jackson and Janin Kleid are two women in a relationship together who sought and were denied a marriage license from the Department of Health, State of Hawaii. Am. Compl. ¶¶ 3-4.  Plaintiff Gary Bradley is a man who entered into a civil union with his male partner under the civil unions law.  <u>Id.</u> ¶ 9.  Bradley asserts that he entered into a civil union and did not seek a marriage license because it was futile for him to do so under § 572-1.  <u>Id.</u> ¶ 10.  Plaintiffs challenge § 572-1 and the marriage amendment as unconstitutional under the federal Constitution, asserting <u>inter alia</u>, that "Hawaii's 'solution' of the problem of giving legal recognition to the relationships of same-sex couples without permitting them to marry, has not created equality but a system as pernicious and damaging in its effects as any system of segregation."  <u>Id.</u> ¶ 78.

Plaintiffs seek summary judgment on their federal equal

protection violation claim.  Defendant Fuddy and HFF seek summary
judgment in their favor on Plaintiffs' federal equal protection
and due process claims.  HFF also seeks to dismiss Defendant
Abercrombie from this action.  Defendant Abercrombie seeks a
summary judgment that heightened scrutiny should apply to
Plaintiffs' claims and argues that § 572-1 violates the
Constitution.[12]

## STANDARD

In general, the purpose of summary judgment is to
identify and dispose of factually unsupported claims and
defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24
(1986).  Summary judgment is therefore appropriate if "the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(a).
"By its very terms, this standard provides that the mere
existence of some alleged factual dispute between the parties
will not defeat an otherwise properly supported motion for
summary judgment; the requirement is that there be no genuine
issue of material fact."  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 247-48 (1986).

---

[12]Defendant Abercrombie states that he "defends the
constitutionality (but not the wisdom) of Article I, Section 23,
of the Hawaii Constitution, because [he] construes that section
as establishing only that nothing in the Hawaii State
Constitution requires the Legislature to allow same sex
marriage."  Abercrombie's Mot. Mem. 4.

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[13/]  <u>Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n</u>, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting <u>Anderson</u>, 477 U.S. at 248).  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citing <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. <u>See</u> <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987).  The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323; <u>Miller v. Glenn Miller Prods.</u>, 454 F.3d 975, 987 (9th Cir. 2006).  This is

---

[13/]Disputes as to immaterial facts do "not preclude summary judgment."  <u>Lynn v. Sheet Metal Workers' Int'l Ass'n</u>, 804 F.2d 1472, 1483 (9th Cir. 1986).  As explained in more detail <u>infra</u>, because of the deferential nature of the applicable rational basis review, and the fact that the state is not required to produce any evidence under such review, disputes of fact that might normally preclude summary judgment in other civil cases, will generally not be substantively material in such review.  <u>See</u> <u>Vance v. Bradley</u>, 440 U.S. 93, 110-11 (1979).

true even when a court is presented with cross-motions for summary judgment; each party must meet this burden. <u>High Tech Gays v. Defense Indus. Sec. Clearance Office</u>, 895 F.2d 563, 574 (9th Cir. 1990).  The moving party may do so with affirmative evidence or by "'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. <u>See id.</u> at 324; <u>Matsushita Elec.</u>, 475 U.S. at 586; <u>Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987). Rather, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."[14/]  <u>Anderson</u>, 477 U.S. at 250.  Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately

---

[14/] "A party asserting that a fact cannot be or is genuinely disputed must support the assertion," and can do so in either of two ways: by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.

## DISCUSSION

The issue in this case is whether Hawaii's marriage laws, which define marriage as a union between a man and woman, violate the Due Process and Equal Protection Clauses of the United States Constitution.  As an initial matter, the Court will discuss HFF's argument that Defendant Abercrombie is not a proper party to this case and must be dismissed.  The Court will then discuss the Supreme Court's summary dismissal in Baker v. Nelson, 409 U.S. 810 (1972) (mem.), which remains binding authority and dictates that Hawaii's marriage laws are constitutional.  The Court then conducts an alternative analysis on the merits, concluding that Hawaii's marriage laws do not violate the Equal Protection or Due Process Clauses.

## I.   Defendant Abercrombie's Status as a Party

HFF asserts that Defendant Abercrombie is not a proper party to this case and must be dismissed on Eleventh Amendment Sovereign Immunity and Article III standing grounds.  HFF's Mot. Mem. 37.  Specifically, HFF contends that the Governor does not administer Hawaii's marriage laws or maintain any control over the county clerks who issue marriage licenses, and accordingly the Governor is not a proper party in this case.  Id.  HFF also asserts that courts have routinely dismissed governors and other high level officials from lawsuits due to the lack of a sufficient connection to the alleged injury.  Id. at 38.

### A.    Sovereign Immunity

Defendant Abercrombie is sued in his official capacity as Governor of Hawaii.  Suits against a state officer in his official capacity, "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (internal quotations omitted).  Thus, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Id. at 166 (internal quotations omitted).  Eleventh Amendment Sovereign Immunity applies to bar claims brought against a state in federal court unless the state consents or Congress unequivocally abrogates the immunity under its Fourteenth Amendment authority. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99, 104 (1984).  Eleventh Amendment immunity is treated as an affirmative defense and can be expressly waived or forfeited if the State fails to assert it. See ITSI T.V. Prods., Inc. v. Agric. Ass'ns, 3 F.3d 1289, 1291 (9th Cir. 1993).

Defendant Abercrombie has explicitly waived Eleventh Amendment immunity with respect to prospective injunctive relief barring enforcement of § 572-1's ban on same-sex marriage. Abercrombie's Mot. Mem. 86.  HFF argues that Defendant Abercrombie has not shown that he has the authority to waive the state's sovereign immunity.  HFF's Reply 39-40.  The Supreme Court has noted that regardless of an official's authority with

29

respect to waiving sovereign immunity under state law, it "has

consistently found waiver when a state [official] . . . has

voluntarily invoked th[e] court's jurisdiction." Lapides v. Bd.

of Regents of Univ. Sys. of Ga., 535 U.S. 613, 514 (2002).  Here,

Defendant Abercrombie has expressly waived sovereign immunity and

sought summary judgment in Plaintiffs' favor.  Thus, he has

"voluntarily invoked" the Court's jurisdiction.  Moreover, HFF

has given the Court no reason to question the power of the

sitting governor, sued in his official capacity as head of the

state executive, to waive Hawaii's sovereign immunity.

        In any event, the decision to invoke sovereign immunity

belongs to the state.  State Police for Automatic Ret. Ass'n v.

Difava, 138 F. Supp. 2d 142, 147 (D. Mass. 2001) (citing Clark v.

Barnard, 108 U.S. 436, 447 (1883)).  Thus, HFF, a Defendant-

Intervenor, cannot force the state, through the governor sued in

his official capacity, to invoke its sovereign immunity.  See

Howard v. Food Lion, Inc., 232 F. Supp. 2d 585, 593 (M.D.N.C.

2002) (determining that the plaintiff could not assert an

Eleventh Amendment immunity defense on behalf of a state official

because "[t]he decision to invoke sovereign immunity belongs to

the state . . . and cannot be made by the opposing party");

Difava, 138 F. Supp. 2d at 147 (holding that a retirement

association could not force the State to invoke its Eleventh

Amendment immunity).[15]

   **B.   Article III**

          Article III provides that federal courts have the power

to resolve "Cases" or "Controversies."  Arizona Christian Sch.

Tuition Org. v. Winn, 131 S. Ct. 1436, 1441 (U.S. 2011).  "To

obtain a determination on the merits in federal court, parties

seeking relief must show that they have standing under Article

III of the Constitution."  Id. at 1440.  To satisfy Article III

standing, at a minimum, (1) the party seeking relief must have

suffered an injury in fact, (2) there must be "a causal

connection between the injury and the conduct complained," and

(3) it must be likely the injury will be redressed by a favorable

decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61

(1992).

          In Citizens for Equal Protection v. Bruning, 455 F.3d

859 (8th Cir. 2006), the Eighth Circuit held that advocates for

gay marriage had standing to challenge a state constitutional

amendment stating that only marriage between a man and a woman

was valid against the Attorney General and Governor of Nebraska.

-------

          [15]Because HFF may not assert the state's sovereign immunity,
the Court need not consider whether the exception to sovereign
immunity for state officials sued in their official capacity for
declaratory and injunctive relief set forth in Ex Parte Young,
209 U.S. 123 (1908), applies to Defendant Abercrombie.  See,
e.g., Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908,
919 (9th Cir. 2004) (explaining that for the Ex Parte Young
exception to sovereign immunity to apply, there must be "'some
connection' between a named state officer and enforcement of a
challenged state law").

Id. at 863-64.  It determined that "when the government erects a barrier making it more difficult for members of a group to obtain a benefit, '[t]he "injury in fact" . . . is the denial of equal treatment resulting from the imposition of the barrier.'"  Id. at 863 (8th Cir. 2006) (alteration in original) (quoting N.E. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. Jacksonville, 508 U.S. 656, 666 (1993)).  The Eighth Circuit then addressed the connection of the injury to the Attorney General and Governor and explained that they both had broad powers to enforce the State's Constitution and statutes, which includes policing compliance with the constitutional amendment at issue.  Id.  The Eighth Circuit thus concluded that the Governor and the Attorney General had "some connection with the enforcement" of the amendment, which satisfied Article III standing requirements.  Id.

Here, Plaintiffs assert that Hawaii's marriage laws are unconstitutional.  Plaintiffs Kleid and Jackson applied for and were denied a marriage license.  Plaintiff Bradley entered into a civil union with his same-sex partner and did not apply for a marriage license because it was futile in light of § 572-1.  This injury – the inability to obtain marriage licenses available to opposite-sex couples – is causally related to Hawaii's restriction of marriage to unions between a man and a woman.  Defendant Abercrombie, as chief executive of Hawaii, is "responsible for the faithful execution of [Hawaii's] laws." Haw. Const. art. 5, §§ 1, 5.  Plaintiffs' injuries thus "have

some connection" to Defendant Abercrombie.  In the event of a favorable decision, Defendant Abercrombie can redress Plaintiffs' injuries by ordering Defendant Fuddy to issue licenses to same-sex couples or replacing her with a director who will do so. Accordingly, Plaintiffs have standing to seek relief from Defendant Abercrombie.

The Court further notes that to dismiss Defendant Abercrombie as an improper party on Article III grounds would call into question the jurisdiction of numerous cases challenging state laws and constitutional amendments that have been brought against a governor in his or her official capacity.  See, e.g., Romer v. Evans, 517 U.S. 620 (1996) (determining merits of suit against governor, state attorney general, and state, challenging the validity of an amendment to Colorado Constitution); Diaz v. Brewer, 656 F.3d 1008 (9th Cir. 2012) (determining merits of suit against, inter alia, Arizona Governor, brought by lesbian and gay state employees challenging the constitutionality of an Arizona statute limiting eligibility for family health care coverage to married heterosexual employees).  Furthermore, in a decision involving whether the intervenors in Perry had standing to appeal, Judge Reinhardt, concurring, noted that "the problem of standing would have been eliminated had the Governor or the Attorney General defended the initiative, as is ordinarily their obligation." Perry v. Schwarzenegger, 628 F.3d 1191, 1201 (9th Cir. 2011) (Reinhardt, J., concurring).  In the decision striking

33

Proposition 8, the Ninth Circuit again discussed Article III standing and noted that "[w]hether the defendant is the state or a state officer, the decision to assert the state's own interest in the constitutionality of its laws is most commonly made by the state's executive branch — the part of state government that is usually charged with enforcing and defending state law." Perry, 671 F.3d at 1071.

Accordingly, the Court concludes that Defendant Abercrombie is a proper party and thus denies HFF's motion to dismiss him from this action.

HFF further asserts in its reply that Defendant Abercrombie does not have standing to seek summary judgment and instead should have filed a "response" to Plaintiffs' Motion. HFF's Reply 46-48 & n.21.  Defendant Abercrombie replies that he does not seek affirmative relief against Defendant Fuddy but rather asks that strict or heightened scrutiny be applied to Plaintiffs' due process and equal protection claims. Abercrombie's Reply 38.  He further argues that in any event, there is nothing in Article III prohibiting him from seeking affirmative relief.  Id.  Specifically, he asserts that he has a direct stake in the outcome of the case which provides concrete adverseness.  Id.

The Court need not consider whether it has jurisdiction over Defendant Abercrombie's Countermotion because it is rendered moot by the Court granting summary judgment in favor of Defendant

34

Fuddy and HFF.  The Court thus denies it as moot.  Because the

Court would like the broadest view of the issues possible, it

will consider Defendant Abercrombie's Countermotion as a brief in

support of Plaintiff's Motion and in opposition to Fuddy's Motion

and HFF's Motion just as it permitted HFF to intervene and Hawaii

Equality to file an amici brief.

## II.   <u>Baker v. Nelson</u>

HFF and Defendant Fuddy assert that the questions

presented by this case were decided by the Supreme Court in

<u>Baker</u>, which they argue is binding precedent.  HFF's Mot. Mem. 4.

In <u>Baker</u>, the Minnesota Supreme Court held that a Minnesota

statute that defined marriage as a union between persons of the

opposite-sex did not violate the First, Eighth, Ninth, and

Fourteenth Amendments of the federal Constitution.  <u>See</u> <u>Baker v.</u>

<u>Nelson</u>, 191 N.W.2d 185 (Minn. 1971), <u>appeal dismissed</u>, 409 U.S.

810 (1972).  The Minnesota Supreme Court rejected the plaintiffs'

claims determining, <u>inter alia</u>, that a right to marry without

regard to the sex of the parties is not a fundamental right.  <u>Id.</u>

at 186-87.  The court further determined that the Equal

Protection Clause was "not offended by the state's classification

of persons authorized to marry" and that there was "no irrational

or invidious discrimination."  <u>Id.</u> at 187.  The United States

Supreme Court summarily dismissed the plaintiffs' appeal "for

want of a substantial federal question."  <u>Baker</u>, 409 U.S. 810.

Per procedural rules in effect at the time, the summary

35

dismissal of a state supreme court decision constituted a decision on the merits.  See Hicks v. Miranda, 422 U.S. 332, 344 (1975).  Such dismissals "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions."  Mandel v. Bradley, 432 U.S. 173, 176 (1977).  "[U]nless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise. . . ."  Hicks, 422 U.S. at 344 (internal quotations omitted).

        "Summary actions . . . should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved."  Mandel, 432 U.S. at 176.  "Questions which merely lurk in the record are not resolved, and no resolution of them may be inferred."  Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 182-83 (1979) (internal quotations and citation omitted).  Thus, a summary dismissal is controlling precedent only if the issues in the two cases are sufficiently similar.  See Hicks, 422 U.S. at 345 n.14.  The "precedential value of a dismissal for want of a substantial federal question extends beyond the facts of the particular case to all similar cases."  Bates v. Jones, 131 F.3d 843, 848 (9th Cir. 1997) (internal quotations omitted).

        The following two questions were presented to the

36

Supreme Court in <u>Baker</u> are relevant here:

> 1.  Whether [Minnesota's] refusal to sanctify appellants' marriage deprives appellants of their liberty to marry and of their property without due process of law under the Fourteenth Amendment.
>
> 2.  Whether [Minnesota's] refusal, pursuant to Minnesota marriage statutes, to sanctify appellants' marriage because both are of the male sex violates their rights under the equal protection clause of the Fourteenth Amendment.

HFF's Mot. Ex. 10, <u>Baker v. Nelson</u>, Jurisdictional Stmt., No. 71-1027, at 3 (Feb. 11, 1971) [hereinafter <u>Baker</u> Jurisdictional Stmt.].[16]

Plaintiffs assert that because of doctrinal changes in the Supreme Court's Due Process Clause analysis and factual differences between this case and <u>Baker</u>, this Court is not bound by the Supreme Court's summary dismissal. Pls.' Opp'n 7-8. Particularly, Plaintiffs rely on the Supreme Court's decision in <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003).

The Supreme Court has not explicitly or implicitly overturned its holding in <u>Baker</u> or provided the lower courts with any reason to believe that the holding is invalid. <u>See Perry</u>, 671 F.3d at 1099 n.1 (N.R. Smith, J., concurring in part and dissenting part) (concluding the Supreme Court cases following

---

[16] The third question, not at issue here, was: "[w]hether Minnesota's] refusal to sanctify appellants' marriage deprives appellants of their right to privacy under the Ninth and Fourteenth Amendments." <u>Baker</u> Jurisdictional Stmt. 3.

Baker do not suggest any doctrinal developments indicating Baker is no longer good law); Wilson v. Ake, 354 F. Supp. 2d 1298, 1305-06 (M.D. Fla. 2005) (same); but see In re Kandu, 315 B.R. at 138 (concluding Baker was not binding on a challenge to DOMA because of different facts and "doctrinal developments" indicated it was no longer binding).  Lawrence had no such effect.

In Lawrence, the Supreme Court expressly stated that "[t]he present case does not involve . . . whether the government must give formal recognition to any relationship that homosexual persons seek to enter." Lawrence, 539 U.S. at 578.  "In so limiting the scope of its decision, the court in Lawrence implicitly recognized that it is one thing to conclude that criminalizing private, consensual homosexual conduct between adults violates due process; it is entirely another matter to conclude that the constitution requires the redefinition of the institution of marriage to include same sex couples." Kerrigan, 957 A.2d at 513.  Additionally, in concurrence, Justice O'Connor stated that the sodomy law "as applied to private, consensual conduct is unconstitutional under the Equal Protection Clause does not mean that other laws distinguishing between heterosexuals and homosexuals would similarly fail under rational basis review." Lawrence, 539 U.S. at 585 (O'Connor, J., concurring).  She continued that Texas could not assert a legitimate interest for the law, "such as . . . preserving the traditional institution of marriage." Id.

Romer v. Evans, 517 U.S. 620 (1996), also does not indicate that Baker is no longer valid because in Romer, the Supreme Court applied rational basis scrutiny to laws that discriminated on the basis of sexual orientation.  Id. at 631-35. Consequently, there are no doctrinal changes in Supreme Court jurisprudence implying that Baker is no longer binding authority. Thus, the binding effect of Baker hinges on whether the issues in this case were presented to and necessarily decided by the Supreme Court.[17/]

### A.    The Due Process Claim

In Baker, two male plaintiffs were not allowed to marry each other pursuant to Minnesota law solely because both were of the same sex.  See Baker 191 N.W.2d at 185.  The Supreme Court determined that the two plaintiffs' claim that they had a fundamental right to marry each other did not raise a substantial federal question.  Here, Plaintiffs also are not allowed to marry their partners solely because they are of the same sex and

---

[17/]In Perry, the majority stated it was unnecessary to consider the binding effect of Baker because it was considering an entirely different issue "squarely controlled by Romer."  671 F.3d at 1082 n.14.  The First Circuit recently did consider the issue and recognized that "Baker does not resolve our own [DOMA] case but it does limit the arguments to ones that do not presume or rest on a constitutional right to same sex marriage."  Mass. v. HHS, 682 F.3d at 8; see also Wilson, 354 F. Supp. 2d at 1304-05 (holding Baker required dismissal of the plaintiffs' claims that DOMA and a state law banning the recognition of same sex marriage violated the Constitution); Morrison v. Sadler, 821 N.E. 2d 15, 19-20 (Ind. App. 2005) (noting that Baker was binding precedent indicating that state bans on same-sex marriage do not violate the Constitution).

Plaintiffs claim that they have a fundamental right to do so. Am. Compl. ¶ 61.  Plaintiffs' due process claim was thus presented to and necessarily decided by the Supreme Court in Baker.  See Perry, 671 F.3d at 1099 n.1 (N.R. Smith, J., concurring in part and dissenting part) ("Whether prohibiting marriage by same-sex couples violates due process was an issue presented and decided in Baker.").  Consequently, the Court is bound by Baker and Plaintiffs' due process claim fails.

**B.  The Equal Protection Claim**

Defendant Abercrombie asserts that the Baker plaintiffs presented a claim of gender discrimination and thus denying marriage on account of sexual orientation was not the precise issue presented in Baker.  Abercrombie's Mot. Mem. 9.  Plaintiffs and Defendant Abercrombie assert because Hawaii has a civil unions law in contrast to Minnesota at the time of Baker, the facts are sufficiently different such that their Equal Protection claim is not controlled by Baker.  Pls.' Opp'n 16-17; Abercrombie's Reply 3.

Defendant Abercrombie's contention that Baker asserted solely a gender discrimination is belied by the jurisdictional statement.  Although in the jurisdictional statement the plaintiffs assert that "[t]he discrimination in this case is one of gender," their claim is not limited to gender discrimination. Baker Jurisdictional Stmt. 16.  The plaintiffs also relied on the state's differing treatment based on their sexual orientation.

40

For example, the plaintiffs argued that "there is no
justification in law for the discrimination against <u>homosexuals</u>";
that "prejudice against <u>homosexuals</u> . . . is unlikely to be cured
until the public acknowledges that <u>homosexuals</u>, like all people,
are entitled to the full protection and recognition of the law";
and that "[c]hildless same sex couples . . . are 'similarly
circumstanced' to childless <u>heterosexual couples</u>." <u>Id.</u> at 7, 10,
16-17 (emphasis added).  The First Circuit recognized that the
plaintiffs in <u>Baker</u> raised an equal protection claim based on
sexual orientation discrimination, noting that holding that
sexual orientation classifications are subject to heightened
scrutiny would "imply[] an overruling of <u>Baker</u>." <u>Mass. v. HHS</u>,
682 F.3d at 9.

  Although the facts in this case are not identical to
those in <u>Baker</u>, the "precedential value of a dismissal for want
of a substantial federal question extends beyond the facts of the
particular case <u>to all similar cases</u>." <u>Wright v. Lane Cnty.
Dist. Court</u>, 647 F.2d 940, 941 (9th Cir. 1981) (emphasis added)
(citing <u>McCarthy v. Philadelphia Civil Serv. Comm'n</u>, 424 U.S.
645, 646 (1976)).  Both this case and <u>Baker</u> involve a challenge
to a state law that defines marriage as a union between a man and
a woman.  Hawaii's civil unions law, enacted subsequent to
Hawaii's marriage laws, is not challenged in this case.  Hawaii's
civil unions law did not take away any rights from same-sex

couples.  Rather, it extended rights that they had never previously possessed.

The plaintiffs in Baker argued that the Equal Protection Clause was violated because Minnesota's laws were based on invidious discrimination, arbitrary, capricious, unreasonable, and not rationally related to any governmental interest.  See Baker Jurisdictional Stmt. 14-15.  Plaintiffs make the same arguments in this case.  The Baker plaintiffs argued that the fact same-sex couples could raise children and that single persons could be adoptive parents supported their claims. Id.  Plaintiffs in this case make similar arguments.  Minnesota did not have an equivalent to Hawaii's marriage amendment. Hawaii's marriage amendment, however, commits the matter to the legislature and does not forbid same-sex marriage.  Moreover, the marriage amendment did not "take away" a preexisting right as the Hawaii Supreme Court has never held that same-sex couples have the right to marry.  Thus, this fact does not render Hawaii's marriage laws so different from Minnesota's at the time of Baker that it can be said the issues in this case were not before the Supreme Court.[18]

---

[18]/Judge N.R. Smith, concurring in part and dissenting in part in Perry, determined that the case "seem[ed] to be distinguishable from the precise issues presented and necessarily decided in Baker" for purposes of the Equal Protection Clause challenge.  671 F.3d 1052, 1099 (N.R. Smith, J., concurring in part and dissenting part).  He explained:

(continued...)

Consequently, the relevant facts of this case are
substantially similar to that raised in <u>Baker</u>, which necessarily
decided that a state law defining marriage as a union between a
man and woman does not violate the Equal Protection Clause.  This
issue did not merely "lurk in the record," but was directly
before the Supreme Court.  <u>Baker</u> is the last word from the
Supreme Court regarding the constitutionality of a state law
limiting marriage to opposite-sex couples and thus remains
binding on this Court.

In the alternative, Plaintiffs' claims fail on the
merits.

## III.  The Merits of Plaintiffs' Claims

Civil marriage is a public institution, created by law
to promote public policy and further social interest.  <u>See</u>
<u>Maynard v. Hill</u>, 125 U.S. 190, 213-14 (1888).  "Because of its

---

[18]/(...continued)
Unlike Minnesota, California granted same-sex couples
right to both the designation and the incidents of
marriage, before withdrawing the right of access to the
designation through Proposition 8.  Therefore, the
<u>constitutionality of withdrawing</u> from same-sex couples
the right of access to the designation of marriage does
not seem to be among the 'specific challenges' raised
in <u>Baker</u>.

<u>Id.</u> at 1100 (emphasis added).  As discussed above, Hawaii's
marriage laws did not take away the designation of marriage after
granting it to same-sex couples.  Additionally, Hawaii did not
enact its civil unions law until years after § 572-1 was amended
and the marriage amendment became operative.  Thus, Judge N.R.
Smith's conclusion does not apply here.

vital importance to society, while the people through their
governments have always encouraged marriage, they have always
regulated it.  Generally that has been at the state level."
Smelt v. Cnty. of Orange, 447 F.3d 673, 680 (9th Cir. 2006).
This state right to regulate marriage, "necessarily includes the
power to classify those persons who may validly marry."  Bruning,
455 F.3d at 867.  The Supreme Court has long recognized this
right.  In 1888, it stated: "Marriage . . . has always been
subject to the control of the legislature.  That body prescribes
the age at which parties may contract to marry, the procedure or
form essential to constitute marriage, the duties and obligations
it creates, its effects upon the property rights of both, present
and prospective, and the acts which may constitute grounds for
its dissolution."  Maynard, 125 U.S. at 205.

     Here, Plaintiffs argue that Hawaii's restriction on
same-sex marriage is outside the bounds of this longstanding
prerogative of states to classify who may marry.  The Court will
first discuss Plaintiffs, Defendant Abercrombie, and Equality
Hawaii's arguments that this case is controlled by Perry v. Brown
and Romer, followed by a discussion of the appropriate level of
scrutiny to apply to Plaintiffs' due process and equal protection
claims.  Finally, the Court conducts the applicable rational
basis review.

### A.   **Perry v. Brown**

In <u>Perry v. Brown</u>, 671 F.3d 1052 (9th Cir. 2012), relying exclusively on the history of same-sex marriage in California, the Ninth Circuit held that Proposition 8 violated the Equal Protection Clause of the U.S. Constitution.  Equality Hawaii asserts that <u>Perry v. Brown</u> controls this case and requires the Court to reject the rationales set forth for Hawaii's marriage laws.  Equality Hawaii's Br. 2.  Specifically, Equality Hawaii asserts that Proposition 8 is "remarkably similar" to the marriage amendment, "which led to a similar two-tiered scheme under Hawaii in which same-sex civil union partners have the identical benefits and burdens conferred upon married couples without the legal status of the term 'marriage.'"  <u>Id.</u> at 3.

Equality Hawaii contends that as with Proposition 8, the marriage amendment "stripped same-sex couples" of the protection against invidious sex discrimination under the Hawaii Constitution and their resulting presumptive entitlement to the legal status of marriage.  <u>Id.</u> at 3-4.  Equality Hawaii further asserts that the marriage amendment, like Proposition 8, "'constitutionalize[d]' the disability it imposed upon same-sex couples by selectively altering the structure of government decision-making to make it far more difficult for same-sex couples to achieve equal access to the status of marriage."  <u>Id.</u> at 6 (alteration in original).  Equality Hawaii contends that

45

these alleged similarities render <u>Perry</u> as directly governing this case.  <u>Id.</u>

Defendant Abercrombie asserts that this is a "take away" case controlled by <u>Perry</u>.  Abercrombie's Mot. Mem. 60.  He asserts that in <u>Baehr</u>, the Hawaii Supreme Court provided Hawaii same-sex couples "with the 'right' to same sex marriage absent the state's ability to satisfy strict scrutiny."  <u>Id.</u>  He states that Hawaii took that right away through a combination of the marriage amendment and "its maintenance of HRS § 572-1's man/woman requirement for marriage."  <u>Id.</u>

In <u>Perry</u>, the Ninth Circuit repeatedly asserted that its decision rested on the "unique and strictly limited effect of Proposition 8," <u>i.e.</u>, the California Supreme Court had extended the right to marry to same-sex couples, same-sex couples had married, California had a domestic partnership law giving same-sex couples rights and responsibilities identical to married spouses, and then the people passed a constitutional amendment taking away solely the right to have the designation of marriage. See <u>Perry</u>, 671 F.3d at 1064, 1076-77.  The Ninth Circuit specifically declined to consider "the broader question – the constitutionality of denying same-sex couples the right to marry."  <u>Id.</u> at 1064.  Hawaii's marriage laws do not have the same "unique and strictly limited effect" of Proposition 8.  A brief history of California's marriage laws sheds light on the

46

differences.

The California legislature made its understanding that marriage was limited to relationships between a man and a woman explicit by amending California's marriage statute in 1977.  Id. at 1065; see Cal. Stats. 1977, ch. 339, § 1.  In 2000, California adopted Proposition 22, an initiative statute, which provided that "[o]nly marriage between a man and a woman is valid or recognized in California."  Cal. Fam. Code § 308.5.  California had, however, created the designation "domestic partnership" for "two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring."  Cal. Stats. 1999, ch. 588, § 2 (codified at Cal. Fam. Code § 297(a)).  In 2008, the California Supreme Court, applying heightened scrutiny, held that California's marriage statutes violated equal protection principles and the due process component of the California Constitution.  See In re Marriage Cases, 183 P.3d 384 (Cal. 2008).

In response to this decision, California residents enacted Proposition 8, an initiative constitutional amendment, which would be equal in effect to other provisions of the California Constitution.  Perry, 671 F.3d at 1067.  A slim majority of voters (52.3 percent) approved Proposition 8, see id., which added a new provision to the California Constitution's Bill of Rights stating: "Only marriage between a man and a woman

47

is valid or recognized in California." Cal. Const. art. 1, § 7.5. The California Supreme Court subsequently rejected a challenge to Proposition 8 as an impermissible change to the California Constitution by an initiative measure, but held that the amendment was not retroactive and thus the approximately 18,000 same-sex marriages already performed in California before its enactment remained valid. See Strauss v. Horton, 207 P.3d 48, 121-22 (Cal. 2009). In making this determination, the California Supreme Court noted that after same-sex couples were granted the right to marriage, but before Proposition 8 was adopted, same-sex couples who married "acquired vested property rights as lawfully married spouses with respect to a wide range of subjects, including, among many others, employment benefits, interests in real property, and inheritances." Id. at 122.

There are several significant differences between California's Proposition 8 and Hawaii's marriage laws. Particularly, no same-sex couples ever had the right to marry in Hawaii. In Baehr, the Supreme Court held that strict scrutiny applied to the state's limitation of marriage to opposite-sex couples under the equal protection principles of the Hawaii Constitution, but remanded for the trial court to apply such scrutiny in the first instance. Baehr v. Lewin, 852 P.2d at 68. Although the trial court found such limitation could not withstand heightened scrutiny on remand, relief was stayed

48

pending appellate review.  <u>Baehr v. Miike</u>, Civ. No. 91-13945, Doc. No. 190 (Order Granting Defendant State of Hawaii's Motion to Stay Injunction Pending Appeal) (Dec. 12, 1996).  Under Hawaii law, "where an appeal has been taken, a judgment of the trial court is not final, at least for purposes of res judicata." <u>Littleton v. State</u>, 708 P.2d 829, 833 (Haw. 1985).

On appeal, the Hawaii Supreme Court held the plaintiffs' claims had become moot before considering the trial court's ruling on the merits.  <u>See Baehr v. Miike</u>, No. 20371, 1999 Haw. LEXIS 391 (Haw. Dec. 9, 1999).  In its unpublished decision, the Hawaii Supreme Court declined to decide whether § 572-1 violated the Hawaii Constitution before the marriage amendment.  <u>See id.</u> at *6 ("The marriage amendment validated HRS § 572-1 by taking the statute out of the ambit of the equal protection clause of the Hawaii Constitution, at least insofar as the statute, both on its face and as applied, purported to limit access to the marital status to opposite-sex couples. Accordingly, whether or not in the past it was violative of the equal protection clause in the foregoing respect, HRS § 572-1 no longer is.").  Thus, the Hawaii Supreme Court never determined whether same-sex couples had a right under the Hawaii Constitution to enter into marriage.  The <u>Perry</u> court explained the importance of this difference as follows: "The context matters.  Withdrawing from a disfavored group the right to obtain

49

a designation with significant societal consequences is different from declining to extend that designation in the first place." Id. at 1079-80.

Equality Hawaii and Defendant Abercrombie assert that nonetheless because the marriage amendment took away same-sex couples' right under the Hawaii Constitution to have § 572-1 reviewed under strict scrutiny, the facts in this case are sufficiently analogous to those in Perry such that it controls. Initially, the argument that the marriage amendment is unconstitutional because it "took away" the judicial determination that state constitutional challenges to § 572-1 are reviewed under strict scrutiny conflicts with Crawford v. Board of Education, 458 U.S. 527 (1982).  In Crawford, the Supreme Court rejected the contention that "once a State chooses to do 'more' than the Fourteenth Amendment requires, it may never recede."  Id. at 539.  Rather, after doing so, "the State was free to return in part to the standard prevailing generally throughout the United States."[19]    Id. at 542.  The Supreme Court

_____

[19]The Supreme Court noted in Crawford that "if the purpose of repealing legislation is to disadvantage a racial minority, the repeal is unconstitutional for this reason."  458 U.S. at 539 n.21.  It additionally noted: "[T]he Proposition only limits state courts when enforcing the State Constitution.  Thus, the Proposition would not bar state-court enforcement of state statutes requiring busing for desegregation or any other purpose."  Id. at 436 n.12.  Here, the classification at issue is not suspect like racial classifications.  Additionally, Hawaii's marriage amendment limits courts from determining that § 572-1
(continued...)

explained that it "would not interpret the Fourteenth Amendment to require the people of a State to adhere to a judicial construction of their State Constitution when that Constitution itself vests final authority in the people." Id. at 540. Therefore, the Supreme Court held that an amendment to the California Constitution, passed by the people, which repealed the California Supreme Court's interpretation of the California Constitution as imposing broader desegregation obligations than those imposed by the federal Constitution, did not violate the Fourteenth Amendment. See id. at 535-37, 537 n.14.

In any event, the Court is not persuaded by this "take-away argument" in light of the other major differences between Hawaii and California and the Ninth Circuit's insistence that it was ruling on the "narrow grounds" of the "unique and strictly limited effect of Proposition 8." See Perry, 671 F.3d at 1064 (emphasis added). Beyond the fact that California had granted

---

[19/](...continued)
violates the state constitution and expressly leaves the determination of whether to allow same-sex marriage to the legislature. I.e., no legislation was repealed. Moreover, as explained below, the Court rejects that the purpose of Hawaii's marriage amendment, which gave the legislature the authority to preserve the traditional definition of marriage, is to disadvantage same-sex couples. See, e.g., Lawrence, 539 U.S. at 585 (O'Connor, J., concurring) ("[u]nlike the moral disapproval of same-sex relations . . . other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group."). The Court notes that the Ninth Circuit, in Perry, pursuant to its narrow holding, rejected the argument that Crawford applied. See Perry, 671 F.3d at 1083-85.

same-sex couples the legal right to marry, Proposition 8 was "enacted . . . _after_ more than 18,000 couples had married (and remained married even after Proposition 8)." _Id._ at 1089.  In Hawaii, no same-sex couples were married at the time § 572-1 was amended or the marriage amendment was passed, nor have any ever been married in Hawaii.

Another major difference is that although California had its Domestic Partnership Act in effect before and after the adoption of Proposition 8, Hawaii's civil unions law was not enacted until over sixteen years after the legislature amended § 572-1 and over twelve years after the people ratified the marriage amendment.  Although Hawaii did pass the Reciprocal Beneficiaries Act around the time the marriage amendment was passed, this act did not provide substantially all of the incidents of marriage.  The _Perry_ court explained, "Proposition 8's only effect was to take away th[e] important and legally significant designation [of marriage], while leaving in place all of its incidents." _Id._ at 1063.  Hawaii's marriage laws did not take away the designation of marriage while leaving in place all of its incidents.  The later-enacted civil unions law also did not take any rights away.  Rather, it extended rights same-sex couples had never previously enjoyed.

Another difference is between the effects of Proposition 8 and Hawaii's marriage amendment on the political

process.  The <u>Perry</u> court explained that Proposition 8
"superseded [California's] <u>Marriage Cases</u> and then went further,
by prohibiting the Legislature or even the People (except by
constitutional amendment) from choosing to make the designation
of 'marriage' available to same-sex couples in the future."  <u>Id.</u>
at 1089.  Significantly, unlike Proposition 8, which took the
definition of marriage out of the legislative arena, Hawaii's
marriage amendment left the definition of marriage up to the
legislature.  Moreover, the legislature expressly stated that the
amendment was designed "to ensure that the legislature will
remain open to the petitions of those who seek a change in the
marriage laws, and that such petitioners can be considered on an
equal basis with those who oppose a change in our current
marriage statutes."  1997 Haw. Sess. Laws 1247.

        Given these differences, and the Ninth Circuit's
express statement it was ruling solely on the narrow grounds of
Proposition 8's "<u>elimination</u> of the right of same-sex couples to
marry," <u>Perry</u> does not govern this case.

    B.    **<u>Romer v. Evans</u>**

        Plaintiffs and Defendant Abercrombie also rely heavily
on <u>Romer</u>.  <u>See</u> Abercrombie's Mot. Mem. 64-68, 69, 75; Pls.' Opp'n
45.  Again, this reliance is misplaced.  Defendant Abercrombie
argues that the only conceivable rationale for Hawaii's marriage
laws "is some form of animus or prejudice against, or moral

53

disapproval of, gays and lesbians." Abercrombie's Mot. Mem. 64. He argues, therefore, "Romer is particularly instructive here." Id.

In contrast to Amendment 2 in Romer, Hawaii's marriage laws are not so unusual or unduly broad that they are "inexplicable by anything but animus" towards same-sex couples. See Romer, 517 U.S. at 632. Amendment 2 imposed a "comprehensive" ban on all "legislative, executive, or judicial actions at any level of state or local government designed to protect the named class [of] homosexual persons or gays and lesbians." Id. at 624. Amendment 2 effectively repealed municipal ordinances and rescinded protections in the government sphere such as bans on employment discrimination and discrimination at state colleges. 517 U.S. at 629-30. The Supreme Court also concluded that it was "a fair, if not necessary, inference from the broad language of the amendment that it deprives gays and lesbians even of the protection of general laws and policies that prohibit arbitrary discrimination in governmental and private settings." Id. at 630.

Here, Hawaii's marriage laws are not "inexplicable by anything but animus" towards homosexuals. The First Circuit similarly rejected the argument that DOMA's dominant purpose was hostility towards homosexuals. See Mass. v. HHS, 682 F.3d at 11. It explained that the many legislators who supported the law

54

"acted from a variety of motives," including the "central and expressed aim being to preserve the heritage of marriage as traditionally defined over centuries of Western civilization." See id.  The First Circuit determined that "[p]reserving th[e] institution [of traditional marriage] is not the same as mere moral disapproval of an excluded group, and that is singularly so in this case given the range of bipartisan support for [DOMA]." Id. (internal citation omitted); see Windsor v. United States, 833 F. Supp. 2d 394, 403 n.3 (S.D.N.Y. 2012) (same).  The First Circuit's decision is consistent with Justice O'Connor's concurrence in Lawrence.  Justice O'Connor explained that "[u]nlike the moral disapproval of same-sex relations . . . other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group."  Lawrence, 539 U.S. at 585 (O'Connor, J., concurring).

In Romer, the Supreme Court explained that the "disqualification of a class of persons from the right to seek specific protection from the law [was] unprecedented."  517 U.S. at 633.  The Supreme Court found the absence of precedent for Amendment 2 instructive; "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision."  Id. (internal quotations).  Here, in contrast, the definition of marriage as a union between a man and woman is not without

55

precedent or unusual.  In fact, it is the historically and traditionally understood definition; while marriages between same-sex couples was first allowed by a state in 2004 and since then, only by a minority of states.  See Smelt, 447 F.3d at 680-81 & n.18; see also Massachusetts v. U.S. Dep't of Health & Human Servs., 698 F. Supp. 2d 234, 239 (D. Mass. 2010).  As Defendant Fuddy explained, "to say that in preserving the traditional definition of marriage Hawaii – along with at least 41 other states and not to mention numerous judges and justices who have upheld such laws – has acted . . . absurdly, ignorantly, or with bigotry, such that the federal judiciary must take the extraordinary step of intervening and overthrowing the democratic process, is simply untenable."  Fuddy's Mot. Mem. 29.

       The actions of the state do not support that the legislature and people of Hawaii acted out of pure animus towards homosexuals in adopting Hawaii's marriage laws.  Specifically, during the same legislative session that the legislature passed the proposed amendment to the Hawaii Constitution, the legislature also passed the Reciprocal Beneficiaries Act.  In the findings under this act, the legislature specifically noted that through the act, certain rights and benefits previously available only to married couples would become available to certain individuals in same-sex relationships.  See H.R.S. § 572C-2.  Subsequently, in 2011, the legislature passed the civil unions

law, granting same-sex couples all of the state legal rights of marriage (except for the title marriage).

Furthermore, in its forthcoming analysis, the Court explains that there is a rational basis for the laws at issue. Thus, unlike in Romer, the classification is not "inexplicable by anything but animus" toward same-sex couples. See Bruning, 455 F.3d at 868 (determining that a state law limiting marriage to opposite-sex couples was not "inexplicable by anything but animus towards same-sex couples" and thus Romer did not control) (internal quotations omitted).

### C.  Plaintiffs' Due Process Claim

The "liberty" the Due Process Clause protects includes more than the absence of physical restraint. Washington v. Glucksberg, 521 U.S. 702, 719 (1997). In substantive due process challenges in which this liberty is at issue, laws implicating a fundamental right are subject to heightened scrutiny. Id. at 720. A state law that does not implicate a fundamental right or suspect classification, however, is subject to rational basis review. Id. at 722.

It is undisputed that there is a fundamental right to marry. Defendant Abercrombie asserts that the fundamental right to marry includes the right of same-sex couples to marry. See Abercrombie's Mot. Mem. 27. Plaintiffs state that the right they seek is not "the right to same sex marriage" but the fundamental

57

"right to marry the person of one's choice."  Pls.' Opp'n 14.

In contrast, Defendant Fuddy and HFF state that the existing

fundamental right to marry does not include a right to marry

someone of the same-sex.  <u>See</u> HFF's Mot. Mem. 18; Fuddy's Mot.

Mem. 16.

The Supreme Court has emphasized its "reluctan[ce] to

expand the concept of substantive due process because guideposts

for responsible decisionmaking in this unchartered area are

scarce and open-ended."  <u>Glucksberg</u>, 521 U.S. at 720 (internal

quotations omitted).  "By extending constitutional protection to

an asserted right or liberty interest, we, to a great extent,

place the matter outside the arena of public debate and

legislative action."  <u>Id.</u>  Consequently, "[t]he doctrine of

judicial self-restraint requires us to exercise the utmost care

whenever we are asked to break new ground in this field."

<u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992)

(internal citations omitted).  In considering a challenge to

"Don't Ask, Don't Tell," ("DADT"), Judge O'Scannlain explained

that "[t]his note of caution is especially important in cases

such as this one, where moral and personal passions run high and

where there is great risk that 'the liberty protected by the Due

Process Clause [will] be subtly transformed into the policy

preferences' of unelected judges.'"  <u>Log Cabin Republicans v.</u>

<u>United States</u>, 658 F.3d 1162, 1174 (9th Cir. 2011) (O'Scannlain,

J., concurring) (quoting Glucksberg, 521 U.S. at 720).

Accordingly, the established method of substantive due process analysis has two primary features: first, courts require a "careful description of the asserted fundamental liberty interest"; and second, the courts consider whether the right is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty such that neither liberty nor justice would exist if it were sacrificed." Glucksberg, 521 U.S. at 720-21 (internal quotations and citations omitted).

### 1.   Description of the Asserted Fundamental Right

In describing the asserted fundamental right, the Supreme Court "has eschewed breadth and generality in favor of narrowness, delicacy, and precision." Log Cabin Republicans, 653 F.3d at 1169 (O'Scannlain, J., concurring).  For example, in Reno v. Flores, 507 U.S. 292 (1993), the Supreme Court determined that the right at issue in a challenge to a regulation governing release of detained alien juveniles was not the right to be free from physical restraint, but was "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government operated or government-selected child care institution." Id. at 302.

The Ninth Circuit followed suit in Raich v. Gonzales, 500 F.3d 850 (9th Cir. 2007), a case challenging the constitutionality of the Controlled Substances Act as applied to users and growers of marijuana for medical purposes.  The Ninth Circuit explained that Raich's asserted right to "mak[e] life-shaping medical decisions that are necessary to preserve the integrity of her body, avoid intolerable physical pain, and preserve her life" does "not narrowly and accurately reflect the right that she seeks to vindicate."  Id. at 862-64 (alteration in original).  "Conspicuously missing from Raich's asserted fundamental right is its centerpiece: that she seeks the right to use marijuana to preserve bodily integrity, avoid pain, and preserve her life."  Id. at 864.  Similarly, missing from Plaintiffs' asserted "right to marry the person of one's choice" is its centerpiece: the right to marry someone of the same gender.

Defendant Abercrombie's assertion that the right to marry someone of the same gender is contained in the existing "right to marry" is unsupported in case law.  To credit this argument would require ignoring that the term "'marriage ordinarily contemplates a relationship between a man and a woman.'"  Adams v. Howerton, 673 F.2d 1036, 1040 (9th Cir. 1982) (citing Webster's Third New International Dictionary 1384 (1971); Black's Law Dictionary 876 (5th ed. 1979)).  Significantly, the

60

Supreme Court cases involving the fundamental right to marry all involved opposite-sex couples.

Consequently, the Supreme Court, in discussing the fundamental right to marry, has had no reason to consider anything other than the traditional and ordinary understanding of marriage as a union between a man and a woman.  Furthermore, in discussing the importance of marriage, the Supreme Court has often linked marriage to procreation.[20/]  See Zablocki v. Redhail, 434 U.S. 374, 383 (U.S. 1978) ("[Marriage] is the foundation of the family in our society. . . . [I]f appellee's right to procreate means anything at all, it must imply some right to enter the only relationship in which the State of Wisconsin allows sexual relations legally to take place."); Loving v. Virginia, 388 U.S. 1, 12 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival."); Skinner v. Oklahoma, 316 U.S. 535, 541 (1942)

_____

[20/]Although same-sex couples now have the ability to procreate with the assistance of technology and third-parties, there is nothing in the aforementioned Supreme Court cases to indicate the Supreme Court was considering anything other than natural procreation.  Furthermore, these cases were decided between 1885-1978, the latter being at the infancy of the introduction of artificial insemination as a viable option for women to conceive without engaging in intercourse.  See Erica Davis, The Rise of Gestational Surrogacy and the Presiding Need for International Regulation, 21 Minn. J. Intl. L. 120, 122 (2012) (explaining that the advances in artificial insemination in the 1980s "opened the door to . . . allowing single people and homosexual couples access to assisted reproductive technology, including the surrogacy market").

("Marriage and procreation are fundamental to the very existence and survival of the race."); <u>Maynard</u>, 125 U.S. at 211 ("[Marriage] is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress."); <u>Murphy v. Ramsey</u>, 114 U.S. 15, 45 (1885) ("[N]o legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth . . . than that which seeks to establish it on the basis of the idea of the family, as <u>consisting</u> in and springing from <u>the union for life of one man and one woman in the holy estate of matrimony</u>.") (emphasis added).  Thus, "in recognizing a fundamental right to marry, the [Supreme] Court has only contemplated marriages between persons of opposite sexes - persons who had the possibility of having children with each other."  <u>Dean v. Dist. of Columbia</u>, 653 A.2d 307, 333 (D.C. 1995).[21/]

_____

[21/]Other courts have also recognized that Supreme Court jurisprudence does not support a fundamental right to marry someone of the same sex.  <u>See</u> <u>In re Kandu</u>, 315 B.R. at 140 ("Even if this Court believes there should be a fundamental right to marry someone of the same sex, it would be incorrect to suggest that the Supreme Court, in its long line of cases on the subject, conferred the fundamental right to marry on anything other than a traditional, opposite-sex relationship."); <u>Andersen v. King Cnty.</u>, 138 P.3d 963, 999 (Wash. 2006) (plurality) ("The fundamental right of a man and woman to marry is linked with the related fundamental right to procreate, as noted in <u>Skinner</u>. Every United States Supreme Court decision concerning the right
(continued...)

Other courts considering claims that same-sex couples have a fundamental right to marry, have concluded that the right at issue is not the existing fundamental "right to marry."  See Wilson, 354 F. Supp. 2d at 1305; In re Kandu, 315 B.R. at 140; Smelt, 374 F. Supp. 2d at 879; Conaway v. Deane, 932 A.2d 571, 619 (Md. 2007) (evaluating challenge under Maryland Constitution); Lewis v. Harris, 908 A.2d 196, 210-211 (N.J. 2006) (evaluating challenge under New Jersey constitution); Baehr v. Lewin, 852 P.2d at 56-57 (evaluating challenge under Hawaii Constitution); In re Marriage of J.B. & H.B., 326 S.W.3d 654, 675 (Tex. App. 2010); but see Perry v. Schwarzenegger, 704 F. Supp. 2d 921, 993 (N.D. Cal. 2011).  The Court agrees that the right at issue here is an asserted new right to same-sex marriage.

## 2.   The Nation's History and Tradition

It is beyond dispute that the right to same-sex marriage is not "objectively, deeply rooted in this Nation's history and tradition."  See In re Kandu, 315 B.R. at 140 ("[T]here are no grounds to conclude objectively that same-sex marriages are deeply rooted in this Nation's history and

---

[21]/(...continued)
to marry has assumed marriage as the union of one man and one woman.  Every party in every right to marry case that the Supreme Court has ever decided included one man in union with one woman. Those decisions do not support any claim other than the right to marry a person of the opposite sex.")(internal citations omitted); Dean, 653 A.2d at 333 ("[W]e cannot overlook the fact that the Supreme Court has deemed marriage a fundamental right substantially because of its relationship to procreation.").

tradition."); <u>Hernandez v. Robles</u>, 855 N.E.2d 1, 10 (N.Y. 2006) ("The right to marry someone of the same sex . . . is not 'deeply rooted.'").  In fact, "it has not even been asserted until relatively recent times."  <u>Hernandez</u>, 855 N.E.2d at 10. Furthermore, as Defendant Abercrombie recognizes, it was 2004 before any state allowed same-sex couples to marry.  <u>See</u> Abercrombie's Mot. Mem. 31; <u>Massachusetts</u>, 698 F. Supp. 2d at 239.  The Ninth Circuit has recognized that the definition of marriage as "a consensual, contractual personal relationship between a man and a woman. . . . is not peculiar; indeed it is traditional."  <u>Smelt</u>, 447 F.3d at 680 & n.18 (citing 2 Samuel Johnson, <u>A Dictionary of the English Language</u> (London, W. Strahan et. al. 1755) (Marriage is: "The act of uniting a man and woman for life."  To marry is: "To join a man and woman."); Noah Webster, <u>A Compendious Dictionary of the English Language</u> 185 (1806) (Marriage is: "the act of joining man and woman."); <u>Webster's Third New International Dictionary</u> 1384 (3d ed. 1986) (Marriage is: "the state of being united to a person of the opposite sex as husband or wife."); <u>Black's Law Dictionary</u> 972 (6th ed. 1990) (Marriage is: "Legal union of one man and one woman as husband and wife."); <u>The Compact Oxford English Dictionary</u> 1039 (2d ed. 1994) (Marriage is: "The condition of being a husband or wife. . . .")).

     Defendant Abercrombie argues that the reliance on the

history and tradition of the Nation is erroneous given the Supreme Court's statement in <u>Lawrence</u> that "neither history nor tradition could save a law prohibiting miscegenation from constitutional attack." Abercrombie's Reply 6-7 (citing 539 U.S. 577-78). Defendant Abercrombie relies on the Supreme Court's decision in <u>Loving v. Virginia</u>, 388 U.S. 1 (1967), in which the Supreme Court struck Virginia's anti-miscegenation statute as violating interracial couples' fundamental right to marry. Defendant Abercrombie asserts that there was no history and tradition of interracial marriage and yet the Supreme Court still analyzed the case as asserting a fundamental right. Abercrombie's Reply 6-7. In <u>Loving</u>, however, the Supreme Court was considering the long recognized right to marry. 388 U.S. at 12. The case did not involve expanding the traditional definition of marriage as being between a man and a woman. This case presents a different right, the right to marry someone of the same sex. The fact that this right is not objectively rooted in the Nation's history does not prohibit statutes defining marriage as a union between a man and woman from constitutional attack. Instead, it precludes the right to marry someone of the

same-sex from being a fundamental right.[22/][23/]   See In re Kandu, 315 B.R. at 140 (holding that because same-sex marriage is not deeply rooted in the history and tradition of our Nation, it is not a fundamental right); Conaway, 932 A.2d at 619-28 (rejecting Defendant Abercrombie's asserted Loving analogy and holding that there is no fundamental right to marry someone of the same-sex under the Maryland Constitution because it is not deeply rooted in history and tradition); Lewis, 908 A.2d at 211 (rejecting Defendant Abercrombie's asserted Loving analogy and concluding that "[w]e cannot find that a right to same-sex marriage is so deeply rooted in the traditions, history, and conscience of the people of this State that it ranks as a fundamental right").

Defendant Abercrombie also relies on the Supreme Court's statement in Lawrence that "[h]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry."  Abercrombie's Reply at 6-7

---

[22/]Defendant Abercrombie and Plaintiffs' further analogies to Loving are unpersuasive in this case.  Loving involved an invidious discrimination on the basis of race, a suspect classification.  See Loving, 388 U.S. at 8-9.

[23/]The Court recognizes that although the lack of history and tradition can prevent an asserted right from being fundamental, "[t]radition alone never can provide sufficient cause to discriminate against a protected class, for '[neither] the length of time a majority [of the populace] has held its convictions [nor] the passions with which it defends them can withdraw legislation from [the] [c]ourt's scrutiny." Kerrigan, 957 A.2d at 479 (alterations in original) (citing Bowers v. Hardwick, 478 U.S. 186, 210 (1986) (Blackmun, J., dissenting)).

(citing Lawrence, 539 U.S. at 572).  Defendant Abercrombie then states that "by overruling Bowers, Lawrence made the recognition of a fundamental right to same sex marriage plausible."  Id. at 7.  Significantly, however, as Justice Scalia points out in dissent, although there was discussion of fundamental propositions and fundamental decisions, "nowhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right' under the Due Process Clause; nor does it subject the Texas law to the standard of review that would be appropriate (strict scrutiny) if homosexual sodomy were a 'fundamental right.'"  539 U.S. at 586 (Scalia, J., dissenting).  Second, the Supreme Court never stated that history and tradition are not important in determining whether an asserted new right is fundamental.  Finally, the Supreme Court explicitly stated that Lawrence did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter."  Id. at 578.  As the Eleventh Circuit explained, "it is a strained and ultimately incorrect reading of Lawrence to interpret it to announce a new fundamental right."  Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 817 (11th Cir. 2004); see also Wilson, 354 F. Supp. 2d at 1306 ("[T]he Supreme Court's decision in Lawrence cannot be interpreted as creating a fundamental right to same-sex marriage.").

Accordingly, the right to same-sex marriage is not a

fundamental right.  Because Hawaii's marriage laws do not implicate a suspect classification, as discussed infra, Plaintiffs' claim that Hawaii's marriage laws violate the Due Process Clause is therefore subject to rational basis review.

### D.   Plaintiffs' Equal Protection Claim

Laws alleged to violate the Equal Protection Clause are subject to one of three levels of scrutiny: strict scrutiny, intermediate scrutiny, or rational basis review.  Clark v. Jeter, 486 U.S. 456, 461 (1988).  Strict scrutiny applies when a classification is based on race, alienage, or national origin. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440 (1985).  Under strict scrutiny review, a state must show the challenged classification is narrowly tailored to further a compelling governmental interest.  Grutter v. Bollinger, 539 U.S. 306, 326 (2003).  Intermediate scrutiny applies to classifications based on illegitimacy and gender.  Cleburne, 473 U.S. at 441.  A classification fails intermediate scrutiny review unless it is substantially related to a sufficiently important governmental interest.  Id.  Other classifications are subject to rational basis review.  See id. at 440-41.  Under rational basis review, a classification will be upheld as long as there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.  Heller v. Doe, 509 U.S. 312, 319 (1993).

### 1.   Gender Discrimination

Plaintiffs assert that § 572-1 discriminates on the basis of gender because it permits a man and a woman to marry but neither two men nor two women to marry.  Am. Compl. ¶ 101.  Contrary to Plaintiffs' assertions, however, the statute does not discriminate on the basis of gender.

Section 572-1 does not treat males and females differently as a class.  It is gender-neutral on its face; it prohibits men and women equally from marrying a member of the same-sex.  A facially gender-neutral statute may nonetheless discriminate on the basis of sex if "the adverse effect reflects invidious gender-based discrimination."  Personnel Adm'r v. Feeney, 442 U.S. 256, 274 (1979); see also In re Kandu, 315 B.R. at 143 ("The test to evaluate whether a facially gender-neutral statute discriminates on the basis of sex is whether the law can be traced to a discriminatory purpose.") (internal quotations omitted).  There is nothing in the legislative history or elsewhere that suggests that the purpose of § 572-1 is to discriminate against men or women as a class.

The Court thus agrees with the vast majority of courts considering the issue that an opposite-sex definition of marriage does not constitute gender discrimination.  See Smelt, 374 F. Supp. 2d at 876-77; Wilson, 354 F. Supp. 2d at 1307-08; In re Kandu, 315 B.R. at 143; In re Marriage Cases, 183 P.3d at 439

("[D]iscrimination on the basis of sex, and discrimination on the basis of sexual orientation . . . traditionally have been viewed as distinct phenomena"); Conaway, 932 A.2d at 599; Andersen v. King Cnty., 138 P.3d 963, 987–89 (Wash. 2006) (plurality); Hernandez, 855 N.E.2d at 10-11; Baker v. Vermont, 744 A.2d 864, 880 n.13 (Vt. 1999); Singer v. Hara, 522 P.2d 1187, 1192 (Wash. Ct. App. 1974); but see Perry v. Schwarzenegger, 704 F. Supp. 2d at 996 ("Sexual orientation discrimination can take the form of sex discrimination."); Golinski, 824 F. Supp. 2d at 982 n.4 (same); Baehr v. Lewin, 852 P.2d at 63 (plurality) (concluding opposite-sex definition of marriage discriminated on the basis of sex).

### 2.   Sexual Orientation Discrimination

Although the Supreme Court has never determined whether sexual orientation classifications should be subject to heightened scrutiny, the Ninth Circuit, in High Tech Gays v. Defense Industry Security Clearance Office, 895 F.2d 563 (9th Cir. 1990), held that homosexuality is not a suspect or quasi-suspect classification.[24/]  See id. at 573-74.  In making this determination, the Ninth Circuit noted that the ruling in Bowers

----

[24/]Although the Ninth Circuit was considering the equal protection component of the Fifth Amendment in High Tech Gays, it expressly noted that the Supreme Court's approach to "'Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.'"  895 F.2d at 571 (quoting Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975)).

v. Hardwick, 478 U.S. 186 (1986), that homosexual conduct could be criminalized was "incongruous" with deeming homosexuals a suspect or quasi-suspect class.  High Tech Gays, 895 F.2d at 573-74.  The Ninth Circuit went on to analyze whether homosexuals were a suspect class in light of the major considerations for such treatment – a history of discrimination, immutability, and politically powerlessness.  Id.  The Ninth Circuit concluded that although homosexuals have suffered a history of discrimination, sexual orientation is not immutable but behavioral and homosexuals are not without political power.  Id.

The Ninth Circuit has not overruled High Tech Gays and has continued to cite it for the proposition that homosexuals are not a suspect class.[25/]  In Flores v. Morgan Hill Unified School District, 324 F.3d 1130 (9th Cir. 2003), the Ninth Circuit cited High Tech Gays for its conclusion that "homosexuals are not a

---

[25/]The Ninth Circuit is not alone.  The circuits that have addressed this issue, i.e., all circuits but the Second and Third Circuits, have unanimously declined to treat sexual orientation classifications as suspect.  See Price-Cornelison v. Brooks, 524 F.3d 1103, 113-14 & n.9 (10th Cir. 2008); Cook v. Gates, 528 F.3d 42, 61 (1st Cir. 2008); Scarbrough v. Morgan Cnty. Bd. of Educ., 470 F.3d 250, 261 (6th Cir. 2006); Bruning, 455 F.3d at 866-67; Johnson v. Johnson, 385 F.3d 503, 532 (5th Cir. 2004); Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 818 (11th Cir. 2004); Nabozny v. Podlesny, 92 F.3d 446, 458 (7th Cir. 1996); Thomasson v. Perry, 80 F.3d 915, 928 (4th Cir. 1996); Woodward v. United States, 871 F.2d 1068, 1076 (Fed. Cir. 1989); Padula v. Webster, 822 F.2d 97, 103-04 (D.C. Cir. 1987); see also Veney v. Wyche, 293 F.3d 726, 732 (4th Cir. 2002) (explaining outside the prison context, sexual orientation classifications are subject to rational basis review).

suspect or quasi-suspect class, but are a definable group
entitled to rational basis scrutiny for equal protection
purposes." See id. at 1137.  In Philips v. Perry, 106 F.3d 1420
(9th Cir. 1997), a case involving DADT, the Ninth Circuit, citing
High Tech Gays, stated that "homosexuals do not constitute a
suspect or quasi-suspect class entitled to greater than rational
basis scrutiny." Id. at 1425.  In Witt v. Department of Air
Force, 527 F.3d 806 (9th Cir. 2008), the Ninth Circuit expressly
stated that "Philips clearly held that DADT does not violate
equal protection under rational basis review, and that holding
was not disturbed by Lawrence, which declined to address equal
protection." Id. at 821 (internal citation omitted) (emphasis
added).

        Plaintiffs assert that this Court is nonetheless not
bound by High Tech Gays, relying on the reasoning set forth by
the district court in Golinski v. Office of Personnel Management,
825 F. Supp. 2d 968 (N.D. Cal. 2012).  Both Defendant Abercrombie
and the court in Golinski contend that because Lawrence overruled
Bowers, the Ninth Circuit's decision is no longer good law.  See
Golinski, 824 F. Supp. 2d at 984; Abercrombie Mot. Mem. 42-43.
The court in Golinski further determined, and Defendant
Abercrombie argues, that the Ninth Circuit had also relied on
"the mistaken assumption" that sexual orientation is "merely
behavioral," rather than the type of immutable characteristic

72

that warrants heightened scrutiny.  See Golinski, 824 F. Supp. 2d
at 984 (internal quotations omitted); Abercrombie's Mot. Mem. 45-
46.  Defendant Abercrombie further argues that "High Tech's not-
politically-powerless conclusion is also not binding in light of
subsequent factual developments . . ., including the overwhelming
nationwide backlash provided by Hawaii's Baehr decision."
Abercrombie's Mot. Mem. 48.

        If the Supreme Court or a Ninth Circuit en banc
decision "undercut[s] the theory or reasoning underlying the
prior circuit precedent in such a way that the cases are clearly
irreconcilable," this Court is not bound by a Ninth Circuit panel
decision.  Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003)
("In future cases of . . . clear irreconcilability, . . .
district courts should consider themselves bound by the
intervening higher authority and reject the prior opinion of this
court as having been effectively overruled."); see Human Life of
Wash. Inc. v. Brumsickle, 624 F.3d 990, 1013 (9th Cir. 2010).
Putting aside the fact that the Ninth Circuit has continued to
state that sexual orientation classifications are not suspect, no
Supreme Court decision has undercut the entire reasoning of High
Tech Gays in a way that is "clearly irreconcilable."

        The reliance by Plaintiffs and Defendant Abercrombie on
Lawrence is misplaced.  The majority in Lawrence did not apply an
equal protection analysis.  Justice O'Connor did so in her

concurrence and determined that rational basis review was appropriate where "the challenged legislation inhibits personal relationships." Lawrence, 539 U.S. at 579-81 (O'Connor, J., concurring). Although Lawrence did nonetheless undercut the reasoning that homosexual conduct could be criminalized, the decision is not "clearly irreconcilable" with the balance of the Ninth Circuit's reasoning, i.e., homosexuality is not immutable but behavioral and that homosexuals are not without political power. Furthermore, post-Lawrence, in Witt, the Ninth Circuit stated that Lawrence did not disturb the holding that DADT did not violate equal protection under rational basis review. Witt, 527 F.3d at 821.

Defendant Abercrombie asserts that the Ninth's Circuit immutability "finding" cannot be reconciled with "current empirical evidence," the Ninth Circuit's decision in Hernandez-Montiel v. INS, 225 F.3d 1084 (9th Cir. 2000), and the Supreme Court's decision in Christian Legal Society v. Martinez, 130 S. Ct. 2971 (2010). Abercrombie's Mot. Mem. 44-47. The Court first notes that its determination of what current empirical evidence may dictate does not give it authority to disregard binding Ninth Circuit precedent.

Defendant Abercrombie's reliance on Hernandez-Montiel is also misguided. In Hernandez-Montiel, a Ninth Circuit panel determined that gay men with female sexual identities in Mexico

comprised a particular social group for purposes of an asylum statute. 225 F.3d at 1094. In reaching its conclusion, the Ninth Circuit stated that "[s]exual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them." Id. at 1093. This decision did not discuss suspect classifications or equal protection. Thus, the Ninth Circuit did not overrule High Tech Gays (nor could it, being only a three-judge panel). See Miller, 335 F.3d at 900. Because the Ninth Circuit has not overruled High Tech Gays, regardless of whether the reasoning of a later Ninth Circuit panel decision is inconsistent with the reasoning in High Tech Gays, High Tech Gays remains binding on this Court unless the reasoning of a Supreme Court or Ninth Circuit en banc decision is clearly irreconcilable. See Brumsickle, 624 F.3d 990 at 1013 ("[I]n the face of intervening Supreme Court and en banc opinions, a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.") (emphasis added) (alteration in original) (internal quotations omitted).

Defendant Abercrombie argues that the Ninth Circuit's immutability finding improperly separated orientation from conduct and is thus irreconcilable with Christian Legal Society. Specifically, in High Tech Gays, the Ninth Circuit stated:

"Homosexuality is not an immutable characteristic; it is behavioral and hence is fundamentally different from traits such as race, gender, or alienage, which define already existing suspect and quasi-suspect classes.  The behavior of such already recognized classes is irrelevant to their identification."  895 F.2d at 573.  In Christian Legal Society, the Supreme Court determined that excluding those students who engaged in "unrepented homosexual conduct" from affiliation with a student club was in effect discrimination based on sexual orientation. 130 S. Ct. at 2990.  Specifically, the Supreme Court rejected the argument that the policy at issue did not exclude individuals because of sexual orientation, "but rather 'on the basis of a conjunction of conduct and the belief that the conduct is not wrong.'"  Id.  In reaching this conclusion, the Supreme Court stated that its "decisions have declined to distinguish between status and conduct in this context."  Id. (emphasis added).  In Christian Legal Society, the Supreme Court was considering a First Amendment challenge to a university's anti-discrimination policy, not an equal protection challenge, and significantly, did not discuss whether homosexuality was immutable.  See id. at 2988-90.  Thus, Christian Legal Society is not "clearly irreconcilable" with the Ninth Circuit's determination that homosexuals are different from other suspect classes because homosexual behavior is not immutable in the sense that the

class's behavior is relevant to identifying homosexuals.

        With regard to the Ninth's Circuit's conclusion that homosexuals are not without political power, Defendant Abercrombie asserts that "[a] ruling resting on a particular complex of facts cannot bind a subsequent court faced with a very different and novel set of facts." Abercrombie's Mot. Mem. 48. In reaching its conclusion, the Ninth Circuit explained: "Legislatures have addressed and continue to address the discrimination suffered by homosexuals on account of their sexual orientation through the passage of anti-discrimination legislation.  Thus, homosexuals are not without political power; they have the ability to and do attract the attention of the lawmakers, as evidenced by such legislation." <u>High Tech Gays</u>, 895 F.2d at 574.

        First, the Court notes that homosexuals have continued to attract the attention of law makers and gain more rights.  For example, Hawaii has enacted the civil unions law and the Governor has moved for partial summary judgment in favor of Plaintiffs in this case.  On a nationwide level, in <u>Golinski</u>, 132 democratic members of Congress submitted an amicus brief to the Ninth Circuit detailing why they believe DOMA should be ruled unconstitutional.  <u>See</u> <u>Golinski</u>, No. 12-5409, Doc. No. 87 (9th Cir.).  President Obama and Attorney General Holder support gay marriage and refuse to defend Section 3 of DOMA.  <u>See</u> Letter from

77

Eric H. Holder, Jr., Att'y Gen., to Rep. John A. Boehner, Speaker
of the House, Letter to Congress on Litigation Involving the
Defense of Marriage Act (Feb. 23, 2011), http://www.justice.gov/
opa/pr/2011/ February/11-ag-223.html.  The Democratic National
Committee recently announced it would add pro-gay marriage
language into their official party platform.  See Teresa Welsh,
Should Gay Marriage Be on the Democratic Party Platform, U.S.
News (August 1, 2012) http://www.usnews.com/opinion/articles/2012
/08/01/should-gay-marriage-be-on-the-democratic-party-platform.
Second, Defendant Abercrombie's argument that this Court is not
bound by High Tech Gays because of the "novel" and "complex" set
of facts in this case is without merit.  Whether sexual
orientation classifications are suspect is a question that does
not depend on the particular or "novel" facts of a case.  Third,
the Court's own conclusion about the political power of
homosexuals does not give it authority to overrule binding Ninth
Circuit precedent.

        In sum, the Court cannot conclude that the state of the
law is such that the Supreme Court has eviscerated the holding
that homosexuals are not a suspect class.  See In re Kandu, 315
B.R. at 143-44 (concluding the court was bound by the Ninth
Circuit's decision in High Tech Gays that homosexuals do not
constitute a suspect or quasi-suspect class).  Consequently, the
Court does not have the power to overrule the Ninth Circuit's

determination that homosexuals do not constitute a suspect class.[26/]  The Court therefore follows the precedent of the eleven circuits that have addressed this issue, including binding Ninth Circuit precedent, that sexual orientation classifications are not suspect.  See supra, n.25 (collecting cases).  Accordingly, rational basis review applies to Plaintiffs' claim under the Equal Protection Clause.

### E.    Rational Basis Review

#### 1.    Standard

A court applying rational basis review will uphold a law so long as the legislative classification bears a rational relationship to some legitimate end.  Romer, 517 U.S. at 631. Rational basis review does not authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." Heller, 509 U.S. at 319 (internal quotations omitted).  Rather, it is "a paradigm of judicial restraint."  F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 314 (1993).

---

[26/]Because the Court is bound by Ninth Circuit precedent, the facts stated in Defendant Abercrombie's CSF that are used to support his argument that homosexuals are a suspect class, including assertions related to the immutability and political power of homosexuals, are not material to the Court's decision. Thus it is unnecessary for the Court to evaluate these highly controversial statements.  Accordingly, the fact that Defendant Fuddy and HFF dispute these assertions does not render summary judgment inappropriate.

"In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. at 313. This wide latitude afforded to states is because "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." Cleburne, 473 U.S. at 440.

Due to this wide latitude, under rational basis review, a law is presumed constitutional and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." Heller, 509 U.S. at 320 (internal quotations omitted). A state is not required to produce evidence to sustain the rationality of a statutory classification and courts must "accept a legislature's generalizations even when there is an imperfect fit between means and ends." Id. at 320-21. Furthermore, the judiciary does not require a legislature to articulate its reasons for enacting a statute, and thus "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." Beach Commc'ns, 508 U.S. at 315.

Plaintiffs argue that the Court should not apply this

ordinary rational basis review.  Rather, they argue that the Court should apply "a more searching form of rational basis review."  Pls.' Opp'n 19.  Plaintiffs rely on the First Circuit's recent decision in Mass. v. HHS, 682 F.3d 1 (1st Cir. 2012).  Both Plaintiffs and the First Circuit rely on City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440 (1985), Department of Agriculture v. Moreno, 413 U.S. 528 (1973), and Romer, in asserting the Court should apply this "more searching form" of review.

In considering a challenge to DOMA, the First Circuit noted that the plaintiffs could not prevail under regular rational basis review.  Mass. v. HHS, 682 F.3d at 9.  The First Circuit forecasted "that the extreme deference accorded to ordinary economic legislation . . . would not be extended to DOMA by the Supreme Court."  Id. at 11.  Thus, the First Circuit applied an "intensified scrutiny" based on a combination of equal protection and federalism concerns.  See id. at 8 ("[E]qual protection and federalism concerns . . . combine – not to create some new category of 'heightened scrutiny' for DOMA under a prescribed algorithm, but rather to require a closer than usual review based in part on discrepant impact among married couples and in part on the importance of state interests in regulating marriage.").

As an obvious distinction with the First Circuit's

decision, this case does not involve the same federalism concerns. In Mass. v. HHS, a federal court was asked to strike a federal statute that encroached on an area of law historically left to the states. Here, Plaintiffs ask a federal court to strike down a state statute regulating an area of law historically within the prerogative of the states.

Moreover, the First Circuit's "intensified" standard is inconsistent with the Ninth Circuit's decision in Adams v. Howerton, 673 F.2d 1036 (9th Cir. 1982). In Adams, the Ninth Circuit held that a provision of the Immigration and Nationality Act denying spouses of homosexual marriages the preferences accorded to spouses of heterosexual marriages did not violate the equal protection component of the Fifth Amendment. Id. at 1041-43. The Ninth Circuit applied ordinary rational basis review to the provision. Id. at 1042-43. It explained that "Congress manifested its concern for family integrity when it passed laws facilitating the immigration of the spouses of some valid heterosexual marriages," and that "[i]n effect, Congress has determined that preferential status is not warranted for spouses of homosexual marriages." Id. It upheld the statute, explaining, "[p]erhaps this is because homosexual marriages never produce offspring, because they are not recognized in most, if in any, of the states, or because they violate traditional and often prevailing societal mores."[27/] Id.

_____

[27/]The Ninth Circuit noted that "some lesser standard of
(continued...)

Plaintiffs' proposed intensified review conflicts with the Eighth Circuit's decision in Bruning.  In Bruning, the Eighth Circuit held that an amendment to the Nebraska Constitution prohibiting same-sex marriage and the equivalent of civil unions did not violate the Equal Protection Clause.  See Bruning, 455 F.3d at 868-69.  After noting that the institution of marriage has always been the predominant concern of state government in our federal system, the Eighth Circuit concluded that rational basis review must be "particularly deferential" in this area. Id. at 867.

Finally, the cases relied upon by Plaintiffs do not support a new level of "intensified scrutiny."  In Romer, the Supreme Court stated that Amendment 2 "fails, indeed defies, even th[e] conventional [rational basis] inquiry."  517 U.S. at 631-32 (emphasis added).  In Cleburne, the Supreme Court invalidated an ordinance as applied to a permit denial for a group home for the mentally disabled.  See Cleburne, 473 U.S. at 435.  The Supreme Court applied the "general rule" that "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Id. at 440.  It concluded, however, that the municipality failed to show how any legitimate concern applied particularly to

---

[27]/ (...continued)
review" may apply to Congress's immigration laws.  Adams, 673 F.2d at 1042.  The Ninth Circuit found it unnecessary to make such a determination, however, because the statute survived ordinary rational basis review.  Id.

mentally retarded residents and not to many other people who could occupy a group home without a permit, such as boarding houses, fraternity houses, hospitals, and nursing homes.  Id. at 450.  The Court thus concluded the ordinance "appear[ed] to rest on an irrational prejudice against mentally retarded."  Id.  In Moreno, the Supreme Court struck a statutory classification that rendered households containing unrelated individuals ineligible under the Food Stamp Act.  See Moreno, 413 U.S. at 537-38.  The Supreme Court applied a "traditional equal protection analysis," but concluded that the classification was "not only 'imprecise,' it [was] wholly without any rational basis."  Id. at 533, 538 (emphasis added).

The Supreme Court has directed that if Supreme Court precedent has direct application in a case, "yet appears to rest on reasons rejected in some other line of decisions," the lower courts "should follow the case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions."  Tenet v. Doe, 544 U.S. 1, 10-11 (2005) (internal quotations omitted).  These three cases do not establish a new form of review.  In these cases, the Supreme Court expressly stated it was applying the "conventional," "general," and "traditional" rational basis analysis.  Rather, these cases dictate that a bare desire to harm a politically unpopular group cannot constitute a legitimate government interest.  See Romer, 517 U.S. at 634-35; Cleburne, 473 U.S. at 446-47; Moreno, 413 U.S. at 538.  The Court has already concluded, however, that

84

Hawaii's marriage laws are not based on a bare desire to harm homosexuals and thus this case is not controlled by these three decisions.

Under this conventional rational basis review, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." Beach Commc'ns, 508 U.S. at 315. Again, the question is not whether the rationales set forth actually motivated the legislature (or people who ratified the marriage amendment), are supported by empirical evidence, or are wise. Instead, it is whether Hawaii could have reasonably believed, or rationally speculated, that Hawaii's marriage laws furthered any legitimate interest.

Here, the Court is faced with cross-motions for summary judgment. In a rational-basis challenge to a legislative classification contained in a law, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Id. Thus, if the evidence, viewed in the light most favorable to HFF and Defendant Fuddy, shows that there is no conceivable rational basis for Hawaii's marriage laws, summary judgment in favor of Plaintiffs is appropriate. On the other hand, if the evidence, viewed in the light most favorable to Plaintiffs, shows that there is any reasonably conceivable rational basis for the policy, HFF and Defendant Fuddy are

85

entitled to summary judgment.

Disputes of fact that might normally preclude summary judgment in other civil cases, will generally not be substantively material in a rational basis review.  See Vance v. Bradley, 440 U.S. 93, 110-11 (1979).  That is, the question before this Court is not whether the legislative facts are true, but whether they are "at least debatable."  See Heller, 509 U.S. at 326; Lupert v. Cal. State Bar, 761 F.2d 1325, 1328 (9th Cir. 1985) ("None of the factual issues raised at trial or on appeal is relevant to the rational basis analysis.  We need only examine whether the statute has a conceivable basis rationally related to a legitimate governmental purpose.").

### 2.    Application

Defendant Fuddy argues that there are at least two reasons that the legislature could rationally endorse the traditional view that marriage shall be only between a man and a woman.  Fuddy's Mot. Mem. 29.  First, she contends that the state has a legitimate and rational interest in encouraging the stability of naturally procreative relationships.  Id.  She states that opposite-sex couples are different from same-sex couples because of their "ability to procreate naturally," and such difference rationally justifies their different treatment under Hawaii law.  Id. at 35.  Second, Defendant Fuddy contends that Hawaii's marriage laws support Hawaii's interest in proceeding with caution when considering changes to the traditional definition of marriage.  Id. at 38.

HFF argues that the following three interests rationally relate to Hawaii's opposite-sex definition of marriage: (1) "steering the natural procreative capacity of opposite-sex couples into marriage"; (2) "promoting the ideal that, wherever possible, children are raised by both their mother and father"; and (3) "reserving watershed changes to such a fundamental and important social institution to the legislature as the policymaking branch."  HFF's Mot. Mem. 20.

Plaintiffs and Defendant Abercrombie contend that these asserted interests are irrational.[28/]  Plaintiffs rely heavily on the civil unions law, stating that none of the asserted rationales explain why the title "marriage" alone has been denied to same-sex couples.  Pls.' Opp'n 25.  Plaintiffs assert that denying the title marriage to same-sex couples does nothing to encourage opposite-sex couples to marry, negating the reasonableness of the asserted rationales.  Id. at 28.

The Court will first discuss the overarching issues of the proper framing of the question at issue and the effect of the

---

[28/]Plaintiffs and Defendant Abercrombie assert that Perry precludes the Court from crediting these rationales.  As already discussed, Perry involved the unique circumstances of California in which Proposition 8 was passed after the state had already extended the right to marriage to same-sex couples, many same-sex couples had actually married, and the state had extended the incidents of marriage through the Domestic Partnership Act. Thus, Proposition 8's only effect was to strip from same-sex couples solely the right to the designation of "marriage."  In analyzing similar rationales in Perry, the Ninth Circuit considered the rationales in light of the "taking away" effect of Proposition 8.  See Perry, 671 F.3d at 1086-95.  As explained supra, this is not a taking away case like Perry.  Thus, HFF and Defendant Fuddy's asserted rationales are not precluded by Perry.

civil unions law on its forthcoming analysis of each rationale. HFF's first and third rationales significantly overlaps with Defendant Fuddy's two rationales, respectively, and thus the Court will discuss them together under the same two headings.

### a.    Plaintiffs' and Defendant Abercrombie's Overarching Arguments

Plaintiffs and Defendant Abercrombie make two overarching arguments - (1) that allowing same-sex couples to marry would not harm the interests identified by their opponents and (2) the civil unions law has rendered Hawaii's marriage laws irrational.

### i.    The Relevant Question

Plaintiffs and Defendant Abercrombie ask this Court to consider whether expanding the line drawn by the state, i.e., expanding the definition of marriage to include unions between same-sex couples, would harm the state's interests.  They argue that the state has failed to show that its interests are advanced by denying same-sex couples the ability to marry.  See Pls.' Reply to HFF 16-19; Abercrombie's Mot. Mem. 51-56.  Plaintiffs additionally assert that if the name "marriage" is strong enough to induce opposite-sex couples to marry, then the denial of the name is also strong enough to cause same-sex couples continuing harm for which there is no rational justification.  See Pls.' Reply to HFF 21.  The Supreme Court, however, has held that a classification subject to rational basis review will be upheld when "the inclusion of one group promotes a legitimate

governmental purpose, and the addition of other groups would not." Johnson v. Robison, 415 U.S. 361, 382-83 (1974).

Thus, the state is not required to show that denying marriage to same-sex couples is necessary to promote the state's interest or that same-sex couples will suffer no harm by an opposite-sex definition of marriage.[29/] See Andersen, 138 P.3d at

---

[29/]The Supreme Court's Cleburne analysis, in which the Supreme Court considered whether the group home would harm the municipalities's legitimate interest, is not irreconcilable with Johnson. The ordinance at issue in Cleburne broadly allowed many structures, such as apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses and dormitories, apartment hotels, etc. It then singled out the mentally retarded who were required to obtain a permit for a group home. See Cleburne, 473 U.S. at 437. In Johnson, the statute at issue singled out veterans who had served on "active duty" in Vietnam and conferred a benefit on them to the exclusion of all others. 415 U.S. at 363. A conscientious objector challenged the provision, seeking to be included in the statutory scheme. Id. at 362-63. In Johnson, the statute was upheld because, inter alia, the government interest of "enhancing and making more attractive service in the Armed Forces" was furthered by the class receiving the benefit but would not be furthered by conscientious objectors. Id. at 382-83. In Cleburne, the municipality did not assert that allowing the many persons able to occupy structures similar to group homes advanced an interest that would not be advanced by allowing the mentally retarded to occupy a group home. Instead, the municipality argued the requirement advanced certain interest such as, inter alia, protecting the residents from a nearby flood plain, reducing congestion in neighborhood streets, and avoiding fire hazards. Cleburne, 473 U.S. at 448-50. In other words, it argued that allowing the mentally retarded to occupy group homes would harm its interest. There was thus no reason to consider the rationales under a Johnson inclusion analysis.

Here, Hawaii's marriage laws single out opposite-sex couples to the exclusion of all other potential relationship arrangements. One such potential arrangement, same-sex couples, seek to be included in those who may marry. HFF and Defendant Fuddy argue that the interests they assert support Hawaii's marriage laws are furthered by allowing opposite-sex couples to marry but would not be furthered, or furthered to the same degree, by allowing same-sex couples to marry. It is therefore
(continued...)

985 (plurality) (explaining the relevant inquiry is whether granting opposite-sex couples the right to marry furthers the state's interest, not whether such interests are furthered by denying same-sex couples the right to marry, and noting "the constitutional inquiry means little if the entire focus, and perhaps outcome, may be so easily altered by simply rewording the question"). Rather, the relevant question is whether an opposite-sex definition of marriage furthers legitimate interests that would not be furthered, or furthered to the same degree, by allowing same-sex couples to marry. See Morrison v. Sadler, 821 N.E. 2d 15, 23 (Ind. App. 2005) ("The key question in our view is whether the recognition of same-sex marriage would promote all of the same state interests that opposite-sex marriage does, including the interest in marital procreation. If it would not, then limiting the institution of marriage to opposite-sex couples is rational and acceptable under . . . the Indiana Constitution."); Standhardt v. Superior Court, 77 P.3d 451, 463 (Ariz. App. 2003).

### ii.   Effect of the Civil Unions Law

Plaintiffs contend that because same-sex couples now have the right to the same benefits and burdens of marriage under the civil unions law, the heart of the asserted rationales has been taken away. Id. at 23-24. Citing Perry, In re Marriage

---

[29]/(...continued)
appropriate to consider the rationales in light of the Johnson inclusion analysis.

Cases, 183 P.3d 384 (Cal. 2008), and Kerrigan v. Commissioner, 957 A.2d 407 (Conn. 2008), Plaintiffs assert that every court adjudicating a challenge to a marriage law in a jurisdiction which has enacted a domestic partnership or civil unions law has taken that law into account.[30/]  Pls.' Reply to HFF 5.  Plaintiffs and Defendant Abercrombie also assert that the fact that opposite-sex couples can also enter into a civil union "undermines both the rationale and the premise that the Legislature reserved the name, 'marriage,' to induce opposite sex couples to marry."  Id. at 8; see Abercrombie's Mot. Mem. 65; Abercrombie's Reply 33.  Plaintiffs and Defendant Abercrombie do not challenge the constitutionality of the civil unions law,

---

[30/]Among other reasons, because rational basis review applies in this case, Plaintiffs' reliance on Kerrigan, and its decision holding a statute reserving marriage to opposite-sex couples but providing for civil unions violated the Connecticut Constitution, is unavailing.  See Kerrigan, 957 A.2d at 411-12.  In Kerrigan, the Connecticut Supreme Court explained that the state constitution provides greater protection than that provided by the federal constitution in some instances, and "[t]herefore, although we may follow the analytical approach taken by courts construing the federal constitution, our use of that approach for purposes of the state constitution will not necessarily lead to the same result as that arrived at under the federal constitution."  Id. at 420.  The court then, in the absence of any binding precedent, determined that sexual orientation classifications are quasi-suspect under the Connecticut Constitution and thus subject to heightened scrutiny.  Id. at 431-32.  Likewise, in In re Marriage Cases, the California Supreme Court decided as a matter of first impression in California, that sexual orientation classifications are suspect for purposes of the California Constitution and applied strict scrutiny to California's marriage laws.  See In re Marriage Cases, 183 P.3d at 441-42. Here, however, the Court is bound by Ninth Circuit precedent that sexual orientation classifications are not suspect.  As discussed supra, Perry is not controlling due to its narrow holding based on the unique facts in California.

which was enacted after the marriage amendment was passed and § 572-1 was amended.  Rather, they assert that in light of the later-enacted civil unions law, § 572-1 is unconstitutional.[31/]

First, no party, nor anything in the legislative history indicates, that the civil unions law is meant to be completely equal to marriage.  See Abercrombie's Mot. Mem. 62 ("The title 'marriage' carries with it significant psychological, sociological, and cultural meaning, and provides a state-sanctioned 'stamp of approval' on opposite sex relationships.").  That is, the civil unions law confers all of the state benefits and burdens of marriage on couples in a civil union, but the title "marriage" has social benefits and cultural meaning.  As HFF explains, despite that same-sex couples can get the legal benefits of marriage through civil unions, the state's purposes of inducing opposite-sex couples to marry are accomplished by the prestige of the institution of marriage.

The fact that opposite-sex couples are not prohibited from entering into civil unions does not nullify the social significance or prestige of marriage such that there is no longer

---

[31/]Plaintiffs state they "do not concede that Section 572-1 was sound before the civil union bill, but neither do they contend that that is the relevant issue."  Pls.' Reply to HFF 3.  Plaintiffs' arguments focus on the civil unions law and the fact that the legal benefits of marriage have been made available to same-sex couples while the legal title of marriage has not.  The Court notes that at the hearing on HFF's motion to intervene, Plaintiffs' counsel explicitly stated that its case did not depend on the civil unions law, which it referred to as "an absurd theory" and "fallacious."  Fuddy's Mot. Ex. 4.

an inducement for opposite-sex couples to marry.[32/]  In any event, the legislature is not required to have a perfect fit between its means and ends.  See Heller, 509 U.S. at 321.  Under rational basis review, the Court must accept the legislature's generalizations, even if the legislature could have drafted a law different to better fulfill its purposes.  See id.

For example, in City of Dallas v. Stanglin, 490 U.S. 19 (1989), the Supreme Court held that a city ordinance restricting admission to certain dance halls to persons between the ages of 14 and 18 survived rational basis review despite the fact that similar restrictions were not imposed elsewhere, including at skating rinks.  Id. at 27-28.  The Court explained that arguments focused on this inconsistency "missapprehend[ed] the nature of rational-basis scrutiny."  Id. at 26.  Specifically, the Supreme Court stated that differences between dance halls and skating rinks "may not be striking, but differentiation need not be striking in order to survive rational-basis scrutiny."  Id. at 28.

Second, there is a difference between the individual interests in marriage and the social or public interests in marriage.  Although legal marriage also secures individual

---

[32/]HFF also argues that the legislature could conclude that the federal benefits available to married couples, but not partners in a civil union, provides an inducement for opposite-sex couples to marry rather than enter a civil union.  This argument is not persuasive because under DOMA, same-sex married couples cannot get federal benefits.  The Court notes that, as discussed supra, the fate of DOMA is uncertain at this time.

interest, it is a public institution enacted for the benefit of society.  See Maynard, 125 U.S. 190.  In Kerrigan, Justice Zarella, dissenting, determined that it was rational for the state to continue to promote the public's interest by limiting marriage to opposite-sex couples "while enacting a civil union law in recognition of the legitimate interests of same-sex couples."  957 A.2d at 530 (Zarella, J., dissenting).  He explained: "[T]he state reasonably could believe that limiting marriage to a man and a woman accomplishes vital social goods, while the institution of civil union promotes the legitimate interests of those who enter into it.  Recognition of the latter private interests does not necessarily entail abandonment of the former public interests."  Id.

        The Court agrees.  The legislature could rationally speculate that by reserving the name "marriage" to opposite-sex couples, Hawaii's marriage laws provide special promotion and encouragement to enter into those relationships advancing societal interests while the civil unions laws protects the individual interests of same-sex couples.  In the absence of a suspect or quasi-suspect classification or a restriction on a fundamental right, the Fourteenth Amendment does not require Hawaii to endorse all intimate relationships on identical terms. See Johnson, 415 U.S. 361; Vance, 440 U.S. at 94-95, 109 (rejecting a challenge to a statutory requirement for retirement at 60 of federal employees covered by the Foreign Service retirement and disability system but not those covered by the

94

Civil Service retirement and disability system and explaining that it was permissible under rational basis review for Congress to "dr[a]w a line around those . . . it thought most generally pertinent to its objective"). Thus, the civil unions law does not render Hawaii's marriage laws irrational. If the state has a legitimate interest in defining marriage as between a man and woman that is rationally related to Hawaii's marriage laws, such laws are not unconstitutional.

The Court also finds it illogical and unwise to conclude that the passage of the civil unions law – advocated for by the gay and lesbian community – renders Hawaii's existing marriage laws irrational and unconstitutional.[33] As Defendant Fuddy noted, this result would be "profoundly prejudicial to (ironically) same-sex couples on the one hand and core notions of federalism on the other."[34] Fuddy's Mot. Mem. 10. To embrace

---

[33]For example, inter alia, Honolulu Pride, Pride Alliance Hawaii, homosexuals, individuals in same-sex relationships, and parents of homosexuals submitted testimony to the Senate in favor of the civil unions law. See SB 232 Testimony 02-08-11, 02-08-11 LATE, 01-25-11, 02-08-11 LATE, available at http://www.capitol.hawaii.gov/Archives/measure_indiv_Archives.aspx?billtype=SB&billnumber=232&year=2011=232&year=2011 (last visited August 3, 2012).

[34]This case does not involve a fundamental right or suspect classification, such as the race-based classification at issue in Brown v. Board of Education, 347 U.S. 483 (1954). Thus, the analogy to Brown set forth by Plaintiffs and Defendant Abercrombie is unpersuasive. See Abercrombie's Mot. Mem. 62 ("This two-tiered system . . . is no better than the long discredited 'separate but equal' regime denounced in Brown v. Bd. of Educ."). Moreover, unlike the Jim Crow laws and segregated school systems, the civil unions law was enacted not to perpetuate discrimination but to afford same-sex couples rights (continued...)

Plaintiffs' argument that Hawaii's marriage laws violate the Constitution based on a later enacted civil unions law would negate the ability of states to experiment with social change without fear of constitutionalizing this divisive social issue. Specifically, accepting Plaintiffs' argument would provide a perverse incentive for states not to enact such civil union laws. See New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("There must be power in the States and the Nation to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs. . . . To stay experimentation in things social and economic is a grave responsibility.  Denial of the right to experiment may be fraught with serious consequences to the nation.").  Moreover, it would punish those states that have extended rights to same-sex couples while retaining the traditional definition of marriage.  Again, the circumstances in Hawaii are different than those in California, where Proposition 8 took away the title of marriage but left in place all of its incidents, because the marriage amendment was passed and § 572-1 was amended when there was no civil unions law.

Accepting the argument that the ability to enter into a civil union renders laws reserving marriage to opposite-sex couples unconstitutional would also force courts to act as policymakers.  What about the states that confer only some of the

---

<sup>34/</sup>(...continued)
they had not previously had.

rights and benefits of marriage on partners in civil unions?[35/]
How many rights benefits would render a state's marriage laws
irrational?  Courts would be required to usurp the typical
legislative function of drawing lines.  This is particularly
troublesome because "[t]he problem of legislative classification
is a perennial one, admitting of no doctrinaire definition."
Williamson v. Lee Optical of Okla., 348 U.S. 483, 489 (1955).

Plaintiffs state that they "categorically reject the
. . . premise that States should be encouraged to experiment even
where they do so on the basis of classificatory schemes that are
unlawful."  Pls.' Reply to HFF 16.  The gay and lesbian
community, however, advocated for the civil unions law, which
resulted in the "classificatory scheme" at issue.  It is
unreasonable to conclude that Hawaii's marriage laws are rendered
unconstitutional by the state granting additional rights, without
taking away any rights, to same-sex couples.  This is the type of
social and political decision within the province of the
legislature.  Accordingly, a state's marriage
laws do not rise or fall with a later-conferred ability of same-

---

[35/]As a recent article noted, "[w]hen civil union laws,
designated beneficiary laws, reciprocal beneficiary laws,
marriage laws limited to different-sex couples, and marriage laws
that do not look to the sex of the parties are considered along
with the various types of domestic partnership laws that exist,
the results are quite chaotic."  See Edward Stein, The Topography
of Legal Recognition of Same-Sex Relationships, 50 Fam. Ct. Rev.
181, 185 (2012).  As just one example, Washington, Maine, and
Nevada all have domestic partnerships that were created by
legislation but differ dramatically in scope of the rights they
confer.  See id. at 184-85.

sex couples to enter into civil unions (or equivalent relationships).

### b. Encouraging the Stability of Relationships that Have the Ability to Procreate Naturally

HFF asserts that throughout different societies, an overriding purpose of marriage "is, and has always been, to regulate sexual relationships between men and women so that the unique procreative capacity of such relationships benefits rather than harms society."  HFF's Mot. Mem. 21.  HFF contends that through the institution of marriage, societies seek to increase the likelihood that children will be born in stable and enduring family units by the mothers and fathers that conceived them.  Id.

HFF states that because only sexual relationships between men and women can produce children, "such relationships have a potential to further – or harm – this interest in a way, and to an extent, that other types of relationships do not."  Id. at 25.  It adds that Hawaii's marriage laws, through providing special recognition to committed opposite-sex relationships, give "an incentive for individuals to channel potentially procreative conduct into relationships in which that conduct is likely to further, rather than harm, society's interest in responsible procreation and childbearing."  Id.  HFF asserts that same-sex couples do not pose the same risk of irresponsible procreation because although they can and do raise children, "they cannot create them in the way opposite-sex couples do – as the often unintended result of even casual sexual behavior."  Id. at 28.

Defendant Fuddy asserts that Hawaii has a legitimate interest in encouraging the stability of naturally procreative relationships.  Fuddy's Mot. Mem. 29.  Defendant Fuddy states that this "responsible procreation" interest rests on two factual premises.  Id. at 30.  First, "[i]t is an 'inescapable fact that only two people, not three, only a man and a woman, can beget a child' without the intervention and assistance of third parties and as an ordinary result of their sexual union."  Id. (quoting House Judiciary Committee, H.R. Rep. No. 104-664, at 13, reprinted in 1996 U.S.C.C.A.N. at 2917).  Second, "[w]hen procreation and childrearing take place outside stable family units, children suffer."  Id.  Defendant Fuddy states that in light of these two facts, "the state has an interest in encouraging opposite-sex couples to channel their sexual relations in a stable, long term relationship, an interest that does not apply as to same-sex couples."  Id. at 31.

Plaintiffs assert that the "responsible procreation" rationale is so attenuated as to be arbitrary and irrational. Pls.' Mot. Mem. 20.  Plaintiffs contend this argument has only been successful in jurisdictions in which both the status and legal incidents of marriage have been reserved to opposite-sex couples.  Pls.' Opp'n 26.  Plaintiffs assert that because the legal incidents of marriage are available to same-sex couples who form civil unions, and opposite-sex couples can "opt out of marriage" and elect to form civil unions, it follows that "the name 'marriage,' in the State's view, does nothing on its own to

induce couples to marry and stay married." Id. at 27.
Plaintiffs assert that even if the word "marriage" would be a
reason for maintaining it as the title for the opposite-sex
union, it would not be a reason for denying that title to same-
sex couples unless doing so promoted "responsible procreation."
Id.

Defendant Abercrombie asserts that "banning same sex
couples from getting married will have no impact upon whether
heterosexual couples get married or not, procreate or not, and
raise their children well or not." Abercrombie's Mot. Mem. 51-
52. He contends that reserving marriage to opposite-sex couples
defeats the goal of responsible procreation by denying the
children of same-sex couples the possibility of having legally
married parents. Id. at 55. He states that although same-sex
couples generally do not accidently procreate, "if the goal is to
lessen the risk that children will be born out of wedlock, the
ban is irrational." Id.

Initially, as discussed supra, the fact that Hawaii has
extended the legal rights of marriage (except for the title
marriage) to same-sex couples via the civil unions law, does not
negate the plausibility that the prestige and social significance
of marriage might induce opposite-sex couples to marry.
Defendant Fuddy and HFF have presented evidence that children
fare better on many different levels when raised in a stable
family unit by both of their parents. See HFF's Mot. Ex. 22,
Kristen Anderson Moore, et al., Marriage from a Child's

Perspective: How Does Family Structure Affect Children, and What Can We Do about It, Child Trends Research Br. 6 (June 2002) ("Children in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabitating relationships face higher risks of poor outcomes than do children in intact families headed by two biological parents.").  They present evidence that when children are born out of wedlock, the question is often whether the child will be raised by the mother alone or both the mother and father.  See HFF's Ex. 29, William J. Doherty, et al., Responsible Fathering, 60 J. Marriage & Family 277, 280 (1998).  HFF's evidence further establishes that unwed mothers often suffer detrimental economic effects.  See id. at 282 ("[F]or many policy specialists, the principal concern with fathering outside of marriage lies with the payment of child support."); see also Christina Gallo, Marrying Poor: Women's Citizenship, Race, and TANF Policies, 19 UCLA Women's L.J. 61, 93 (2012) ("Single mothers are indeed more likely to be poor; 38.1% live below 125% of the poverty level, as opposed to 8.9% of married couples.").  Accordingly, it follows that encouraging procreation to take place within a marital relationship advances two legitimate goals identified by Defendant Fuddy: "1) to increase the percentage (not necessarily the total number) of 'children raised in stable married families' and 2) to decrease the number and percentage of children accidently conceived outside such relationships."  Fuddy's Reply 15.

Same-sex couples cannot naturally procreate.  Thus, the

101

Court agrees with Defendant Fuddy's explanation that "[w]hatever may be the case with the first reason (and the issue is certainly debatable), the undeniable facts of biology mean that encouraging opposite-sex couples to marry furthers the second reason; encouraging same-sex couples to marry does not."  Fuddy's Reply 15.  In other words, conferring the unique and socially significant legal status of marriage on same-sex couples would not further the interest in decreasing the number of children accidently conceived outside of a stable long-term relationship.  See Bruning, 455 F.3d at 867 (concluding that the responsible procreation theory "justifies conferring the inducements of marital recognition and benefits on opposite-sex couples, who can otherwise produce children by accident, but not on same-sex couples, who cannot"); Standhardt, 77 P.3d at 463 ("Because same-sex couples cannot by themselves procreate, the State could also reasonably decide that sanctioning same-sex marriages would do little to advance the State's interest in ensuring responsible procreation within committed, long-term relationships.").

One court explained the theory as follows: "[t]hose persons who have invested the significant time, effort, and expense associated with assisted reproduction or adoption may be seen as very likely to be able to provide [a stable] environment, with or without the 'protections' of marriage, because of the high level of financial and emotional commitment exerted in conceiving or adopting a child or children in the first place." Morrison, 821 N.E.2d at 24.  Natural reproduction, however, "may

occur without any thought for the future." Id. The court

concluded that because the recognition of same-sex marriage would

not further this interest in responsible procreation, "the

legislative classification of extending marriage benefits to

opposite-sex couples but not same-sex couples is reasonably

related to a clearly identifiable, inherent characteristic that

distinguishes the two classes: the ability or inability to

procreate by 'natural' means." Id. at 25.

The fact that not all opposite-sex couples have the

ability or desire to procreate does not render this interest

irrational. Plaintiffs and Defendant Abercrombie's arguments to

the contrary fail to appreciate the deference the Court must

afford the state in rational basis review. "A classification

does not fail rational-basis review because it is not made with

mathematical nicety or because in practice it results in some

inequality." Heller, 509 U.S. at 321 (internal quotations

omitted). Instead, "courts are compelled under rational-basis

review to accept a legislature's generalizations even when there

is an imperfect fit between means and ends." Id.

For one, there would be pragmatic and constitutional

problems with the state inquiring whether each couple that

applies for a license has the ability or desire to have children.

Inter alia, "it would implicate constitutionally-rooted privacy

concerns" and "interfere with the fundamental right of opposite-

sex couples to marry." In re Kandu, 315 B.R. at 147; see

Eisenstadt v. Baird, 405 U.S. 438, 453-54 (1972) ("If the right

of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."); <u>Loving</u>, 388 U.S. at 12.  Moreover, "even where an opposite-sex couple enters into a marriage with no intention of having children, 'accidents' do happen, or persons often change their minds about wanting to have children."  <u>Morrison</u>, 821 N.E.2d at 24-25.  Thus, the institution of marriage both "encourages opposite-sex couples to form a relatively stable environment for the 'natural' procreation of children . . . [and] encourages them to stay together to raise a child or children together if there is a 'change in plans.'"[36/] <u>Id.</u> at 25.

The Supreme Court has held that "[u]nder rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a

_____

[36/]Many courts have credited the responsible procreation theory and held that there is a rational link between the capability of naturally conceiving children – unique to two people of opposite genders – and limiting marriage to opposite-sex couples.  <u>See</u> <u>Bruning</u>, 455 F.3d at 867-68; <u>Wilson</u>, 354 F. Supp. 2d at 1308-09; <u>In re Kandu</u>, 315 B.R. at 145-47; <u>Conaway</u>, 932 A.2d at 630-31; <u>Andersen</u>, 138 P.3d at 982 (plurality) ("[N]o other relationship has the potential to create, without third party involvement, a child biologically related to both parents, and the legislature rationally could decide to limit legal rights and obligations of marriage to opposite-sex couples."); <u>In re Marriage of J.B. & H.B.</u>, 326 S.W.3d at 677 ("Because only relationships between opposite-sex couples can naturally produce children, it is reasonable for the state to afford unique legal recognition to that particular social unit in the form of opposite-sex marriage."); <u>Morrison</u>, 821 N.E.2d at 23-31; <u>Standhardt</u>, 77 P.3d at 461-64; <u>but see</u> <u>Perry v. Schwarzenegger</u>, 704 F. Supp. 2d at 999-1000; <u>Goodridge</u>, 798 N.E. 2d at 961-64.

State's decision to act on the basis of those differences does not give rise to a constitutional violation." Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 366-67 (2001) (internal quotations omitted). Here, opposite-sex couples, who can naturally procreate, advance the interest in encouraging natural procreation to take place in stable relationships and same-sex couples do not to the same extent. Thus, Hawaii's marriage laws are reasonably related to this legitimate state interest. See id.; Johnson, 415 U.S. at 382-83. That is all that is required under this highly deferential review.

Plaintiffs and Defendant Abercrombie have failed to show that this rationale is not at least arguable. Thus, summary judgment in favor of Defendant Fuddy and HFF is appropriate. See Beach Commc'ns, 508 U.S. at 320 ("The assumptions underlying these rationales may be erroneous, but the very fact that they are 'arguable' is sufficient, on rational-basis review, to 'immuniz[e]' the congressional choice from constitutional challenge.") (alteration in original); Lofton, 358 F.3d at 820 ("Unless appellants' evidence, which we view on summary judgment review in the light most favorable to appellants, can negate every plausible rational connection between the statute and Florida's interest in the welfare of its children, we are compelled to uphold the statute.").

> c. **Promoting the Ideal, Where Possible, Children Are Raised by Their Mother and Father in a Stable Relationship**

HFF asserts that it is rational for Hawaii to specially

recognize opposite-sex relationships to promote the ideal that children be raised by both a mother and a father in a stable family unit.  HFF's Mot. Mem. 29.  Plaintiffs contend that the legislature was clear that domestic partners be afforded equality of all the rights, benefits, protections, and responsibilities as those given to married spouses, "'including any law relating to parent-child relationships.'"  Pls.' Opp'n at 30-31 (quoting H. Stand. Comm. Rep. No. 156, at *2 (Feb. 9, 2011)).  Plaintiffs and Defendant Abercrombie contend that the legislature's actions and statement cannot be harmonized with the "optimal child rearing" rationale.  Id. at 31; Abercrombie's Mot. Mem. 68-69.  Plaintiffs further argue that "HFF has offered no rational relationship between the title, 'marriage,' and the goal of promoting the 'optimal child rearing environment.'"  Pls.' Opp'n at 32. Defendant Abercrombie argues that there is no scientific evidence to support that opposite-sex couples are better parents than same-sex couples.  Abercrombie's Mot. Mem. 73.

     Under rational basis scrutiny, however, empirical support is not necessary to sustain a classification.  Beach Commc'ns, 508 U.S. at 315.  "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."  Id.  In any event, both sides present evidence on this point.  Defendant Abercrombie presents evidence that there is no support for the assertion that children fare better when raised by opposite-sex rather than same-sex couples.  See Abercrombie's Countermotion

Ex. O, American Psychological Association, APA Policy Statement: Sexual Orientation, Parents, & Children ("[R]esults of research suggest that lesbian and gay parents are as likely as heterosexual parents to provide supportive and healthy environments for their children"); Abercrombie's Countermotion, Michael E. Lamb Declaration ¶ 29 ("The social science literature overwhelmingly rejects the notion that there is an optimal gender mix of parents or that children and adolescents with same-sex parents suffer any developmental disadvantages compared with those with two opposite-sex parents.").

On the other hand, HFF presents evidence that children do best when raised by their two biological parents.  See HFF's Mot. Ex. 22, Moore, et al., supra, at 6 ("[R]esearch clearly demonstrates that family structure matters for children, and the family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage."); HFF's Mot. Ex. 31, Mark Regnerus, How Different Are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study, 41 Soc. Sci. Research 752 (2012) (finding that children raised by married biological parents fared better than children raised in same-sex households in a range of significant outcomes).  HFF also presents evidence that children benefit from having a parent of each sex.  See HFF's Mot. Ex. 25, David Popenoe, Life Without Father: Compelling New Evidence that Fatherhood and Marriage Are Indispensable for the Good of Children and Society, 146 (1996) ("The burden of social science

evidence supports the idea that gender differentiated parenting is important for human development and that the contribution of fathers to childrearing is unique and irreplaceable."); see also Lynn D. Wardle, Essay, "Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation, 24 Harv. J.L. & Pub. Pol'y 771, 780 (2001) ("Heterosexual marriage reasonably may be assumed to provide the most advantageous environment in which children can be reared, providing profound benefits of dual gender parenting to model intergender relations and show children how to relate to persons of their own and the opposite gender.").

Both sides point out flaws in their opponents' evidence.  See Abercrombie's Mot. Mem. 71-79; Pls.' Opp'n 29-31; Pls.' Reply to HFF 18 ("[T]he Regnerus study is badly flawed because it compares apples to oranges.  By Regnerus' own admission, almost half of his sample of adult children from same sex households had once lived with biological parents."); HFF's Opp'n Ex. 32, Loren D. Marks, Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting, 41 Soc. Sci. Research 735, 748 (2012) (explaining flaws in 59 studies conducted on same-sex parenting, including the involvement of small, non-random, convenience samples, and concluding that the generalized claim of "no difference" was "not empirically warranted").

In applying rational basis review, if "the question is

at least debatable," the Court must uphold the classification. See Heller, 509 U.S. at 326 (internal quotations omitted). Accordingly, the rational basis standard only requires that the optimal parenting rationale be based on rational speculation that other things being equal, it is best for children to be raised by their married biological parents or with two parents of opposite genders. Here, the parties conflicting evidence establishes that the question "is at least debatable." Therefore, Plaintiffs and Defendant Abercrombie have failed to show there is a genuine dispute of material fact as to whether the question is at least debatable, and summary judgment in favor of Defendant Fuddy and HFF is appropriate. See Vance, 440 U.S. at 112 ("[I]t is the very admission that the facts are arguable that immunizes from constitutional attack the congressional judgment represented by th[e] statute: It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety.") (internal quotations omitted).

Other courts have likewise determined that this rationale is at least debatable. The Eleventh Circuit concluded that although the importance of heterosexual role models is a matter of ongoing debate, it "ultimately involve[s] empirical disputes not readily amenable to judicial resolution – as well as policy judgments best exercised in the legislative arena." Lofton, 358 F.3d at 821-22. The Eleventh Circuit thus found that

this consideration provided "a reasonably conceivable rationale

for Florida to preclude all homosexuals, but not all heterosexual

singles, from adopting."  Id. at 822.

The New York Supreme Court determined that it was

rational for the legislature to conclude that other things being

equal, it is better for children to grow up with both a mother

and a father.  Hernandez, 855 N.E.2d at 7.  The court explained,

"[i]ntuition and experience suggest that a child benefits from

having before his or her eyes, every day, living models of what

both a man and a woman are like."  Id.  A Texas appellate court

explained that "[t]he state also could have rationally concluded

that children are benefited [sic] by being exposed to and

influenced by the beneficial and distinguishing attributes a man

and a woman individually and collectively contribute to the

relationship."  In re Marriage of J.B. & H.B., 326 S.W.3d at 678.

Although Hawaii has given same-sex couples all rights

given to married couples regarding raising children, this does

not discredit the rationale.  "That the State does not preclude

different types of families from raising children does not mean

that it must view them all as equally optimal and equally

deserving of State endorsement and support."  Goodridge, 798

N.E.2d at 1000 (Cordy, J., dissenting).  Thus, "[t]he Legislature

may rationally permit adoption by same-sex couples yet harbor

reservations as to whether parenthood by same-sex couples should

be affirmatively encouraged to the same extent as parenthood by

the heterosexual couple whose union produced the child."  Id. at

1001.  Accordingly, it is not irrational for the state to provide support for the parenthood of same-sex couples through the civil unions law, but not to the same extent or in the same manner it encourages parenthood by opposite-sex couples.

### d.  Cautiously Experimenting With Social Change

HFF asserts that the legislature is entitled to experiment with its social policy to determine what is in the state's best interests.  HFF's Opp'n 9-10.  It argues that "[t]he state should not be constitutionally compelled to race down this path while so many questions about the impact of same-sex marriage remain unanswered."  HFF's Mot. Mem. 35.

Defendant Fuddy points out that the marriage amendment does not impose a fundamental barrier to the legislative process, but rather commits the matter to the legislature.  Fuddy's Mot. Mem. 39.  She cites the legislature's statement in the preface of the bill for the marriage amendment that the measure was designed "to ensure that the legislature will remain open to the petitions of those who seek a change in the marriage laws, and that such petitioners can be considered on an equal basis with those who oppose a change in our current marriage statutes."  Id. at 39-40 (citing H.R. 117, Haw. Session Laws 1246-47).

Plaintiffs assert that the "proceeding with caution" rationale and deferring to the legislature cannot explain or justify why the title "marriage" alone has been denied to same-sex couples.  Pls.' Mot. Mem. 32.  Plaintiffs contend that "the State has already made a fundamental change to the traditional

definition of marriage, and it did so in one blow by enacting the civil union law." Id. at 33.

Throughout history and societies, marriage has been connected with procreation and childrearing. See, e.g., HFF's Mot. Ex. 17, W. Bradford Wilcox, et al., eds., Why Marriage Matters 15 (2d ed. 2005) ("As a virtually universal human idea, marriage is about regulating the reproduction of children, families, and society."). The legislature could rationally conclude that on a societal level, the institution of marriage acts to reinforce "the important legal and normative link between heterosexual intercourse and procreation on the one hand and family responsibilities on the other." Goodridge, 798 N.E.2d at 995 (Cordy, J., dissenting).

It follows that it is not beyond rational speculation to conclude that fundamentally altering the definition of marriage to include same-sex unions might result in undermining the societal understanding of the link between marriage, procreation, and family structure. See HFF's Mot. Ex. 33, Witherspoon Institute, Marriage and the Public Good: Ten Principles, 18-19 (2008) (concluding that changing the meaning of marriage "would further undercut the idea that procreation is intrinsically connected to marriage. It would further undermine the idea that children need both a mother and father, further weakening the societal norm that men should take responsibility for the children they beget."); HFF's Mot. Ex. 34, Andrew J. Cherlin, The Deinstitutionalization of American Marriage, 66

Journal of Marriage & Family 848, 848-50 (November 2004) (explaining that the movement to legalize same-sex marriage is the most recent development in the deinstitutionalization of marriage, i.e., the "weakening of the social norms that define people's behavior" in the social institution of marriage).

Under rational basis review, the state is not required to show that allowing same-sex couples to marry will discourage, through changing societal norms, opposite-sex couples from marrying. Rather, the standard is whether the legislature could rationally speculate that it might. It is at least debatable that altering "that meaning would render a profound change in the public consciousness of a social institution of ancient origin."[37/] See Lewis, 908 A.2d at 222. In any event, under Johnson, HFF and Defendant Fuddy are not required to show that changing the institution of marriage might harm the state's interest. See Johnson, 415 U.S. 361.

It is beyond dispute that allowing same-sex couples to

---

[37/]The Court notes that holding Hawaii's marriage laws as lacking a rational basis might have unintended consequences. Once the link between marriage and procreation is taken away, and encouraging a socially desirable family structure is deemed irrational, there is no rational limiting principle for other types of relationships. See Israel v. Allen, 577 P.2d 762 (Colo. 1978) (holding a statute prohibiting marriage between adopted brothers and sisters unconstitutional and noting "[t]he physical detriment to the offspring of persons related by blood is totally absent") (citation omitted); United States Survey on Domestic Partnerships, 22 J. Am. Acad. Matrim. Law. 125, 136 (2009) ("The state also, with consanguinity requirements, wants to ensure that those who decide to have children will not bear children with someone closely related to them, to guard against birth defects that could occur in the aggregate.").

marry would alter marriage as currently defined in Hawaii. Accordingly, the state may rationally decide to observe the effect of allowing same-sex marriage in other states before changing its definition of marriage.  Moreover, Hawaii could rationally conclude that by enacting the reciprocal beneficiaries act, followed years later by the civil unions law, and retaining the definition of marriage as a union between a man and woman, it is addressing a highly-debated social issue cautiously.  By doing so, it may observe the effect of the reciprocal beneficiaries and civil unions laws before deciding whether or not to extend the title marriage, along with the already conferred legal rights, to same-sex couples.

Although the legislature has flexibility to amend or repeal social experiments that prove unwise, courts have no such ability once they constitutionalize an issue.  In discussing the institution of marriage, the Ninth Circuit has stated that "it is difficult to imagine an area more fraught with sensitive social policy considerations in which federal courts should not involve themselves if there is an alternative."  Smelt, 447 F.3d at 681. In discussing the need for judicial restraint in certain circumstances, the Hawaii Supreme Court has likewise acknowledged the need to "recognize that, although courts, at times, in arriving at decisions have taken into consideration social needs and policy, it is the paramount role of the legislature as a coordinate branch of our government to meet the needs and demands of changing times and legislative accordingly."  Bissen v. Fujii,

466 P.2d 429, 431 (Haw. 1970).

Hawaii's history reveals that it has been open to considering the rights of same-sex couples.  In 1997, the legislature enacted the reciprocal beneficiaries statute.  1997 Haw. Sess. Laws 383 (H.B. 118).  The legislature notes in the findings of the statute that two individuals of the same gender who were prohibited from marrying would have access to certain rights and benefits then only available to married couples.  See H.R.S. § 572C-2.  Subsequently, in 2011, the legislature passed a civil unions law, affording same-sex couples the right to enter civil unions and obtain all of the state legal rights of married couples (except the title marriage).  The trajectory of Hawaii's history has been moving towards providing more rights for same-sex couples, but the legislature has not changed its definition of marriage.

In this situation, to suddenly constitutionalize the issue of same-sex marriage "would short-circuit" the legislative actions that have been taking place in Hawaii.  See Osborne, 557 U.S. at 72-73 (concluding that to recognize a constitutional right to access state evidence for DNA testing at a time when forty-six states and the federal government had enacted laws regarding DNA testing "would short-circuit what looks to be a prompt and considered legislative response").  "Deliberate consideration of, and incremental responses to rapidly evolving scientific and social understanding is the norm of the political process — that it may seem painfully slow to those who are

115

already persuaded by the arguments in favor of change is not a sufficient basis to conclude that the processes are constitutionally infirm." <u>Goodridge</u>, 798 N.E.2d at 1004 (Cordy, J., dissenting).

The Court reiterates that rational basis review is the "paradigm of judicial restraint" and the Fourteenth Amendment "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." <u>Beach Commc'ns</u>, 508 U.S. at 313-14.  In conducting rational basis review, it is not the role of the courts to "sit as a superlegislature [and] judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." <u>Heller</u>, 509 U.S. at 319.  Where, as here, "there are plausible reasons" for the state's action, the Court's "inquiry is at an end." <u>United States R.R. Ret. Bd. v. Fritz</u>, 449 U.S. 166, 179 (1980).

Accordingly, because Hawaii's marriage laws are rationally related to legitimate government interests they do not violate the federal Constitution.

## CONCLUSION

For the foregoing reasons, the Court GRANTS HFF's Motion for Summary Judgment; GRANTS Defendant Fuddy's Motion for Summary Judgment; DENIES Plaintiffs' Motion for Summary Judgment; DENIES HFF's Motion to Dismiss Defendant Abercrombie; and DENIES AS MOOT Defendant Abercrombie's Motion for Summary Judgment.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 8, 2012.



_____
Alan C. Kay
Sr. United States District Judge

Natasha N. Jackson, et al. v. Neil S. Abercrombie, et al., Civ. No. 11-00734 ACK-KSC; Order Granting HFF's Motion for Summary Judgment and Defendant Fuddy's Motion for Summary Judgment, Denying Plaintiffs' Motion for Summary Judgment and HFF's Motion to Dismiss Defendant Abercrombie, and Denying as Moot Defendant Abercrombie's Motion for Summary Judgment.